Filed        21-CI-00515    06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

## COMMONWEALTH OF KENTUCKY
## FRANKLIN CIRCUIT COURT
### DIVISION: _____
### CASE NO.: _____

| | |
|---|---|
| **CITY OF RUSSELL, KENTUCKY,** | |
| **CITY OF JENKINS, KENTUCKY,** | |
| **CITY OF PINEVILLE, KENTUCKY,** | |
| **CITY OF WORTHINGTON, KENTUCKY,** | |
| **CITY OF VANCEBURG, KENTUCKY,** | |
| **CITY OF GREENUP, KENTUCKY,** | |
| **CITY OF SOUTH SHORE, KENTUCKY,** | |
| **CITY OF BELLEFONTE, KENTUCKY,** | **CLASS ACTION COMPLAINT** |
| **ON BEHALF OF THEMSELVES AND ALL OTHER SIMILARLY SITUATED HOME RULE CITIES,** | ***JURY TRIAL REQUESTED*** |
| **PLAINTIFFS,** | |
| **v.** | |
| **ABBOTT LABORATORIES,** | |
| **TEVA PHARMACEUTICAL INDUSTRIES, LTD,** | |
| **ALLERGAN PLC,** | |
| **ENDO INTERNATIONAL PLC,** | |
| **JOHNSON & JOHNSON,** | |
| **AMNEAL PHARMACEUTICALS, INC.,** | |
| **MYLAN PHARMACEUTICALS, INC.,** | |

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000001 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

**WEST-WARD PHARMACEUTICALS CORP.,**

**KVK TECH, INC.,**

**ASSERTIO THERAPEUTICS, INC.,**

**DEPOMED INC.,**

**AMERISOURCEBERGEN DRUG CORPORATION,**

**ANDA, INC.,**

**CARDINAL HEALTH, INC.,**

**CVS HEALTH CORPORATION LLC,**

**KROGER COMPANY,**

**MCKESSON CORPORATION,**

**RITE AID CORPORATION,**

**KENTUCKY CVS PHARMACY LLC,**

**RITE AID OF KENTUCKY, INC.,**

**WALGREEN CO.,**

**WALMART INC.,**

                    **DEFENDANTS.**

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

# TABLE OF CONTENTS

Procedural Statement .............................................................................................. 1

Introduction ............................................................................................................. 1

    A.    Kentucky's Opioid Crisis—Epidemic. ............................................... 1

    B.    The National Opioid Crisis—Epidemic. ............................................ 4

    C.    This Lawsuit and the Plaintiffs'—Kentucky Home Rule Cities—Claims. ....... 6

        1.    The Opioid Manufacturers. ................................................. 6

        2.    The Distributors and Pharmacies– the Suppliers. ....................... 8

Jurisdiction & Venue ............................................................................................... 9

Parties ...................................................................................................................... 10

    A.    Plaintiffs—Kentucky Home Rule Cities. ........................................ 10

    B.    Defendants. ....................................................................................... 13

        1.    Manufacturing ("Marketing") Defendants. ............................. 14

            a.    Abbott Labs. ........................................................ 14

            b.    Teva. ................................................................... 15

            c.    Allergan. ............................................................. 17

            d.    Endo. .................................................................. 18

            e.    Johnson & Johnson. ............................................ 20

            f.    Amneal. .............................................................. 22

            g.    Mylan. ................................................................ 23

            h.    West-Ward. ......................................................... 23

            i.    KVK-Tech. .......................................................... 24

            j.    Assertio. ............................................................. 24

        2.    Wholesale Distributor Defendants. ....................................... 25

            a.    AmerisourceBergen Entities ................................ 25

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000003 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

b.   Anda.................................................................................... 26

c.   Cardinal Health.................................................................... 27

d.   CVS...................................................................................... 27

e.   Kroger.................................................................................. 28

f.   McKesson............................................................................ 28

g.   Rite Aid Corp...................................................................... 29

h.   Walgreens............................................................................ 29

i.   Walmart............................................................................... 30

3.   Retail Pharmacy Defendants............................................... 30

a.   CVS Pharmacy.................................................................... 31

b.   Kroger.................................................................................. 31

c.   Rite Aid KY......................................................................... 31

d.   Walgreens. .......................................................................... 32

e.   Walmart............................................................................... 32

**Factual Background**................................................................................ **32**

A.   **The Opioid Epidemic.**................................................................ **32**

1.   The National Opioid Epidemic. .......................................... 32

2.   Kentucky's Opioid Epidemic.............................................. 37

B.   **The Manufacturer ("Marketing") Defendants' False, Deceptive, and Illicit Marketing of Opioids**................................................................ **38**

1.   The Manufacturer ("Marketing") Defendants Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids.......... 41

a.   Direct Marketing................................................................. 42

b.   Indirect Marketing. ............................................................ 43

2.   The Manufacturer ("Marketing") Defendants' Coordinated Marketing Scheme Misrepresented the Significant Risks of Opioids........................ 55

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000004 of 000157

- ii -

a. The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs. ...................................................................... 55

b. The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs. .................... 61

3. The Manufacturer ("Marketing") Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations. ....................................... 64

4. The Manufacturer ("Marketing") Defendants made Materially Deceptive Statements and Concealed Material Facts. ............................................... 65

5. The Manufacturer ("Marketing") Defendants Fraudulently Concealed Their Misconduct. ...................................................................................... 70

**C.** **The Wholesale Distributor Defendants' Unlawful Sale and Distribution of Opioids. .......................................................................................................... 72**

1. Wholesale Distributor Defendants' Have a Duty to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders. ................................................................................................................ 73

2. The Wholesale Distributor Defendants Breached their Legal Duties. ....... 76

3. The Wholesale Distributor Defendants Actively Avoided, and Willfully Misrepresented their Compliance with, their Legal Duties. ..................... 78

**D.** **The Manufacturer ("Marketing") Defendants Unlawful Failure to Prevent Diversion and Failure to Monitor, Report, and Prevent Suspicious Orders. 83**

**E.** **All Defendants Engaged in Unlawful Conduct and Breached their Legal Duties thereby Causing the Harm and Substantial Damages Alleged Herein. .......................................................................................................................... 85**

**F.** **The Retail Pharmacy Defendants Were on Notice of and Contributed to the Illegal Diversion of Prescription Opioids.......................................................... 87**

1. The Retail Pharmacy Defendants Have a Duty to Prevent Diversion. ..... 89

2. Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms their Compliance Failures...................................................... 92

a. CVS.................................................................................................... 92

b. Walgreens. ....................................................................................... 95

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000005 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

      c.    Rite Aid. .................................................................................. 97

G.    **The Opioid ("Marketing") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids.** ........ 99

    1.    The Opioid Conspiracy's Purpose—Increased Sales & Profit. ................ 99

    2.    The Opioid Marketing Conspiracy. ....................................................... 104

    3.    The Opioid ("Marketing") Defendants Controlled and Paid Front Groups and KOLs to Promote and Maximize Opioid Use. ................................. 108

    4.    Additional Evidence of the Opioid Conspiracy. ..................................... 108

H.    **The Manufacturer and Distributer ("Opioid Supply") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids.** .......................................................................... 111

**Class Allegations** ................................................................................................. 121

**Claims for Relief** ................................................................................................ 124

A.    **Public Nuisance (All Defendants).** ................................................................. 124

B.    **Negligence (All Defendants).** ......................................................................... 133

C.    **Negligence *Per Se*—Statutory Reporting Violation (All Defendants).** .......... 135

D.    **Negligence *Per Se*—False Advertising Violation (Opioid ("Marketing") Defendants and Opioid Supply Defendants).** ................................................ 137

E.    **Negligent Misrepresentation (All Defendants).** ............................................. 138

F.    **Civil Conspiracy (Opioid ("Marketing") Defendants).** ................................. 139

G.    **Civil Conspiracy (Opioid Supply Defendants).** ............................................ 141

H.    **Consumer Protection (All Defendants).** ........................................................ 141

I.    **Fraud by Omission (All Defendants).** ........................................................... 143

J.    **Unjust Enrichment (All Defendants).** ............................................................ 145

K.    **Punitive Damages (All Defendants).** .............................................................. 146

**Prayer for Relief** ................................................................................................ 148

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000006 of 000157

Filed      21-CI-00515    06/25/2021    Amy Feldman, Franklin Circuit Clerk

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

## PROCEDURAL STATEMENT

1.      The headings contained in this Class Action Complaint are intended only to assist in reviewing the statements and allegations contained herein.  To avoid the unnecessary repetition in each section, the Plaintiffs affirm and incorporate each paragraph in each section of this Class Action Complaint as though fully set forth therein.

2.      Despite its length, the factual allegations contained in this Class Action Complaint are *not exhaustive* and are presented throughout this Class Action Complaint solely to provide the Defendants with the requisite notice of the basis for the Plaintiffs' allegations and claims. The Plaintiffs expressly reserve the right to plead additional facts where and as necessary to ensure complete relief.  Further, pursuant to CR 15.02, this Class Action Complaint should be deemed to conform with the evidence on which the Plaintiffs' claims are ultimately tried.

## INTRODUCTION

A.      **Kentucky's Opioid Crisis—Epidemic.**

3.      No state has been hit harder by the opioid epidemic than Kentucky. The opioid epidemic poses an ongoing crisis in Kentucky. The rate of overdose deaths involving opioid prescriptions in Kentucky rose steadily from 1.0 deaths per 100,000 persons in 1999 to 10.2 deaths per 100,000 persons in 2017.

4.      In 2015, Kentucky shared the 2nd highest overdose rate in the country. Data from 2013 onward shows that Kentucky has the 3rd highest drug overdose mortality rate in the country. Between 2012 and 2016, drug overdoses caused a total of 5,822 deaths in Kentucky. In 2017, there were 1,565 fatal drug overdoses in Kentucky, which is an increase to approximately 130 deaths per month. Kentucky has double the overdose rate of the national average. Drug overdoses have become the leading cause of accidental death in Kentucky.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000007 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

5.      In 2015, 102 opioid prescriptions were written for every 100 Kentucky residents, which was 1.5 times the national average. Kentucky's overdose fatalities, which were already high, increased dramatically in 2015. Overdose deaths of Kentucky residents, regardless of where the death occurred, and non-residents who died in Kentucky, numbered 1,249 in 2015.

6.      In 2015, drug overdoses accounted for 51.17% of Kentucky's statewide accidental deaths, more than motor vehicle accidents, fire, drowning and gunshot wounds combined. In 2015, opioids accounted for 46.63% of the statewide total of drug related fatal overdose victims. In 2016, the number of deaths statewide due to drug overdoses was nearly five-times that of car accidents.

7.      Opioid abuse has reached epidemic levels in Kentucky. From February 1, 2016, to January 31, 2017, pharmacies in Kentucky filled prescriptions for 307,234,816 doses of prescription opioids—the equivalent of 69 doses for every man, woman, and child residing in Kentucky.

8.      The progression from prescription opioids to the use of illicit drugs, particularly injectable heroin, is well documented, with approximately 75% of heroin users reporting that their initial drug use was through prescription. As Kentucky citizens who become addicted to prescription opioids have predictably migrated to illicit, but less expensive, opioids, namely heroin and fentanyl, overdoses have dramatically increased. The opioid-overdose reversal drug naloxone was administered in four out of every seven emergency medical services runs; and on average, seven response calls per day were to drug-related incidents.

9.      Opioids have endangered public health in Kentucky even beyond addiction and overdose. Addicts who are not killed by drug addiction experience a variety of health consequences (including non-fatal overdoses) and engage in a variety of risky drug-seeking

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000008 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

behaviors. Widespread drug addiction imposes costs on the community including health care and substance abuse treatment costs – a substantial portion of which were provided by Plaintiffs – as well as other costs borne by their respective cities.

10.     Kentucky's children have been especially vulnerable to the opioid epidemic. Along with overdose deaths, the number and rate of neonatal abstinence syndrome ("NAS") – a condition suffered by babies born to mothers addicted to opioids – has also increased dramatically in Kentucky. Kentucky has had one of the highest rates of pregnant women using opioids in the country.

11.     In 2014, Kentucky had the third-highest rate of pregnant women with opioid use disorder. In just one 12-month period, between August 1, 2014, and July 31, 2015, 1,234 infants in Kentucky were born addicted to opioids, more than 100 newborns per month. The number of NAS cases in Kentucky totaled 1,115 in 2016 based on hospital discharge data. In 2017, the number of babies born with NAS in Kentucky had increased by 375% since 2007.

12.     These infants will spend weeks in neonatal intensive care units while they painfully withdraw from the drugs – a process so painful that it traps many adults on opioids. Research has indicated that these children are likely to suffer from continued serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening.

13.     The widespread use of opioids and corresponding increases in addiction and abuse have led to increased emergency room visits, emergency responses to overdoses, and emergency medical technicians' administration of naloxone—an antidote to opioid overdose. In Louisville, the police force administered 123 doses of naloxone in just the first six weeks of 2017— representing approximately three overdoses each day. It also has resulted in dramatic

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000009 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

growth in drug-related crimes. There have been increases in domestic violence, robberies, burglaries, and thefts, among other crimes across Kentucky. An estimated 90% of defendants in Floyd County are prosecuted for crimes related to prescription drug abuse or diversion.

14.     Kentucky has seen an increase in blood borne diseases caused by intravenous drug use, including hepatitis C (HCV) and human immunodeficiency (HIV). Intravenous use of opioids, which has been a particular problem with easy-to-inject Opana ER, has led to a surge in HCV in the state and created a risk of an even broader epidemic. Kentucky and other states in the central Appalachian region of the country experienced a 364% increase in reported acute HCV among individuals aged 30 years old or below between 2006 and 2012.

15.     Kentucky had the highest rate of new hepatitis C infections in the nation—more than six times the national average—from 2008 through 2015. If untreated, hepatitis C continues to be transmitted, including in childbirth. Hepatitis C can ultimately cause liver cancer, fibrosis, or cirrhosis, and is the leading cause of liver transplants in the country.

16.     Across Kentucky, families and communities face heartbreaking tragedies that cannot be adequately conveyed by statistics, and they have faced them all too often. Many grieving families have been financially tapped out by the costs of repeated cycles of addiction treatment programs; others have lost hope and given up. The increasing number of cases takes both a physical and mental toll on investigators, first-responders, and ultimately the public at large—the Plaintiffs.

**B.     The National Opioid Crisis—Epidemic.**

17.     The United States is in the midst of an opioid epidemic caused by the Defendants', *see infra*, collective and individual unlawful marketing, sale, distribution, and dispensing of prescription opioids that has resulted in addiction, criminal activity, serious health

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000010 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

issues, and the loss of life.

18.     The United States constitutes 4.6% of the world's population but consumed 80% of the world's opioid supply in 2011. According to the Centers for Disease Control and Prevention ("CDC"), from 1999 to 2014, the sales of prescription opioids in the U.S. nearly quadrupled, but there was no overall change in the amount of pain that Americans reported.

19.     It is undisputed that opioids are both addictive and deadly. Between 1999 and 2014, more than 165,000 Americans died of opioid overdose. Deaths related to opioids are accelerating. In 2011, the CDC declared that prescription opioid deaths had reached "epidemic levels." That year, 11,693 people died of prescription opioid overdoses. Since then, prescription opioid deaths have more than quadrupled, reaching 47,600 Americans in 2017— more than ten times the number of Americans who died in the entire Iraq War.

20.     According to the CDC, opioid overdoses killed more than 45,000 people, nationally, over a 12-month timeframe that ended in September 2017. It is already the deadliest drug epidemic in American history. If current trends continue, lost lives from opioid overdoses will soon represent the vast majority of all drug overdose deaths in the United States.

21.     The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications." In many cases, heroin abuse starts with prescription opioid addiction. An inflated volume of opioids invariably leads to increased diversion and abuse. Indeed, there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."

22.     For most people who misuse opioids, the source of their drugs can typically be found in the excess supply of drugs in the community, beyond what is needed for legitimate

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000011 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

medical purposes. Filling an opioid prescription is a significant risk factor for overdose.

23. According to the CDC, the United States is currently seeing the highest overdose death rated ever recorded. Aside from overdose, long-term opioid use is associated with a significant increase in mortality from other causes. As opioid-related deaths increase, the life expectancy in the United States decreases.

**C.** **This Lawsuit and the Plaintiffs'—Kentucky Home Rule Cities—Claims.**

24. The Plaintiffs, comprised solely of Kentucky Home Rule Cities with populations of less than 4,000, bring this lawsuit to eliminate the hazard to public health and safety caused by the opioid (defined as all opiate drugs whether natural, synthetic, or semi-synthetic) epidemic, to abate the nuisance caused thereby, and to recoup monies that have been spent because of Defendants' individual and collective false, deceptive, and unfair marketing and/or unlawful diversion of prescription opioids. Such economic damages were foreseeable to Defendants and were sustained because of Defendants' wanton, reckless, intentional and/or unlawful actions and omissions.

### 1. The Opioid Manufacturers.

25. This lawsuit is focused on the primary cause of the opioid crisis: the false and misleading marketing scheme in which the Defendants joined and conspired to dramatically increase the demand for and sale of opioids throughout the Commonwealth of Kentucky.

26. The Defendants who manufacture, market, promote, and sell prescription opioids precipitated this crisis. These opioids have various brand names and generic names, and include OxyContin, fentanyl, hydrocodone, oxycodone, among others. Through a massive marketing campaign premised on false and incomplete information, these Defendants engineered a dramatic shift in how and when opioids are prescribed by the medical community and used by patients.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000012 of 000157

- 6 -

Filed            21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

27.     To increase the potency, and corresponding demand for opioids, the Defendants who manufacture opioids sought to first develop a "better" opioid pain-killer—like Big Tobacco's spiking the nicotine content in cigarettes, the manufactures spiked the efficacy of the opioids.

28.     The manufactures then orchestrated a campaign of misinformation—a relentless and methodical plan to increase their respective sales and profits dramatically and exponentially—to broaden and deepen the market and demand for opioids.  This campaign hinged on convincing the medical community (i) that opioids should be used not just for acute care, but also for chronic pain; and (ii) that opioids were not addictive—they were low risk.  This campaign was predicated on a systemic and calculated lie.

29.     The manufacturers knew that opioids were _not_ appropriate for long-term use and, more importantly, that they were extremely addictive.  Again, the manufacturers sought to benefit from this addictive feature by increasing the efficacy of the opioids—creating a dependent client for life.

30.     Studies have found diagnosed opioid dependence rates in primary care settings as high as 26%. Among opioid users who received four prescriptions in a year, 41.3% meet diagnostic criteria for a lifetime opioid-use disorder. Because opioids cause tolerance and dependence, patients who take the drugs for even a short time become a physiologically captured market.

31.     According to the U.S. Department of Health and Human Services, more than two million Americans are now opioid-dependent. The difficulty in stopping use is particularly true for patients first prescribed an extended-release opioid. Patients who initiated treatment on an extended-release opioid – such as OxyContin – have a 27.3% likelihood to be using opioids one

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000013 of 000157

Filed            21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

year later, and a 20.5% likelihood of using opioids three years later. Whether in the end a patient meets the clinical definition of addiction or is simply dependent and unable to stop using opioids, once opioids are prescribed for even a short period of time, patients are hooked.

32.     Opioids pose high risks for children and adolescents. Most of the use in this population is off label because opioids are _not_ approved for children. Use of prescription opioid pain medication before high school graduation is associated with a 33% increase in the risk of later opioid misuse. The misuse of opioids in adolescents strongly predicts the later onset of heroin use. Nonetheless, there have been significant increases in opioid prescribing for children and adolescents, for conditions such as headaches and sports injuries.

33.     Again, the manufacturers' goal was simple: dramatically increase sales by (i) increasing the potency; and (ii) convincing doctors to prescribe opioids not only for acute pain (e.g., cancer or short-term post-operative pain), but also for common chronic pain (e.g., back pain and arthritis). They did this even though they knew that opioids were highly addictive and subject to abuse, and that their claims regarding the risks, benefits, and superiority of opioids for long-term use were patently false and misleading.

### 2.     The Distributors and Pharmacies– the Suppliers.

34.     The opioid distributors and retail pharmacies comprised the suppliers who, recognizing and being driven by the significant profits from the distribution, sale and dispensing of opioids, willfully and knowingly disregarded their duties under Kentucky law—resulting in the flood of opioids throughout the Commonwealth of Kentucky that precipitated the opioid epidemic.

35.     The suppliers, through their willingness to uncritically supply whatever quantities of opioids pharmacies ordered and fill prescriptions without scrutiny or hesitation, normalized

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000014 of 000157

Filed                    21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

overprescribing and caused widespread proliferation and availability of these dangerous drugs throughout communities in the Commonwealth.

36.     The sharp increase in opioid use resulting from Defendants' conduct has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the Commonwealth.

37.     The suppliers' practice of continually filling, and refilling, opioid prescriptions, including from suspicious prescribers, and failing to report suspicious orders of opioids has enabled an oversupply of opioids to communities throughout the Commonwealth.

38.     The suppliers—in particular the distributors—had significant financial incentives to distribute higher volumes of opioids and not to report suspicious orders or guard against diversion. Wholesale drug distributors acquire opioids from the manufacturers at an established wholesale acquisition cost. Discounts and rebates are generally offered by manufacturers based on market share and volume. As a result, higher volumes may decrease the cost per pill to distributors which in turn allows wholesale distributors to offer more competitive prices, or alternatively, pocket the difference as additional profit.

## JURISDICTION & VENUE

39.     This Court has subject matter jurisdiction over the claims asserted in this lawsuit pursuant to Kentucky Revised Statutes 23A.010.  Plaintiffs' claims do *not* fall within Kentucky Revised Statutes 24A.120.  The amount in controversy *exceeds* five thousand dollars ($5,000), exclusive of interest and costs.

40.     Venue is proper in this Court.  Defendants' individual and collective actions occurred throughout the Commonwealth of Kentucky including Franklin County.  Defendants' agents are registered with, and located in, Franklin County.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000015 of 000157

Filed                    21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

41. This action is ***not*** removable to federal court for many reasons, including *inter alia*: (i) a lack of complete diversity of citizenship; (ii) the claims asserted herein arise solely under Kentucky's laws and regulations; (iii) no claims are asserted under any federal law or regulation, and any inference to the contrary is expressly disavowed; and (iv) the claims asserted herein are solely on behalf of ***Kentucky*** Home Rule cities with populations of less than 4,000.

42. This action is similarly ***not*** removable to federal court under the Class Action Fairness Act for many reasons, including, *inter alia*: (i) ***more than*** two-thirds—in fact all—of the Plaintiffs are Kentucky citizens; (ii) the Plaintiffs seek significant relief from ***no less than*** three (3) Defendants who are Kentucky citizens; and (iii) whose conduct—individually and collectively—occurred in Kentucky and form the basis of Plaintiffs' claims—also asserted under Kentucky law.

43. Both general and personal jurisdiction apply to each Defendant named herein. Each Defendant purposely availed themselves of the privilege of seeking and doing business in the Commonwealth of Kentucky—reaping billions of dollars in profits at the expense of the Plaintiffs. Given the foregoing, as well as the Defendants' respective obligations to comply with Kentucky's licensing and permit requirements for the manufacture, distribution, sale, and dispensing of opioids, Defendants should have anticipated being "haled" into this Court to answer for their illicit and improper activities.

## PARTIES

**A.    Plaintiffs—Kentucky Home Rule Cities.**

44. Plaintiff City of Russell, Kentucky ("Russell") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents. *See* e.g., KRS 81.005(1). As a Home Rule city, Russell's mandate

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000016 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

45.     Plaintiff City of Jenkins, Kentucky ("Jenkins") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Jenkin's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

46.     Plaintiff City of Pineville, Kentucky ("Pineville") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Pineville's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

47.     Plaintiff City of Worthington, Kentucky ("Worthington") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Worthington's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

48.     Plaintiff City of Vanceburg, Kentucky ("Vanceburg") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000017 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Vanceburg's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

49.     Plaintiff City of Greenup, Kentucky ("Greenup") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Greenup's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

50.     Plaintiff City of South Shore, Kentucky ("South Shore") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, South Shore's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

51.     Plaintiff City of Bellefonte, Kentucky ("Bellefonte") is a Kentucky Home Rule City governmental entity authorized, and entrusted with, protecting the public health, safety, and welfare of its residents.  *See* e.g., KRS 81.005(1). As a Home Rule city, Bellefonte's mandate includes asserting and pursuing all available relief for the claims asserted in this lawsuit relating to Defendants' individual and collective actions in their improper, reckless, willful, and wanton distribution of opioid drugs.

52.     Plaintiffs bring this action on their behalf, and on behalf of all other Kentucky

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000018 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Home Rule cities (collectively the "Plaintiffs"). *See* e.g., CR 23. The Plaintiffs include all similarly situated Kentucky Home Rule cities with populations of ***less than*** four thousand (4,000).[1]

53. Plaintiffs have declared that opioid abuse, addiction, morbidity, and mortality has created a serious and significant public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market caused or contributed to this public nuisance, both in the past and continuing into the foreseeable future. The distribution and diversion of opioids into and throughout the Commonwealth of Kentucky, and into Plaintiffs' respective city, created this foreseeable opioid crisis and opioid public nuisance for which Plaintiffs seek all available relief.

**B.     Defendants.**

54. All of the actions described herein were part of, and in furtherance of, the unlawful manufacture, promotion, marketing, distribution, sale, and dispensing of opioids throughout the Commonwealth of Kentucky, and were:

- authorized, ordered, and/or performed by Defendants' respective alter-egos, subsidiaries, officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment; and/or

- with Defendants' respective actual, apparent, and/or ostensible authority.

55. The true name, identity, and capacity of Defendants' respective alter-egos, subsidiaries, officers, agents, employees, or other representatives, including and capacities, whether individual, corporate, associate, are presently unknown to Plaintiff and the Plaintiff Class (collectively the "Plaintiffs"). Plaintiffs therefore reserve the right to amend this complaint

---

[1]     Plaintiffs' proposed class definition is provided further herein.

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000019 of 000157

Filed

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

where, and as, necessary to obtain full and complete relief for their claims from all those responsible.

### 1.      Manufacturing ("Marketing") Defendants.

56.     The Manufacturing ("Marketing") Defendants are defined below. At all relevant times, the Manufacturing ("Marketing") Defendants have manufactured, promoted, marketed, distributed, and sold opioids throughout the Commonwealth of Kentucky—activities which have failed to comply with their legal obligations to their patients and to the public at large.

### a.      Abbott Labs.

57.     Defendant, Abbott Laboratories ("Abbott Labs"), is an Illinois corporation with its principal place of business in Abbott Park, Illinois.  Abbot Labs includes Abbott Laboratories, Inc. ("Abbott Inc") a wholly owned subsidiary whose principal place of business is also in Abbott Park, Illinois.

58.     At all relevant times, Abbott Labs acted in concert with its wholly owned subsidiary as agents and/or principals of one another in relation to the conduct described herein.

59.     Abbott Labs was primarily engaged in the promotion, marketing and distribution of opioids throughout the Commonwealth of Kentucky pursuant to a co-promotional agreement with the Purdue Entities.

60.     Based on the Abbott Labs' efforts, OxyContin became the largest selling opioid in the U.S.  Pursuant to the co-promotional agreement, the Abbott Entities received twenty-five to thirty percent (25-30%) of all net sales for OxyContin prescriptions written by doctors its sales force called on.

61.     With the Abbott Labs' marketing assistance—specifically, its sales force, sales of OxyContin dramatically increased from $49 million in its first full year on the market to $1.2

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000020 of 000157

Filed          21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

billion in 2002. Over the life of the co-promotional agreement, Abbott Labs collected nearly

$500 million—a substantial portion of which resulted from sales throughout the Commonwealth

of Kentucky.  These significant profits were the product of blatant misrepresentations, improper

off-label marketing, and disinformation.

62.     Abbott Labs' improper actions in their sale of OxyContin is well established.  An

October 28, 2016, article from Psychology Today entitled *America's Opioid Epidemic* stated:

> Abbott and Purdue actively misled prescribers about the
> strength and safety of the painkiller [OxyContin]. To
> undermine the policy of requiring prior authorization, they
> offered lucrative rebates to middlemen such as Merck
> Medco [now Express Scripts] and other pharmacy benefits
> managers on condition that they eased availability of the
> drug and lowered co-pays.

63.     Abbott Labs' misconduct and illegal actions, as further addressed herein, have

caused injuries to and throughout the Commonwealth of Kentucky for which relief is both

necessary, warranted, and required.

### b.      Teva.

64.     Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli

corporation with its principal place of business in Petah Tikva, Israel. Teva Ltd. is traded on the

New York Stock Exchange (NYSE: TEVA). In its most recent Form 10-K filed with the

Securities and Exchange Commission, Teva Ltd. stated that it is the leading generic drug

company in the United States. Teva Ltd. operates globally, with significant business transactions

in the United States. In 2018, its gross profit from North American operations was $4.979

million.  Teva Ltd. includes: (i) Cephalon, Inc. ("Cephalon"), a Delaware corporation and wholly

owned and controlled subsidiary; and (ii) Teva Pharmaceuticals USA, Inc. ("Teva USA") is a

Delaware corporation and wholly owned and controlled subsidiary.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000021 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

65.     At all relevant times, Teva Ltd. acted in concert with its wholly owned subsidiaries as agents and/or principals of one another in relation to the conduct described herein.

66.     Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora throughout the Commonwealth of Kentucky.[2] Actiq has been approved **only for** the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain." Fentora has been approved by the FDA **only for** the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain." In 2008, Cephalon pled guilty to a criminal violation for its misleading promotion of Actiq and two other drugs and agreed to pay a $425 million penalty for its illegal actions.

67.     All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo.  Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales," including *inter alia* sales of Fentora.

68.     Through interrelated operations like these, Teva Ltd. actively operates in the United States—specifically the Commonwealth of Kentucky—through its directly controlled and managed subsidiaries Cephalon and Teva USA. As a result of these efforts, the United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and

---

[2]     Teva USA also sells generic opioids in the United States, including generic opioids previously sold by Allergan PLC, whose generics business Teva Ltd., Teva USA's parent company based in Israel, acquired in August 2016.  *See infra*.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000022 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

69.     In furtherance of their opioid promotions, marketing, and resulting sales, the Teva Ltd—through Cephalon—made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, many of whom were not oncologists and did not treat cancer pain, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

70.     Teva Ltd.'s misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### c.     Allergan.

71.     Defendant Allergan PLC ("Allergan PLC") is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Shares of Allergan are traded on the New York Stock Exchange (NYSE: AGN). In its most recent Form 10-K filed with the SEC, Allergan PLC stated that it does business in the United States through its U.S. Specialized Therapeutics and U.S. General Medicine segments, which generated nearly 80% of the company's $15.8 billion in net revenue during the year ended December 31, 2018.

72.     Allergan PLC was purchased by Actavis PLC in March 2015, and the combined company changed its name to Allergan PLC in March 2015.   Actavis PLC was acquired by

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000023 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Watson Pharmaceuticals, Inc. ("Watson Pharma") in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then to Actavis PLC in October 2013.

73.     Allergan PLC includes: (i) Watson Laboratories, Inc. ("Watson Labs") a wholly owned and controlled subsidiary; (ii) Actavis Pharma, Inc. ("Actavis Pharma") a wholly owned and controlled subsidiary; and (iii) Actavis LLC ("Actavis LLC") also a wholly owned and controlled subsidiary.

74.     At all relevant times, Allergan PLC acted in concert with its wholly owned subsidiaries as agents and/or principals of one another in relation to the conduct described herein.

75.     Allergan PLC manufactured multiple branded and generic opioids, including Kadian, Duragesic, Opana, and Norco, which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

76.     In furtherance of their opioid promotions, marketing, and resulting sales, the Allergan PLC—through Actavis—made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

77.     Allergan PLC's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

**d.     Endo.**

78.     Defendant Endo International PLC ("Endo PLC") has global headquarters in

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000024 of 000157

- 18 -

Filed                21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania.

79.     Endo PLC includes: (i) Endo Health Solutions Inc. ("Endo Health") a Delaware corporation with its principal place of business in Malvern, Pennsylvania and a wholly owned and controlled subsidiary; (ii) Endo Pharmaceuticals Inc. ("Endo Pharma") a wholly owned and controlled subsidiary and Delaware corporation with its principal place of business in Malvern, Pennsylvania; (iii) Par Pharmaceutical, Inc. ("Par Pharma") a Delaware corporation with its principal place of business located in Chestnut Ridge, New York and a wholly owned and controlled subsidiary; and (iv) Par Pharmaceuticals Companies, Inc. ("Par Inc.") a Delaware corporation with its principal place of business located in Chestnut Ridge, New York and a wholly owned and controlled subsidiary.

80.     At all relevant times, Endo PLC acted in concert with its wholly owned subsidiaries as agents and/or principals of one another in relation to the conduct described herein.

81.     Endo PLC manufactured multiple branded and generic opioids, including Opana/Opana ER, Percodan, Percocet, generic versions of oxycodone, oxymorphone, hydromorphone and hydrocodone, which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

82.     The sale of Opioids made up roughly $403 million of Endo PLC's gross revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013 and accounted for 10% of total revenue in 2012. Endo PLC also manufactured, promoted, marketed and sold generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, by itself and through its wholly owned and controlled subsidiary, Qualitest Pharmaceuticals, Inc.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000025 of 000157

- 19 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

83.     In furtherance of its opioid promotions, marketing, and resulting sales, Endo PLC made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

84.     Endo PLC's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### e.     Johnson & Johnson.

85.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey.

86.     J&J includes Janssen Pharmaceuticals, Inc. ("Janssen Pharma") a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and a wholly owned and controlled subsidiary of J&J.  Janssen Pharma was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

87.     J&J also includes Noramco, Inc. ("Noramco") a Delaware company headquartered in Wilmington, Delaware and a wholly owned and controlled subsidiary of J&J until July 2016. Noramco, Inc. was an integral part of J&J's opium processing—the active pharmaceutical ingredients ("APIs") necessary for opioid pain medication.

88.     At all relevant times, J&J acted in concert with its wholly owned subsidiaries as agents and/or principals of one another in relation to the conduct described herein.

89.     J&J manufactured branded opioids—including, Duragesic (Fentanyl), Nucynta

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000026 of 000157

- 20 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

(Tapentadol), Nucynta ER, Ultram (Tramadol), Ultram ER, Ultracet, and Tylox— which were in turn promoted, marketed and sold throughout the Commonwealth of Kentucky.

90.  Before 2009, Duragesic accounted for at least $1 billion in J&J's annual sales. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

91.  In furtherance of its opioid promotions, marketing, and resulting sales J&J made thousands of payments to physicians nationwide, including in the Commonwealth of Kentucky, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids—to manipulate the market thereby increasing their corresponding sales and resulting profits.

92.  Further, as part of its "pain management franchise," from the 1990s through at least 2016, J&J supplied—sold for a profit to—other opioid manufacturers with opioid API's necessary to manufacture opioid drugs.   Using a subsidiary based in Tasmania—Tasmanian Alkaloids Limited ("Tasmanian Alkaloids"), J&J cultivated and processed opium poppy plants to manufacture narcotic raw materials that were imported into the U.S. to be processed and made into the API's necessary to manufacture opioid drugs s necessary to manufacture opioid drugs.

93.  The Tasmanian Alkaloids were imported and processed by J&J and subsequently sold to other opioid manufacturers in the U.S.  As a result, the Tasmanian Alkaloids were a crucial and key component of J&J's "pain management franchise" in the U.S.  This franchise also encompassed all of J&J's opioid products.

94.  Specifically, J&J supplied the following opioid APIs to other opioid drug manufacturers in the U.S., including Purdue and Teva: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000027 of 000157

- 21 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

95.      J&J's efforts resulted in their "pain management franchise" becoming the number

one (#1) supplier of narcotic API's in the U.S.  By effectively cornering the market with its API

production—using opium poppy plant production, extraction, and importation—J&J was

uniquely positioned to provide U.S. opioid manufacturers with what it deemed "Security of

Supply" and "Direct Access to Narcotic Raw Material - From Our Fields to Your Formulations."

Using its franchise, J&J supplied the necessary opioid component—oxycodone API—to U.S.

opioid manufacturers.

96.      To increase demand, market share, and ultimately their profits, J&J began a

project to develop a *high* thebaine[3] poppy—subsequently named the *Norman Poppy*.  J&J

described the *Norman Poppy* as a transformational technology that would drive the significant

growth of the oxycodone market.

97.      J&J's misconduct and illegal actions, as further addressed herein, have caused

injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary,

warranted, and required.

### f.      Amneal.

98.      Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a Delaware

corporation with its principal place of business in New Jersey.  Amneal Inc. is the managing

member of Amneal LLC ("Amneal LLC") a Delaware limited liability company with its

principal place of business in New Jersey.  Amneal Inc conducts and exercises full control over

all activities of Amneal LLC.

99.      At all relevant times, Amneal Inc. acted in concert with Amneal LLC in relation

to the conduct described herein.

---

[3]      Thebaine, also known as codeine methyl enol ether, is an opiate alkaloid.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000028 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

100.    Amneal Inc. manufactured multiple generic opioids, including versions of Percocet, Ultracet, Ultram, Suboxone, Vicoprofen, and Narco, which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

101.    Amneal Inc's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### g.    Mylan.

102.    Defendant Mylan Pharmaceuticals, Inc. ("Mylan") is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

103.    Mylan manufactured opioids—including many Schedule II controlled substances such as Fentanyl—which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

104.    Mylan's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### h.    West-Ward.

105.    Defendant West-Ward Pharmaceuticals Corp., k/n/a Hikma Pharmaceuticals, PLC ("West-Ward") is a multinational pharmaceutical company with its headquarters in London, United Kingdom, and its principal place of business in the United States located in Eastontown, New Jersey.

106.    West-Ward manufactured opioids—which were in turn promoted, marketed, distributed, and sold throughout the Commonwealth of Kentucky.

107.    West-Ward's misconduct and illegal actions, as further addressed herein, have

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000029 of 000157

- 23 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

caused injuries to and throughout the Commonwealth of Kentucky for which relief is both

necessary, warranted, and required.

### i. KVK-Tech.

108.   Defendant KVK Tech, Inc. ("KVK") is a Pennsylvania business entity with its

principal place of business in Pennsylvania.

109.   KVK-Tech manufactured opioids— which were in turn promoted, marketed,

distributed, and sold throughout the Commonwealth of Kentucky.

110.   KVK-Tech's misconduct and illegal actions, as further addressed herein, have

caused injuries to and throughout the Commonwealth of Kentucky for which relief is both

necessary, warranted, and required.

### j. Assertio.

111.   Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. ("Assertio") is a

Delaware corporation with its principal place of business in Lake Forest, Illinois.

112.   Defendant Depomed Inc. ("Depomed") is a California corporation with its

principal place of business in Newark. California.

113.   At all relevant times, Assertio and Depomed (collectively, the "Assertio Entities")

acted in concert with one another and acted as agents and/or principals of one another in relation

to the conduct described herein.

114.   The Assertio Entities market themselves as a specialty pharmaceutical company

focused on pain and other central nervous system conditions.  In this capacity, in April 2015, the

Assertio Entities acquired the rights to Nucynta and Nucynta ER for $1.05 billion from the

Johnson & Johnson Entities.  Prior to and subsequent to the acquisition, the Assertio Entities

manufactured opioids which were in turn promoted, marketed, distributed, and sold throughout

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000030 of 000157

- 24 -

Filed          21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

the Commonwealth of Kentucky.

115.     The Assertion Entities' misconduct and illegal actions, as further addressed

herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief

is both necessary, warranted, and required.

### 2.     Wholesale Distributor Defendants.

116.     The Wholesale Distributor Defendants are defined below. At all relevant times,

the Wholesale Distributor Defendants have promoted, marketed, distributed, and sold opioids

throughout the Commonwealth of Kentucky—activities which have universally failed to

comply with their legal obligations to their patients and to the public at large.

117.     The Wholesale Distributor Defendants were, and remain, engaged in "wholesale

distribution" as defined by Kentucky law. The Wholesale Distributor Defendants were, and

remain, a substantial cause for the volume of prescription opioids plaguing the Commonwealth

of Kentucky.

118.     Collectively, Amerisource Bergen Entities, Anda, Cardinal Health, CVS, Kroger,

McKesson, Rite Aid Corp, Smith Drug, Walgreens, and Walmart are referred to herein as the

"Wholesale Distributor Defendants." *See infra*.

### a.     AmerisourceBergen Entities

119.     Defendant AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a

Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania.

120.     AmerisourceBergen includes H. D. Smith, LLC f/k/a H. D. Smith Wholesale

Drug Co. ("H. D. Smith") a wholesaler of pharmaceutical drugs that distributed opioids

throughout the Commonwealth of Kentucky.  H. D. Smith was a privately held independent

pharmaceuticals distributor of wholesale brand, generic and specialty pharmaceuticals and is a

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000031 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Delaware corporation with its principal place of business in Illinois. H. D. Smith Wholesale

Drug Co. was restructured and is currently doing business as H. D. Smith, LLC. H.D. Smith

LLC's sole member is H. D. Smith Holdings, LLC, and its sole member is H. D. Smith Holding

Company, a Delaware corporation with its principal place of business in Illinois. H. D. Smith is

the largest independent wholesaler in the United States. In January 2018, Defendant

AmerisourceBergen acquired H. D. Smith as a wholly owned and controlled subsidiary.

121.    At all relevant times, AmerisourceBergen acted in concert with its wholly owned

subsidiaries as agents and/or principals of one another in relation to the conduct described

herein.

122.    AmerisourceBergen is a wholesale distributor of opioids throughout the

Commonwealth of Kentucky.

123.    AmerisourceBergen' misconduct and illegal actions, as further addressed herein,

have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both

necessary, warranted, and required.

**b.    Anda.**

124.    Defendant Anda, Inc., ("Anda") is a Florida corporation with its principal place of

business in Weston, Florida.

125.    Anda through its various subsidiaries and affiliated entities, including Anda

Pharmaceuticals, Inc., is the fourth largest wholesale distributor of generic pharmaceuticals in

the United States. In October 2016, the Teva Entities acquired Anda from the Allegan Entities

for $500 million in cash.

126.    Anda has, at all relevant times, acted as a wholesale distributor of opioids

throughout the Commonwealth of Kentucky.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000032 of 000157

- 26 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

127.     Anda's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### c.     Cardinal Health.

128.     Defendant Cardinal Health, Inc. ("Cardinal Health") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

129.     Cardinal Health is a global distributor of pharmaceutical drugs and medical products. It is one of the largest wholesale distributors of opioids in the United States with annual revenues in excess of $121.5 billion.  Additionally, in December 2013, Cardinal Health formed a ten-year agreement with CVS Caremark to form the largest generic drug sourcing operation in the United States.

130.     Cardinal Health has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

131.     Cardinal Health's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### d.     CVS.

132.     Defendant CVS Health Corporation LLC ("CVS") is a Delaware limited liability company with its principal place of business in Rhode Island.

133.     CVS has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

134.     CVS' misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary,

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000033 of 000157

- 27 -

Filed                    21-CI-00515        06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

warranted, and required.

### e. Kroger.

135.    Defendant Kroger Company ("Kroger") is an Ohio corporation with headquarters in Cincinnati, OH.

136.    Kroger conducts business as a pharmaceutical wholesale distributor under the following named business entities, each of which is wholly owned and controlled by Kroger: Kroger Limited Partnership I and Kroger Limited Partnership II (collectively "Kroger").

137.    Kroger has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

138.    Kroger's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### f. McKesson.

139.    Defendant McKesson Corporation ("McKesson") dba McKesson Drug Company is a Delaware corporation with its principal place of business located in Irving, Texas.

140.    McKesson is the largest pharmaceutical distributor in North America. McKesson delivers approximately one-third of all pharmaceuticals used in North America. For fiscal year ending on March 31, 2018, McKesson generated revenues of $208 billion, placing it seventh on the Fortune 500 list. In its 2018 Annual Report, McKesson stated that it "partner[s] with [pharmaceutical] manufacturers, providers, pharmacies, governments and other organizations in healthcare to help provide the right medicines, medical products and healthcare services to the right patients at the right time, safely and cost-effectively."

141.    According to its 2017 Annual Report, McKesson's "pharmaceutical distribution

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000034 of 000157

Filed                    21-CI-00515        06/25/2021      Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

business operates and serves customer locations in all 50 states and Puerto Rico through a network of 27 distribution centers, as well as a primary redistribution center, two strategic redistribution centers and two repackaging facilities."

142.   In January 2017, McKesson paid a record $150 million to resolve an investigation for failing to report suspicious orders of certain drugs, including opioids. In addition to the monetary penalty, McKesson was required to suspend sales of controlled substances from distribution centers in Ohio, Florida, Michigan, and Colorado.

143.   McKesson has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

144.   McKesson's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### g.   Rite Aid Corp.

145.   Defendant Rite Aid Corporation ("Rite Aid") is a Delaware corporation with its principal office located in Camp Hill, Pennsylvania.

146.   Rite Aid has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

147.   Rite Aid's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### h.   Walgreens.

148.   Defendant Walgreen Co. ("Walgreens") is an Illinois corporation with its principal place of business in Deerfield, Illinois.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000035 of 000157

- 29 -

Filed
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

149.    Walgreens has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

150.    Walgreens' misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### i.    Walmart.

151.    Defendant Walmart Inc. ("Walmart") f/k/a Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

152.    Walmart has, at all relevant times, acted as a wholesale distributor of opioids throughout the Commonwealth of Kentucky.

153.    Walmart's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### 3.    Retail Pharmacy Defendants.

154.    As the title implies, the Retail Pharmacy Defendants operated as retail pharmacies in the Commonwealth of Kentucky.  In that capacity, the Retail Pharmacy Defendants sold, transferred, dispensed, and distributed opioids—notably without fulfilling their Kentucky common law and Kentucky statutory duties.

155.    The Retail Pharmacy Defendants, for their own financial gain and without regard to the resulting damages caused, willfully and knowingly participated in the distribution of opioids throughout the Commonwealth of Kentucky.

156.    Collectively, CVS Pharmacy, Kroger, Rite Aid KY, Walgreens, and Walmart are referred to herein as the "Retail Pharmacy Defendants."  *See infra*.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000036 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

### a. CVS Pharmacy.

157.    Defendant Kentucky CVS Pharmacy LLC ("CVS Pharmacy") is a Kentucky limited liability company with a principal office in Woonsocker, Rhode Island.

158.    CVS Pharmacy operated and conducted business as a retail pharmacy—selling, transferring, dispensing, and distributing opioids, throughout the Commonwealth of Kentucky.

159.    CVS Pharmacy's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### b. Kroger.

160.    Defendant Kroger Company ("Kroger") is an Ohio corporation with headquarters in Cincinnati, OH.

161.    Kroger operated and conducted business as a retail pharmacy—selling, transferring, dispensing, and distributing opioids, throughout the Commonwealth of Kentucky.

162.    Kroger's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### c. Rite Aid KY.

163.    Defendant Rite Aid of Kentucky, Inc. ("Rite Aid KY") is a Kentucky corporation with a principal office in Harrisburg, Pennsylvania.

164.    Rite Aid KY operated and conducted business as a retail pharmacy—selling, transferring, dispensing, and distributing opioids, throughout the Commonwealth of Kentucky.

165.    Rite Aid KY's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000037 of 000157

- 31 -

necessary, warranted, and required.

### d.   Walgreens.

166.   Defendant Walgreen Co. ("Walgreens") dba Walgreens is an Illinois corporation with its principal place of business in Deerfield, Illinois.

167.   Walgreens operated and conducted business as a retail pharmacy—selling, transferring, dispensing, and distributing opioids, throughout the Commonwealth of Kentucky.

168.   Walgreens' misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### e.   Walmart.

169.   Defendant Walmart Inc. ("Walmart") f/k/a Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

170.   Walmart operated and conducted business as a retail pharmacy—selling, transferring, dispensing, and distributing opioids, throughout the Commonwealth of Kentucky.

171.   Walmart's misconduct and illegal actions, as further addressed herein, have caused injuries to and throughout the Commonwealth of Kentucky for which relief is both necessary, warranted, and required.

### FACTUAL BACKGROUND

A.   **The Opioid Epidemic.**

1.   **The National Opioid Epidemic.**

172.   The past two decades have been characterized by increasing abuse and diversion of prescription drugs, including opioid medications, in the United States.  Prescription opioids have become widely prescribed for chronic pain—not just acute pain.

173.   By 2010, enough prescription opioids were sold to medicate every adult in the

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000038 of 000157

- 32 -

Filed                21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.

174.    By 2011, the U.S. Department of Health and Human Resources, Centers for

Disease Control and Prevention, declared prescription painkiller overdoses were at epidemic

levels. The news release noted:

- The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

- More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

- Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

- The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

- Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

- Almost 5,500 people start to misuse prescription painkillers every day.

175.    The number of annual opioid prescriptions written in the United States is now

roughly equal to the number of adults in the population. Many Americans have become addicted

to prescription opioids, and the number of deaths due to prescription opioid overdose has

escalated. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase

of more than 22 percent over the 52,404 drug deaths recorded the previous year.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000039 of 000157

- 33 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

176.    In its 2017 Overdose Fatality Report, the Kentucky Office of Drug Control Policy

found that:

> Substance abuse, particularly the diversion and abuse of
> prescription drugs along with heroin and illicit fentanyl,
> remains one of the most critical public health and safety
> issues facing Kentucky. Over the past decade, the number
> of Kentuckians who die from drug overdoses has steadily
> climbed to more than 1,500 this year, exacting a
> devastating toll on families, communities, social services
> and economic growth.

177.    The same report noted that the number of opioid related deaths continued to

increase throughout the Commonwealth of Kentucky.

> Kentucky overdose fatalities increased in 2017. Overdose
> deaths of Kentucky residents, regardless of where the death
> occurred, and non-residents who died in Kentucky, totaled
> 1,565 as reported to the Office of Vital Statistics in June
> 2018. Of those, 1,468 were Kentucky residents. That's
> compared to 1,404 overdose deaths counted in the 2016
> report. Within the 1,565 overdose deaths, toxicology was
> available for 1,468 of those. A review of cases autopsied by
> the Kentucky Medical Examiner's Office and toxicology
> reports submitted by coroners indicates that in 2017:
>
> - People ages 35 to 44 were the largest demographic
>   in overdose deaths. Followed by 45 to 54.
>
> * * * * *
>
> - Fentanyl was involved in 763 Kentucky resident
>   overdose deaths. That accounts for 52 percent of all
>   deaths, up from 47 percent in 2016.

178.    Oxycodone addiction has been a source of opioid addiction in America since the

1960s, with a spike in popularity in the mid-1990s. Throughout this time, the U.S. government

and researchers studied oxycodone addiction and misuse. Their research revealed shocking

statistics, including:

- Oxycodone products sell for an average price of $1 per
  milligram on the streets;

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000040 of 000157

- 34 -

Filed          21-CI-00515       06/25/2021       Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- In 1996, before OxyContin came out, the federal government recorded 49 oxycodone-related deaths. In 1999, the federal government recorded 262 oxycodone-related deaths

- In 2013, 2 percent of eighth graders, 3.4 percent of 10th graders and 3.6 percent of 12th graders surveyed in the Monitoring The Future study said that they abused OxyContin in the previous year.

- Of the 20.5 million Americans with addiction in 2015, 2 million were addicted to prescription narcotics including oxycodone.

- Opioid addiction and abuse led to 20,101 overdose deaths in 2015.

- Women were at higher risk of prescription opioid abuse and addiction than men.

- 4 out of 5 (80%) new heroin users started out misusing prescription painkillers.

179.    The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. People who are addicted to prescription opioid painkillers are forty (40) times more likely to be addicted to heroin.

180.    Heroin is pharmacologically similar to prescription opioids. Just as with opioids—e.g., OxyContin—heroin is made from the resin of poppy plants.  Milky, sap-like opium is first removed from the pod of the poppy flower.  This opium is then refined to make morphine, then further refined into different forms of heroin.

181.    The majority of current heroin users report having used prescription opioids non-medically before they initiated heroin use. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use.

182.    The CDC reports that drug overdose deaths involving heroin continue to climb sharply, with heroin overdoses more than tripling in 4 years. This increase mirrors large

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000041 of 000157

Filed          21-CI-00515       06/25/2021       Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

increases in heroin use across the country and has been shown to be closely tied to opioid pain reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk factor for heroin initiation and use, specifically among persons who report past-year dependence or abuse. The increased availability of heroin combined with its relatively low price (compared with diverted prescription opioids) and high purity appear to be major drivers of the upward trend in heroin use and overdose.

183.     The societal costs of prescription drug abuse are significant. Across the nation, local governments struggle with the ever-expanding epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their lives after overdosing on opioids.

184.     The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare." The economic burden of prescription opioid misuse alone is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.

185.     The U.S. opioid epidemic is continuing, and drug overdose deaths nearly tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.  The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.

186.     The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country. Meanwhile, the Manufacturer ("Marketing") Defendants, the Wholesale Distributor Defendants, and Retail Pharmacy Defendants extract billions of dollars of revenue from the addicted American public while public entities such as the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000042 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Plaintiffs incur significant economic damages caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic.

187.    The Manufacturer ("Marketing") Defendants and the Wholesale Distributor Defendants have continued their wrongful, intentional, and unlawful conduct, despite their knowledge that such conduct is causing and/or contributing to the national, state, and local opioid epidemic.

## 2.    Kentucky's Opioid Epidemic.

188.    The Commonwealth of Kentucky has been especially damaged by the national opioid crisis, with an opioid prescription rate of 128.4 per 100 persons, which ranks fourth in the country (U.S. median rate: 82.5) and a benzodiazepine prescription rate of 57.4 per 100 persons which ranks fifth nationally (U.S. median rate: 37.6).

189.    As reported by the CDC, Kentucky's drug overdose rate has increased more rapidly and has remained significantly higher than the national average.  As already noted, according to the Kentucky Office of Drug Control Policy, fatal overdoses in Kentucky soared to unprecedented levels in 2016, jumping 7.4 percent to 1,404 overdose deaths. In 2015, Kentucky overdose deaths rose by 21.1 percent over the number overdose deaths in 2014. In 2016, three in ten Kentuckians (27%) said they knew someone with problems from prescription painkillers.

190.    According to data kept by KVC Kentucky, a behavioral health and child welfare organization in Lexington, the number of children in foster care in Kentucky rose from 6,000 in 2012 to 8,000 in 2015, with about a third of them entering the system because of their parents' substance abuse. Children with parents addicted to drugs tend to stay in foster care longer, and they often enter the system having experienced significant trauma, which makes their care more expensive.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000043 of 000157

Filed                21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

191.     In Kentucky, data from hospital discharge records indicate the number of newborns with Neonatal Abstinence Syndrome, a collection of symptoms newborn babies experience in withdrawing from opioid medications taken by the mother, has increased 23-fold in the last decade.

192.     While overall inpatient admissions for substance abuse treatment in Kentucky in 2015 (19,005) were down from 2005 (22,705), heroin and other opioids accounted for nearly half (46.2 percent) of those admissions in 2015, compared to just 11.6 percent in 2005.

193.     Data maintained by the Agency for Healthcare Research and Quality for 2007 through 2016 document a sharp increase in opioid-related inpatient hospital stays in Kentucky. The annual rate of such stays per 100,000 population has continued to increase.  Further, the rate of opioid related Emergency Department visits increased 65.6% in Kentucky between 2009 and 2014.

**B.     The Manufacturer ("Marketing") Defendants' False, Deceptive, and Illicit Marketing of Opioids.**

194.     The opioid epidemic did not happen by accident, but rather is the direct result of the conscious and calculated decision by the Manufacturer ("Marketing") Defendants to significantly and exponentially increase their sales and resulting profits—without regard to the resulting damages to the end-user, the public, and ultimately the Plaintiffs.

195.     Before the 1990s, generally accepted standards of medical practice dictated that opioids were for the treatment of acute short-term pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care.

196.     Due to the lack of evidence that opioids improved the ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other negative side effects, the use of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000044 of 000157

- 38 -

Filed                    06/25/2021          Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioids for chronic pain was discouraged and/or prohibited. As a result, the medical community

generally did *not* prescribe opioids for chronic pain.

197.    Each of the Manufacturer ("Marketing") Defendants conducted, and has

continued to conduct, a marketing scheme designed to persuade prescribers, end-users, and the

public that opioids can and should be used for chronic pain, resulting in opioid treatment for a far

broader group of patients who are much more likely to become addicted and suffer other adverse

effects from the long-term use of opioids.

198.    In connection with this scheme, each of the Manufacturer ("Marketing")

Defendants spent, and continues to spend, millions of dollars on promotional activities and

materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using

them for chronic pain.

199.    The Manufacturer ("Marketing") Defendants have made false and misleading

claims, contrary to the language on their drugs' labels, regarding the risks of using their drugs

that:

- downplayed the serious risk of addiction;

- created and promoted the concept of "pseudo-addiction" when signs of
  actual addiction began appearing and advocated that the signs of
  addiction should be treated with more opioids;

- exaggerated the effectiveness of screening tools to prevent addiction;

- claimed that opioid dependence and withdrawal are easily managed;

- denied the risks of higher opioid dosages; and

- exaggerated the effectiveness of "abuse-deterrent" opioid formulations
  to prevent abuse and addiction.

200.    The Manufacturer ("Marketing") Defendants falsely touted the benefits of long-

term opioid use, including the unproven ability of opioids to improve function and quality of life,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000045 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

even though there was no scientifically reliable evidence to support their marketing claims.

201.    The Manufacturer ("Marketing") Defendants have disseminated these common—
and deceptive—messages to reverse the popular and medically accepted understanding of
opioids and risks of ongoing opioid use. They disseminated these deceptive messages directly,
through their sales representatives, in speaker groups led by physicians the Manufacturer
("Marketing") Defendants recruited for their support of their marketing messages, and through
unbranded marketing and industry-funded front groups.

202.    The Manufacturer ("Marketing") Defendants' efforts were highly successful.
Opioids are now the _**most prescribed**_ class of drugs. Globally, opioid sales generated $11 billion
in revenue for drug companies in 2010 alone; sales in the United States have exceeded $8 billion
in revenue annually since 2009.

203.    In an open letter to the nation's physicians in August 2016, the U.S. Surgeon
General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors
. . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when
prescribed for legitimate pain."

204.    The resulting epidemic has resulted in an enormous oversupply (i.e., flood) of
prescription opioids available for sale (the supply) and resulting illicit use, and a population of
physically and psychologically dependent end-users (the demand).   And when those end-users
can no longer afford or obtain opioids from licensed dispensaries, they often turn to the illicit
purchase of the supply or, faced with their addiction, turn to non-prescription opioids, including
heroin.

205.    The Manufacturer ("Marketing") Defendants knowingly intentionally, recklessly
and with wholesale indifference to the negative impact continued their conduct, as alleged

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000046 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

herein, created the opioid nuisance and causing the harms and damages alleged herein.

> **1. The Manufacturer ("Marketing") Defendants Used Multiple Avenues to Disseminate Their False and Deceptive Statements about Opioids.**

206.    The Manufacturer ("Marketing") Defendants spread their false and deceptive statements by marketing their respective branded opioids directly to prescribers and end-users throughout the Commonwealth of Kentucky.

207.    The deception included the use of seemingly unbiased and independent third parties controlled and manipulated by the Manufacturer ("Marketing") Defendants to spread their false and deceptive statements trivializing and minimizing the risks and instead exhorting the benefits of opioids for the treatment of chronic pain.

208.    The Manufacturer ("Marketing") Defendants employed the same marketing plans and strategies and deployed the same messages throughout the Commonwealth of Kentucky.

209.    Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that the Manufacturer ("Marketing") Defendants' messages are coordinated for consistent delivery across their marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. Manufacturer ("Marketing") Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

210.    Manufacturer ("Marketing") Defendants ensure marketing consistency nationwide through national and regional sales representative training; national training of local medical liaisons, the company employees who respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker slide decks, and sales training materials; and nationally coordinated advertising.

211.    Manufacturer ("Marketing") Defendants' sales representatives and physician

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000047 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

### a. Direct Marketing.

212. The Manufacturer ("Marketing") Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer ("Marketing") Defendant conducted and continues to conduct advertising campaigns exhorting the purported benefits of their branded drugs, while diminishing the significant risks. For example, upon information and belief, the Manufacturer ("Marketing") Defendants spent more than $14 million on medical journal advertising of opioids in 2011—a three-fold increase from 2001.

213. Many of the Manufacturer ("Marketing") Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo distributed and made available on its website *opana.com* a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like a construction worker, a chef, and a teacher, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

214. Each Manufacturer ("Marketing") Defendant promoted the use of opioids for chronic pain through "detailers"—sales representatives who visited individual doctors and medical staff in their offices—and small-group speaker programs.

215. The Manufacturer ("Marketing") Defendants have not corrected this coordinated campaign of misinformation. Instead, each Manufacturer ("Marketing") Defendant devoted massive resources to direct sales contacts with doctors. Upon information and belief, in 2014 alone, the Manufacturer ("Marketing") Defendants spent in excess of $168 million on detailing

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000048 of 000157

- 42 -

Filed          21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

branded opioids to doctors, more than twice what they spent on detailing in 2000.

216.    The Manufacturer ("Marketing") Defendants' detailing to doctors was, and remains, highly effective. Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence.

217.     Even without such studies, the Manufacturer ("Marketing") Defendants' purchase, manipulate and analyze some of the most sophisticated data available in any industry, data available from IMS Health Holdings, Inc., to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, the Manufacturer ("Marketing") Defendants know their detailing to doctors is highly effective at enforcing their deceptive messages—resulting in continued significant sales and corresponding profits.

218.    The Manufacturer ("Marketing") Defendants' detailers have been reprimanded for their deceptive promotions. In March 2010, for example, the FDA found that Actavis had been distributing promotional materials that "minimize[] the risks associated with Kadian and misleadingly suggest[] that Kadian is safer than has been demonstrated." Those materials in particular "fail to reveal warnings regarding potentially fatal abuse of opioids, use by individuals other than the patient for whom the drug was prescribed."

### b.    Indirect Marketing.

219.    The Manufacturer ("Marketing") Defendants' also surreptitiously marketed their opioids using unbranded advertising, paid speakers and "key opinion leaders" ("KOLs"), and industry-funded organizations posing as neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

220.    The Manufacturer ("Marketing") Defendants deceptively marketed opioids

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000049 of 000157

- 43 -

Filed                    21-CI-00515       06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

throughout the Commonwealth of Kentucky through unbranded advertising—e.g., advertising that promotes opioid use generally but does not name a specific opioid.

221.    This advertising was ostensibly created and disseminated by independent third parties, but by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer ("Marketing") Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain.

222.    Just as they controlled the distribution of their "core messages" via their own detailers and speaker programs, the Manufacturer ("Marketing") Defendants controlled the distribution of these messages in scientific publications, treatment guidelines, Continuing Medical Education ("CME") programs, and medical conferences and seminars. To this end, the Manufacturer ("Marketing") Defendants used third-party public relations firms to help control those messages when they originated from third parties.

223.    The Manufacturer ("Marketing") Defendants marketed through third party, unbranded advertising to avoid regulatory scrutiny because that advertising is not submitted to, and typically is not reviewed by Kentucky state regulator.

224.    The Manufacturer ("Marketing") Defendants also used third party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source.  Similar to the use of third-party marketing by Big Tobacco, the Manufacturer ("Marketing") Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive prescribers, end-users, and the public about the risks of opioid use for chronic pain.

225.    The Manufacturer ("Marketing") Defendants also solicited and retained doctors to

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000050 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals

paid for by Defendants. These speaker programs provided:

- incentives for doctors to prescribe specific opioids (so they might be selected to promote the drug);

- recognition and compensation for the doctors selected as speakers; and

- an opportunity to promote the drug through the speaker to his or her peers.

226.     The speakers were then presented to the public under the false pretense that they

were providing unbiased and medically accurate presentations when they were, in fact,

presenting a script prepared by the Manufacturer ("Marketing") Defendants.  On information and

belief, these presentations conveyed misleading information, omitted material information, and

failed to correct prior misrepresentations about the significant risks of opioids—including their

use for management of chronic pain.

227.     Similar to the collaborative marketing employed by Big Tobacco, the

Manufacturer ("Marketing") Defendants coordinated and controlled their deceptive marketing

through third parties they controlled by:

- funding, assisting, encouraging, and directing doctors who served as KOLS; and

- funding, assisting, directing, and encouraging seemingly neutral and credible Front Groups.

228.     The Manufacturer ("Marketing") Defendants then worked together with those

KOLs and Front Groups to taint the sources that prescribers, end-users, and the public relied on

for ostensibly "neutral" guidance, such as treatment guidelines, CME programs, medical

conferences and seminars, and scientific articles. Thus, working individually and collectively,

and through these Front Groups and KOLs, the Manufacturer ("Marketing") Defendants

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000051 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

persuaded prescribers, end-users, and the public that what they have long known—that opioids are addictive drugs and unsafe in most circumstances for long-term use—was untrue, and that the compassionate treatment of pain required opioids.

229.    Pro-opioid doctors are one of the most important avenues that the Manufacturer ("Marketing") Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use.

230.    The Manufacturer ("Marketing") Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.

231.    The Manufacturer ("Marketing") Defendants utilized many KOLs, including many of the same ones. Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL the Manufacturer ("Marketing") Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon.

232.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS") / American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1996 and again in 2009. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by the Manufacturer ("Marketing") Defendants.

233.    Dr. Portenoy also made frequent media appearances promoting opioids and

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000052 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

spreading misrepresentations, such as his claim that "the likelihood that the treatment of pain

using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He

appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat

chronic pain. On this widely watched program, broadcast nationwide, Dr. Portenoy claimed:

> Addiction, when treating pain, is distinctly uncommon. If a
> person does not have a history, a personal history, of
> substance abuse, and does not have a history in the family
> of substance abuse, and does not have a very major
> psychiatric disorder, most doctors can feel very assured that
> that person is not going to become addicted.

234.     Dr. Portenoy later admitted that he "gave innumerable lectures in the late 1980s

and '90s about addiction that weren't true."   Notably, his lectures falsely claimed that fewer than

1% of patients would become addicted to opioids.

235.     According to Dr. Portenoy, because the primary goal was to "destigmatize"

opioids, he and other doctors promoting them overstated their benefits and glossed over their

risks. Dr. Portenoy later conceded that "[d]ata about the effectiveness of opioids does not exist."

Dr. Portenoy candidly stated: "Did I teach about pain management, specifically about opioid

therapy, in a way that reflects misinformation? Well, . . . I guess I did."

236.     Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director

of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr.

Webster was President of American Academy of Pain Medicine ("AAPM") in 2013. He is a

Senior Editor of Pain Medicine, the same journal that published Endo special advertising

supplements touting Opana ER. Dr. Webster was the author of numerous CMEs sponsored by

Cephalon, Endo, and Purdue. At the same time, Dr. Webster was receiving significant funding

from the Manufacturer ("Marketing") Defendants (including nearly $2 million from Cephalon).

237.     During a portion of his time as a KOL, Dr. Webster was under investigation for

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000053 of 000157

- 47 -

Filed          21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

overprescribing by the U.S. Department of Justice's Drug Enforcement Agency, which raided his clinic in 2010. Although the investigation was closed without charges in 2014, more than 20 of Dr. Webster's former patients at the Lifetree Clinic died as the result of opioid overdoses.

238.    Dr. Webster created and promoted the Opioid Risk Tool, a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen, and Purdue.

239.    Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating, also, their reliance on the Manufacturer ("Marketing") Defendants and those under their influence and control.

240.    In 2011, Dr. Webster presented, via webinar, a program sponsored by the Purdue Entities entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors throughout the Commonwealth of Kentucky.

241.    Dr. Webster also was a leading proponent of the concept of "pseudo addiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to increase a patient's dose of opioids. As he and co-author Beth Dove wrote in their 2007 book

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000054 of 000157

Filed          21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

*Avoiding Opioid Abuse While Managing Pain*—a book that is still available online—when faced

with signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's

first response." Upon information and belief, the Endo Entities distributed this book to doctors.

Years later, Dr. Webster reversed himself, acknowledging that "[pseudo addiction] obviously

became too much of an excuse to give patients more medication."

242.     The Manufacturer ("Marketing") Defendants also entered into arrangements with

seemingly unbiased and independent patient and professional organizations to promote opioids

for the treatment of chronic pain.

243.     Under the direction and control of the Manufacturer ("Marketing") Defendants,

these "Front Groups" generated treatment guidelines, unbranded materials, and programs that

favored chronic opioid therapy. They also assisted the Manufacturer ("Marketing") Defendants

by responding to negative articles, by advocating against regulatory changes that would limit

opioid prescribing in accordance with the scientific evidence, and by conducting outreach to

vulnerable patient populations targeted by the Manufacturer ("Marketing") Defendants.

244.     These Front Groups depended on the Manufacturer ("Marketing") Defendants for

funding and, in some cases, for survival. The Manufacturer ("Marketing") Defendants exercised

control over programs and materials created by these groups by collaborating on, editing, and

approving their content, and by funding their dissemination. In doing so, the Manufacturer

("Marketing") Defendants ensured the Front Groups would generate only the messages that the

Manufacturer ("Marketing") Defendants wanted to distribute. Despite this, the Front Groups held

themselves out as independent and serving the needs of their members.

245.     In particular, Endo, J&J, and Teva each utilized multiple Front Groups, including

many of the same ones. Several of the most prominent are described below, but there are many

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000055 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

others, including the American Pain Society ("APS"), American Geriatrics Society ("AGS"), the

Federation of State Medical Boards ("FSMB"), American Chronic Pain Association ("ACPA"),

the Center for Practical Bioethics ("CPB"), the U.S. Pain Foundation ("USPF") and Pain &

Policy Studies Group ("PPSG").

246.     The most prominent of the Manufacturer ("Marketing") Defendants' Front

Groups was the American Pain Foundation ("APF"), which, upon information and belief,

received more than $10 million in funding from opioid manufacturers from 2007 until it closed

its doors in May 2012, primarily from Endo. APF issued education guides for consumers,

reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized

their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids

for returning veterans, which has contributed to high rates of addiction and other adverse

outcomes—including death—among returning soldiers. APF also engaged in a significant

multimedia campaign—through radio, television and the internet—to educate patients about their

"right" to pain treatment, namely opioids. All of the programs and materials were available

nationally and were intended to reach the Commonwealth of Kentucky.

247.     In 2009 and 2010, more than 80% of APF's operating budget came from

pharmaceutical industry sources. Including industry grants for specific projects, APF received

about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its

budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total

income of about $3.5 million. By 2011, upon information and belief, APF was entirely

dependent on incoming grants from Endo, Teva, Cephalon, and others to avoid using its line of

credit.

248.     APF held itself out as an independent patient advocacy organization. It often

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000056 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its controlling sponsors. Upon information and belief, APF was often called upon to provide "patient representatives" for the Manufacturer ("Marketing") Defendants' promotional activities, including for the Purdue Entities' *Partners Against Pain and Janssen's Let's Talk Pain*.

249.    APF functioned largely as an advocate for the interests of the Manufacturer ("Marketing") Defendants, not patients or the public. Indeed, upon information and belief, as early as 2001.

250.    Plaintiffs are informed, and believe, that on several occasions, representatives of the Manufacturer ("Marketing") Defendants, often during informal meetings at conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

251.    The U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and the Manufacturer ("Marketing") Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

252.    Another front group for the Manufacturer ("Marketing") Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer ("Marketing") Defendants, the AAPM issued purported

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000057 of 000157

Filed        21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

treatment guidelines and sponsored and hosted medical education programs essential to the

Manufacturer ("Marketing") Defendants' deceptive marketing of chronic opioid therapy.

253.    AAPM received substantial funding from opioid manufacturers. For example,

AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top

of other funding) to participate. The benefits included allowing members to present educational

programs at off-site dinner symposia in connection with AAPM's marquee event—its annual

meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual

event as an "exclusive venue" for offering education programs to doctors.

254.    Membership in the corporate relations council also allows drug company

executives and marketing staff to meet with AAPM executive committee members in small

settings. Endo and Teva were members of the council and presented deceptive programs to

doctors who attended this annual event.

255.    Upon information and belief, AAPM is viewed internally by Endo as "industry

friendly," with Endo advisors and speakers among its active members. Endo attended AAPM

conferences, funded its CMEs, and distributed its publications. The conferences sponsored by

AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.

AAPM's presidents have included top industry supported KOLs Perry Fine and Lynn Webster.

Dr. Webster was even elected president of AAPM even while he was the subject of a DEA

investigation.

256.    The Manufacturer ("Marketing") Defendants were able to influence AAPM

through both their significant and regular funding and the leadership of pro-opioid KOLs within

the organization.

257.    In 1996, AAPM and APS jointly issued a consensus statement entitled "*The Use*

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000058 of 000157

Filed        21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

*of Opioids for the Treatment of Chronic Pain*," endorsing opioids to treat chronic pain and claiming the risk of a patients' addiction to opioids was low.

258.    Dr. Haddox, who co-authored the AAPM/APS statement, was a paid speaker at the time. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and, upon information and belief, was taken down from AAPM's website only after a doctor complained.

259.    AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Treatment guidelines have been relied upon by doctors, especially the general practitioners and family doctors targeted by the Manufacturer ("Marketing") Defendants.  Treatment guidelines not only directly inform doctors' prescribing practices but are cited throughout the scientific literature and referenced by third party payors in determining whether they should cover treatments for specific indications. Pharmaceutical sales representatives employed by the Manufacturer ("Marketing") Defendants discussed treatment guidelines with doctors during individual sales visits.

260.    At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received direct financial support from the Manufacturer ("Marketing") Defendants.

261.    The 2009 Guidelines promoted opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and concluded the risk of addiction was manageable for end-users regardless of past abuse histories.

262.    One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000059 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

drug companies, including Manufacturer ("Marketing") Defendants, made to the sponsoring organizations and committee members.

263.    These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in the Commonwealth of Kentucky during the relevant time period, are still available online, and were reprinted in the Journal of Pain.

264.    The Manufacturer ("Marketing") Defendants widely referenced and promoted the 2009 Guidelines without disclosing the lack of evidence to support them or the Manufacturer ("Marketing") Defendants financial support to members of the panel.

265.    The Manufacturer ("Marketing") Defendants coordinated their efforts, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, they combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project.

266.    PCF is comprised of representatives from the Manufacturer ("Marketing") Defendants opioid manufacturers—including Endo, J&J, and Teva—and various Front Groups, almost all of which received substantial financial funding from the Manufacturer ("Marketing") Defendants.

267.    Among other projects, PCF worked to ensure that a mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer ("Marketing") Defendants determined would reduce physician prescription rates and corresponding result in lower sales and profits.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000060 of 000157

Filed        21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

2. **The Manufacturer ("Marketing") Defendants' Coordinated Marketing Scheme Misrepresented the Significant Risks of Opioids.**

   a. **The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly understating and misstating the dangerous addiction risks of the opioid drugs.**

268.    To falsely assure prescribers, end-users, and the public opioids were safe, the Manufacturer ("Marketing") Defendants deceptively trivialized and failed to disclose the significant risks of long-term opioid use—particularly the high risk of addiction—through a series of orchestrated misrepresentations that have been conclusively debunked. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that:

- starting patients on opioids was low risk because most patients would not become addicted, and because those at greatest risk for addiction could be identified and managed;

- patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs;

- the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and

- abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

269.    The Manufacturer ("Marketing") Defendants have not only failed to correct these misrepresentations, they continue to make them today.

270.    Several of the Manufacturer ("Marketing") Defendants, including the Endo and Purdue Entities, entered into settlement agreements with public entities that expressly prohibited them from continuing to make many of the misrepresentations identified in this Complaint. Yet each Manufacturer ("Marketing") Defendant continued to misrepresent the risks of long-term

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000061 of 000157

- 55 -

Filed         21-CI-00515    06/25/2021     Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioid use in the Commonwealth of Kentucky.

271.    Further examples of the Manufacturer ("Marketing") Defendants' false,

deceptive, and unfair claims about the purportedly low risk of addiction include:

- Actavis's predecessor had a patient education brochure distributed in 2003—"*Managing Chronic Back Pain*"—that admitted opioid addiction was possible, but falsely claimed that it is "less likely if you have never had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, it appears that Actavis continued to use this brochure in 2009 and beyond.

- Teva sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which suggested that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.

- Endo sponsored a website, "*PainKnowledge*," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, *PainAction.com*, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "*Informed Consent*" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

- Upon information and belief, Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem."

- J&J reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "*myth*" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

- J&J maintained a website entitled *Prescriberesponsibly.com* that claimed any concerns about opioid addiction were "overestimated."

272.    Consistent with the Manufacturer ("Marketing") Defendants' published marketing

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000062 of 000157

Filed         21-CI-00515    06/25/2021     Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

materials, upon information and belief, detailers on behalf of the Endo, J&J, and Teva minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above—doing so throughout the Commonwealth of Kentucky.

273.     Notably, in seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer ("Marketing") Defendants' Front Groups APF and NFP argued in an amicus brief to the U.S. 4th Circuit Court of Appeals that "patients rarely become addicted to prescribed opioids," citing research by their KOL, Dr. Portenoy.

274.     These claims were and remain contrary to longstanding scientific evidence. A 2016 opioid prescription guideline explained that there is extensive evidence of the possible harms of opioids (including opioid use disorder an alternative term for opioid addiction and overdose. The guideline further explained that opioid pain medication use presents serious risks, including overdose and opioid use disorder and that continuing opioid therapy for 3 months substantially increases risk for opioid use disorder.

275.     The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."

276.     Endo had represented to the public on their *opana.com* website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted." The State of New York found that Endo had _no evidence_ for that statement. As a result of the finding and settlement, the Endo Entities agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000063 of 000157

- 57 -

Filed                    21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

take opioids do not become addicted" in New York.  Endo remained free to continue their false statements in other states, including the Commonwealth of Kentucky.

277.    In addition to mischaracterizing the highly addictive nature of opioids, the Manufacturer ("Marketing") Defendants sought to foster a fundamental misunderstanding of the signs of addiction. Specifically, the Manufacturer ("Marketing") Defendants misrepresented, to prescribers and end-users, that warning signs and/or symptoms of addiction were, instead, signs of undertreated pain—*pseudo-addiction*—and instructed doctors to *increase* the opioid prescription dosage for end users who were already in danger of permanent addiction.

278.    Pseudo-addiction was a term coined by Dr. David Haddox.  KOL Dr. Portenoy popularized the term. Examples of the false, misleading, deceptive, and unfair statements regarding pseudo-addiction include:

- Teva sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of *pseudo-addiction*, rather than true addiction. The 2012 edition, which remains available for sale online, continued to represent to the public that pseudo-addiction was real.

- J&J sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudo-addiction . . . refers to patient behaviors that may occur when pain is under-treated ... Pseudo-addiction is different from true addiction because such behaviors can be resolved with effective pain management."

- Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "*Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*," which, upon information and belief, promoted pseudo-addiction by teaching that a patient's aberrant behavior was the result of untreated pain. The Endo Entities appear to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

279.    In addition to misstating the addiction risk and inventing the pseudo-addiction

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000064 of 000157

Filed                    21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

falsehood, a third category of false, deceptive, and unfair practice is the Manufacturer

("Marketing") Defendants' false instructions that addiction risk screening tools, patient contracts,

urine drug screens, and similar strategies allow them to reliably identify and safely prescribe

opioids to patients predisposed to addiction.

280.    These misrepresentations were especially insidious because the Manufacturer

("Marketing") Defendants aimed them at general practitioners and family doctors who lack the

time and expertise to closely manage higher-risk patients on opioids.

281.    The Manufacturer ("Marketing") Defendants' misrepresentations made these

prescribers feel more comfortable prescribing opioids to end-users, and end-users more

comfortable starting on opioid therapy for chronic pain. Illustrative examples include:

- Endo paid for a 2007 supplement in the *Journal of Family Practice*
  written by a doctor who became a member of Endo's speakers bureau
  in 2010. The supplement *Pain Management Dilemmas in Primary
  Care: Use of Opioids*, emphasized the effectiveness of screening tools,
  claiming end-users at high risk of addiction could safely receive opioid
  therapy using a "maximally structured approach" involving toxicology
  screens and pill counts.

282.    A fourth category of deceptive messaging regarding dangerous opioids is the

Manufacturer ("Marketing") Defendants' false assurances regarding the alleged ease of

eliminating opioid dependence.

283.    The Manufacturer ("Marketing") Defendants falsely claimed opioid dependence

can easily be addressed by tapering and that opioid withdrawal is *not* a problem, but they failed

to disclose the increased difficulty of stopping opioids after long-term use.

284.    The Manufacturer ("Marketing") Defendants nonetheless continued their

coordinated and deceptive marketing efforts, including continuing to downplay the severity of

opioid detoxification. For example, upon information and belief, a CME sponsored by Endo,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000065 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

285.    A fifth category of false, deceptive, and unfair statements the Manufacturer ("Marketing") Defendants made to sell more drugs is that opioid dosages could be increased indefinitely without added risk. The ability to escalate dosages was critical to their efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. The Manufacturer ("Marketing") Defendants' deceptive claims include.

- Upon information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis appears to have continued to use these materials in 2009 and beyond.

- Endo sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claimed that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and insinuated that they are therefore the most appropriate treatment for severe pain. This publication is still available online.

- Endo sponsored a website, "*Pain Knowledge*," that, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

- Endo also distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 Endo Pharmaceuticals PM-0120). In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The marketing response was, "The dose can be increased … You won't 'run out' of pain relief."

- J&J sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000066 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioid dosages.

- Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Manufacturer ("Marketing") Defendants' Front Groups APF and NFP argued in an amicus brief to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.

286. The Manufacturer ("Marketing") Defendants' coordinated and deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that opioids can cure addiction and abuse.

287. The Manufacturer ("Marketing") Defendants made misleading claims about the efficacy of their _abuse-deterrent_ opioid formulations. For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant suggesting it would be more difficult to abuse. This claim was false.

288. Endo's own studies, which it failed to disclose, recognized that Opana ER could still be ground and chewed. In June 2017, Opana ER was removed from the market.

**b. The Manufacturer ("Marketing") Defendants engaged in a coordinated campaign of false, deceptive, and unfair assurances grossly overstating the benefits of the opioid drugs.**

289. To convince prescribers, end-users, and the public opioids were appropriate for treating chronic pain, the Manufacturer ("Marketing") Defendants also had to persuade them of the benefits of long-term opioid use.

290. Manufacturer ("Marketing") Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly continued to market opioids as appropriate for—and supported by scientific evidence—long-term use in treating chronic pain. Examples of the Manufacturer ("Marketing") Defendants' false claims included:

- Upon information and belief, Actavis distributed an advertisement claiming that the use of Kadian to treat chronic pain would allow

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000067 of 000157

- 61 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

- Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

- J&J sponsored and edited a patient education guide *Finding Relief: Pain Management for Older Adults* (2009) – which stated as "a fact" that "opioids may make it easier for people to live normally." The guide listed expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs.

- J&J promoted Ultracet for everyday chronic pain and distributed posters, for display in doctors' offices, of presumed patients in active professions; the caption read, "Pain doesn't fit into their schedules."

- Responsible Opioid Prescribing (2007), sponsored and distributed by the Endo and Teva, taught that relief of pain by opioids, by itself, improved patients' function.

- Teva sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." This publication is still available online.

- Endo's NIPC website "Pain Knowledge" claimed in 2009, upon information and belief, that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

- Endo was the sole sponsor, through NIPC, of a series of CMEs entitled "*Persistent Pain in the Older Patient*." Upon information and belief, a CME disseminated via webcast claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

- J&J sponsored and funded a multimedia patient education campaign called "*Let's Talk Pain.*" One feature of the campaign was to complain

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000068 of 000157

- 62 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

that patients were *under-treated*. In 2009, upon information and belief, a Janssen-sponsored website, part of the "*Let's Talk Pain*" campaign, featured an interview edited by The Johnson & Johnson Entities claiming that opioids allowed a patient to "continue to function."

- Endo's., J&J's, and Teva's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

291.     The Manufacturer ("Marketing") Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing medications like NSAIDs, so that prescribers, end-users, and the public would look to opioids first for the treatment of chronic pain. Once again, these misrepresentations by the Manufacturer ("Marketing") Defendants contravened the scientific evidence confirming that opioids should only be used as a last resort in patients for which alternative treatment options like non-opioid drugs are inadequate.

292.     Teva deceptively marketed their opioids Actiq and Fentora for chronic pain even though the FDA expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful *fentanyl-based* IR opioids. Neither is approved, nor been shown to be safe or effective, for treating chronic pain.

293.     Teva conducted and continued to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was *not* approved, inappropriate, and unsafe. As part of their campaign, Teva used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

- They paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors "[c]linically, broad classification of pain syndromes as either cancer or non-cancer related has limited utility" and recommended Actiq and Fentora for

- 63 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000069 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

patients with chronic pain.

- Upon information and belief, their sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

- In December 2011, they widely disseminated a journal supplement entitled "*Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet* (FENTORA) *and Oral Transmucosal Fentanyl Citrate* (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News—three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promoted Fentora for "multiple causes of pain"—and not just for cancer pain.

294.    Teva's deceptive marketing gave prescribers, end-users, and the public the false impression that Actiq and Fentora were safe and effective for treating chronic pain and also approved by the FDA for such uses.  Again, this was false.

295.    Endo has been cited for their failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

### 3.    The Manufacturer ("Marketing") Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.

296.    As a part of their deceptive marketing scheme, the Manufacturer ("Marketing") Defendants identified and targeted susceptible prescribers and vulnerable end-user populations in the U.S., including within the Commonwealth of Kentucky. For example, the Manufacturer ("Marketing") Defendants focused their deceptive marketing on primary care doctors, who were

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000070 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

more likely to treat chronic pain end-users and prescribe opioids but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept and to rely on the Manufacturer ("Marketing") Defendants' misrepresentations.

297. The Manufacturer ("Marketing") Defendants also targeted vulnerable end-user populations like the elderly and veterans, who tend to suffer from chronic pain. The Manufacturer ("Marketing") Defendants targeted these vulnerable end-users even though the risks of long-term opioid use were significantly greater for them.

#### 4. The Manufacturer ("Marketing") Defendants made Materially Deceptive Statements and Concealed Material Facts.

298. As alleged herein, the Manufacturer ("Marketing") Defendants made and disseminated deceptive statements regarding material facts and further concealed material facts, in the course of manufacturing, marketing, and selling prescription opioids.

299. The Manufacturer ("Marketing") Defendants' actions were intentional and/or unlawful. Such statements include, but are not limited to, those set out below and alleged throughout this Complaint.

300. Endo made and/or disseminated deceptive statements, and concealed material facts in such a way as to make their statements deceptive, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of end-user education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high risk patients;

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*COM : 000071 of 000157*

- 65 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudo-addiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations – including over $5 million to the organization responsible for many of the most egregious misrepresentations – that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudo-addiction;

- Creating, endorsing, and supporting the distribution of prescriber and end-user education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic

- 66 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000072 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

non-cancer pain, including known rates of abuse and addiction and the
lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat
chronic non-cancer pain to prescribers through in-person detailing.

301.  J&J made and/or disseminated deceptive statements, and concealed material facts

in such a way as to make their statements deceptive, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of end-user
education materials that contained deceptive statements;

- Directly disseminating deceptive statements through internet sites over
which Janssen exercised final editorial control and approval stating
that opioids are safe and effective for the long-term treatment of
chronic non-cancer pain and that opioids improve quality of life, while
concealing contrary data;

- Disseminating deceptive statements concealing the true risk of
addiction and promoting the deceptive concept of pseudo-addiction
through internet sites over which Janssen exercised final editorial
control and approval;

- Promoting opioids for the treatment of conditions for which Janssen
knew, due to the scientific studies it conducted, that opioids were not
efficacious and concealing this information;

- Sponsoring, directly distributing, and assisting in the dissemination of
end-user education publications over which Janssen exercised final
editorial control and approval, which presented an unbalanced
treatment of the long-term and dose dependent risks of opioids versus
NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made
deceptive statements concerning the use of opioids to treat chronic
non-cancer pain;

- Providing necessary financial support to pro-opioid pain organizations
that made deceptive statements, including in end-user education
materials, concerning the use of opioids to treat chronic non-cancer
pain;

- Targeting the elderly by assisting in the distribution of guidelines that
contained deceptive statements concerning the use of opioids to treat
chronic non-cancer pain and misrepresented the risks of opioid

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000073 of 000157

- 67 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

addiction in this population;

- Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudo-addiction;

- Creating, endorsing, and supporting the distribution of prescriber and end-user education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating end-user education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing.

302. Teva made and/or disseminated untrue, false and deceptive statements, and concealed material facts in such a way as to make their statements deceptive, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of end-user education materials that contained deceptive statements;

- Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudo-addiction, even for high-risk end-users;

- Providing significant financial support to pro-opioid KOL doctors who

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000074 of 000157

- 68 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Filed                    21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

- Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain treating end-users;

- Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events, when such uses are unapproved and unsafe; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing and speakers' bureau events.

303. Allergan made and/or disseminated deceptive statements, and concealed material facts in such a way as to make their statements deceptive, including, but not limited to, the following:

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to prescribers through in-person detailing;

- Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000075 of 000157

- 69 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

treatment of chronic non-cancer pain and that opioids improve quality of life;

- Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

### 5. The Manufacturer ("Marketing") Defendants Fraudulently Concealed Their Misconduct.

304.    The Manufacturer ("Marketing") Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the significant risks and illusory benefits of using opioids for chronic pain—even though they were fully aware and knew their representations were false and deceptive.

305.    The history of opioids, as well as research and clinical experience, establish that opioids are highly addictive and are responsible for a litany of serious adverse outcomes.

306.    At all times relevant to this Complaint, the Manufacturer ("Marketing") Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturer ("Marketing") Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs.

307.    The Manufacturer ("Marketing") Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer ("Marketing") Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain.

308.    The Manufacturer ("Marketing") Defendants never disclosed their role in shaping,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000076 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

editing, and approving the content of information and materials disseminated by these third parties.

309.    The Manufacturer ("Marketing") Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, *PainKnowledge.org*, which is run by the NIPC, did not disclose the Endo Entities' involvement. Other Manufacturer ("Marketing") Defendants, such as the Johnson & Johnson and Purdue Entities, ran similar websites that masked their own role.

310.    The Manufacturer ("Marketing") Defendants manipulated their promotional materials and the scientific literature to make it appear that these documents were accurate, truthful, and supported by objective evidence when they were not.

311.    The Manufacturer ("Marketing") Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.

312.    The Manufacturer ("Marketing") Defendants invented "pseudo-addiction" and promoted it to an unsuspecting medical community.

313.    The Manufacturer ("Marketing") Defendants provided the medical community with false and misleading information about ineffectual strategies to avoid or control opioid addiction.

314.    The Manufacturer ("Marketing") Defendants recommended to the medical community that dosages be increased, without disclosing the risks.

315.    The Manufacturer ("Marketing") Defendants spent millions of dollars over a period of years on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising the risks, and promoting sales.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000077 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

316.    The lack of support for the Manufacturer ("Marketing") Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the Plaintiffs.

317.    The Manufacturer ("Marketing") Defendants successfully concealed from the medical community, end-users, and health care payors facts sufficient to arouse suspicion of the claims that the Plaintiffs now assert.

318.    Plaintiffs did not, and could not, know of the existence or scope of the Manufacturer ("Marketing") Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**C.    The Wholesale Distributor Defendants' Unlawful Sale and Distribution of Opioids.**

319.    The Wholesale Distributor Defendants owe a duty under Kentucky law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating within the Commonwealth of Kentucky.  The duty also included those opioid orders the Wholesale Distributor Defendants knew or should have known were likely to be diverted into the Commonwealth of Kentucky.

320.    The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

321.    Each of the Wholesale Distributor Defendants repeatedly and purposefully breached its duties under Kentucky law. Such breaches are a direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into the Commonwealth of Kentucky.

322.    The unlawful diversion of prescription opioids is a direct and proximate cause and/or substantial contributing factor to the opioid epidemic, prescription opioid abuse,

- 72 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000078 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

addiction, morbidity and mortality in the Commonwealth of Kentucky.

323. This diversion and the epidemic are direct and proximate cause of the harm and injury for which Plaintiffs seek relief. The opioid epidemic in the Commonwealth of Kentucky remains an immediate hazard to public health and safety.

324. The resulting opioid epidemic is a temporary and continuous public nuisance and remains unabated.

325. The Wholesale Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the resulting harms and damages alleged herein.

> **1.** **Wholesale Distributor Defendants' Have a Duty to Guard Against, and Report, Unlawful Diversion and to Report and Prevent Suspicious Orders.**

326. In the Commonwealth of Kentucky, opioids are a Schedule II controlled substance because they have a "high potential for abuse" and the potential to cause "severe psychic or physical dependence" and/or "severe psychological . . . dependence."

327. As wholesale drug distributors, each Wholesale Distributor Defendant was required to first be licensed by the Kentucky Cabinet for Health and Family Services. To receive and maintain this license, each Wholesale Distributor Defendant assumed a duty to comply with "all applicable federal and state laws and regulations relating to controlled substances."

328. Each Wholesale Distributor Defendant was further required to be licensed by the Kentucky Board of Pharmacy. To receive and maintain this license, each of the Wholesale Distributor Defendants assumed a duty to "demonstrates or continues to demonstrate acceptable operational procedures, including . . . compl[iance] with all" Kentucky statutes and regulations.

329. Kentucky prohibits a licensed pharmacy wholesale distributor from "[k]nowing or

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000079 of 000157

- 73 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

having reason to know that a pharmacist, pharmacist intern, or pharmacy technician has engaged in or aided and abetted the unlawful distribution of [controlled substances] and failing to report any relevant information to the board."

330.    Failing to report known or suspected unlawful distribution of controlled substances may subject a pharmacy wholesale distributor to denial, non-renewal, suspension, or revocation of their license, among other penalties.

331.    Additionally, Kentucky's minimum requirements for wholesale drug distribution mandate that "all sales and distributions shall be in accordance with . . . the federal controlled substances laws."

332.    Each of the Wholesale Distributor Defendants has an affirmative duty under Kentucky law to act as a gatekeeper guarding and protecting the public against the diversion of highly addictive and dangerous opioids.

333.    Kentucky declared "[t]he regulation of controlled substances in this Commonwealth is important and necessary for the preservation of public safety and public health." Kentucky further declared "effective control and regulation" of all "persons who are required to obtain a license, certificate, or permit from the Board of Pharmacy, whether located in or outside the Commonwealth, that distribute, manufacture, or sell drugs within the Commonwealth" is necessary in order to "promote, preserve, and protect public health, safety, and welfare."

334.    The Kentucky Board of Pharmacy regulations state that "[a] wholesale distributor shall not . . . operate in a manner that endangers the public health."

335.    The Wholesale Distributor Defendants admit that they have not only statutory and regulatory responsibilities to detect and prevent diversion of controlled prescription drugs but

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000080 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

undertake such efforts as responsible members of society.

336.     The Wholesale Distributor Defendants knew they were required to monitor,
detect, and halt orders that did not comply with Kentucky law.

337.     Industry compliance guidelines established by the Healthcare Distribution
Management Association, the trade association of pharmaceutical distributors, explain that
distributors are at the center of a sophisticated supply chain and therefore are uniquely situated to
perform due diligence in order to help support the security of the controlled substances they
deliver to their customers.

338.     Each of the Wholesale Distributor Defendants sold and distributed prescription
opioids, including hydrocodone and/or oxycodone, to retailers throughout the Commonwealth of
Kentucky—including retailers from which the Wholesale Distributor Defendants' knew opioids
were likely to be diverted.

339.     Each of the Wholesale Distributor Defendants owed, and owes, an ongoing, duty
to monitor and detect suspicious orders of prescription opioids that were not in accordance with
Kentucky law.

340.     Each of the Wholesale Distributor Defendants owed a, and owes an ongoing, duty
under Kentucky law to:

- investigate and refuse suspicious orders of prescription opioids;

- report suspicious orders of prescription opioids; and

- prevent the diversion of prescription opioids into illicit markets in the
  Commonwealth of Kentucky.

341.     The foreseeable harm resulting from a breach of these duties is the diversion of
prescription opioids for non-medical purposes and subsequent plague of opioid addiction.
The foreseeable harm resulting from the diversion of prescription opioids for non-medical

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000081 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed                    21-CI-00515    06/25/2021         Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

purposes is abuse, addiction, morbidity and mortality throughout the Commonwealth of Kentucky and the damages caused thereby.

### 2. The Wholesale Distributor Defendants Breached their Legal Duties.

342.    Because the Wholesale Distributor Defendants handle such large volumes of controlled substances and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on them to create, maintain, and enforce effective controls to prevent diversion of controlled substances—any deviation from these required checks and balances results in a system collapse, in this case a foreseeable and preventable opioid epidemic.

343.    The sheer volume of prescription opioids distributed to pharmacies throughout the Commonwealth of Kentucky, and/or to pharmacies from which the Wholesale Distributor Defendants knew the opioids were likely to be diverted, is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.  By way of example, the Wholesale Distributor Defendants:

- failed to report suspicious orders;

- unlawfully filled suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency;

- breached their duty to monitor, detect, investigate, refuse, and report suspicious orders of prescription opiates;

- breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels;

- breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the authorities of suspicious orders when discovered; and

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000082 of 000157

- 76 -

Filed                    21-CI-00515    06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into channels other than legitimate medical, scientific and industrial channels.

344.    Kentucky's laws at issue here are, and for which the Wholesale Distributor

Defendants are required and obligated to comply, are expressly for the protection of the public.

> The practice of pharmacy within the Commonwealth is declared to be a professional practice affecting the public health, safety, and welfare, and is subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that the practice of pharmacy, as defined in this chapter, should merit and receive the confidence of the public, and only qualified persons shall be permitted to engage in the practice of pharmacy and ensure the quality of drugs and related devices distributed within the Commonwealth. This chapter shall be liberally construed to carry out these objectives and purposes. The persons entrusted through this chapter to engage in the practice of pharmacy shall be pharmacists. They shall be recognized by the Commonwealth as health care professionals, and, within their statutory scope of practice, providers of pharmacy-related primary care.[4]

345.    The Wholesale Distributor Defendants' violations of public safety statutes

constitute prima facie evidence of negligence *per se* under Kentucky law.

346.    The Wholesale Distributor Defendants knowingly, willfully, intentionally, and

recklessly sold and distributed prescription opioids to obviously suspicious physicians and

pharmacies, enabled the illegal diversion of opioids, aided criminal activity, and disseminated

massive quantities of prescription opioids into the black market—all with intent of increasing

their respective sales and profits.

347.    The Wholesale Distributor Defendants acted with actual malice and reckless

disregard in breaching their duties, i.e., they have acted with a conscious disregard for the rights

---

[4]   *See* KRS 415.002.

Filed                    21-CI-00515    06/25/2021      Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000083 of 000157

Filed                21-CI-00515      06/25/2021      Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

and safety of the citizens of the Commonwealth of Kentucky—said actions resulting the substantial social and economic harm, the opioid epidemic.

348.     The Wholesale Distributor Defendants' repeated shipments of suspicious orders, over an extended period of time, in violation of Kentucky's public safety statutes, and without reporting the suspicious orders to the relevant authorities demonstrates wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others and warrants an award of punitive damages.

### 3.     The Wholesale Distributor Defendants Actively Avoided, and Willfully Misrepresented their Compliance with, their Legal Duties.

349.     The Wholesale Distributor Defendants have repeatedly misrepresented their compliance with their legal duties under Kentucky law and have wrongfully and repeatedly disavowed those duties in an effort to mislead regulators and the public regarding the Wholesale Distributor Defendants' compliance with their legal duties.

350.     Wholesale Distributor Defendant McKesson recently admitted to breaching its duties to monitor, report, and prevent suspicious orders. Pursuant to an Administrative Memorandum of Agreement ("2017 Agreement") entered into in January 2017, McKesson admitted that, at various times during the period from January 1, 2009 through the effective date of the Agreement (January 17, 2017) it did not identify or report certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious.

351.     The 2017 Agreement determined that Wholesale Distributor Defendant McKesson "distributed controlled substances to pharmacies even though those McKesson Distribution Centers should have known that the pharmacists practicing within those pharmacies had failed to fulfill their corresponding responsibility to ensure that controlled substances were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000084 of 000157

- 78 -

in the usual course of their professional practice…"

352.    Wholesale Distributor Defendant McKesson admitted that, during this time period, it "failed to maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific and industrial channels by sales to certain of its customers … at the McKesson Distribution Centers" including the McKesson Distribution Center located in "Washington Courthouse, Ohio."

353.    Due to these violations, Wholesale Distributor Defendant McKesson agreed that its authority to distribute controlled substances from the Washington Courthouse, Ohio facility (among other facilities) would be partially suspended.

354.    The 2017 Memorandum of Agreement followed a 2008 Settlement Agreement in which Wholesale Distributor Defendant McKesson also admitted it had failed to report suspicious orders of controlled substances.  In the 2008 Settlement Agreement, McKesson "recognized that it had a duty to monitor its sales of all controlled substances and report suspicious orders," but had failed to do so.

355.    The 2017 Memorandum of Agreement confirmed that Wholesale Distributor Defendant McKesson had continued to violate its admitted legal duties by "fail[ing] to properly monitor its sales of controlled substances and/or report suspicious orders … in accordance with McKesson's obligations." As a result of these ongoing violations, McKesson was fined $150,000,000.

356.    Even though it had been sanctioned in 2008 for failure to comply with its legal obligations regarding controlling diversion and reporting suspicious orders, and even though it had specifically agreed in 2008 that it would no longer violate those obligations, Wholesale Distributor Defendant McKesson continued to violate its legal duties.

Filed          21-CI-00515     06/25/2021     Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

357.    Because of the Wholesale Distributor Defendants' refusal to comply with their

legal obligations, the DEA has repeatedly taken administrative action to attempt to force

compliance. For example, in May 2014, the U.S. Department of Justice, Office of the Inspector

General, Evaluation and Inspections Divisions, reported that the DEA issued final decisions in

178 registrant actions between 2008 and 2012. The Office of Administrative Law Judges issued

a recommended decision in a total of 117 registrant actions before the DEA issued its final

decision, including 76 actions involving orders to show cause and 41 actions involving

immediate suspension orders. These actions include the following:

- On April 24, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

- On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

- On May 2, 2008, McKesson Corporation entered into an Administrative Memorandum of Agreement ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance

- 80 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000086 of 000157

Filed                21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 C.F.R. § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

- On September 30, 2008, Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

- On February 2, 2012, the DEA issued an Order to Show Cause and Immediate Suspension Order against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

- On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

- On January 5, 2017, McKesson Corporation entered into an Administrative Memorandum Agreement with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

358.     Rather than abide by their admitted and non-delegable duties under public safety laws, the Wholesale Distributor Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000087 of 000157

- 81 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

right to "cure" any violations of law before a suspension order can be issued.

359.    In addition to taking actions to limit regulatory prosecutions and suspensions, the Wholesale Distributor Defendants undertook to fraudulently convince the public that they were complying with their legal obligations, including those imposed by licensing regulations. Through such statements, the Wholesale Distributor Defendants attempted to assure the public they were working to curb the opioid epidemic.

360.    For example, Wholesale Distributor Defendant Cardinal Health claimed that it uses "advanced analytics" to monitor its supply chain and represented that it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity." Given the sales volumes and Cardinal Health's history of violations, its executive was either: (i) not telling the truth; or (ii) if it actually used such a system, willfully ignored the results.

361.    Similarly, Wholesale Distributor Defendant McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country." Again, given its history of repeated violations, this statement was either false or Wholesale Distributor Defendant McKesson willfully ignored the results.

362.    By misleading the public about the effectiveness of their controlled substance monitoring programs, the Wholesale Distributor Defendants successfully concealed the facts sufficient to arouse suspicion of the Plaintiffs' claims. The Plaintiffs did not know of the existence or scope of the Wholesale Distributor Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

363.    Meanwhile, the opioid epidemic rages unabated throughout the Commonwealth of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000088 of 000157

Filed          06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Kentucky. The epidemic continues unabated because the regulatory fines and suspensions failed to effect change in the Wholesale Distributor Defendants' illegal and deceptive conduct. The Wholesale Distributor Defendants simply elected to treat the fines as a cost of doing business—continuing to generate billions of dollars in annual revenue and corresponding profits, at the expense of the public.

364.    Moreover, even when a suspension occurs, it does little to abate the opioid epidemic. The Wholesale Distributor Defendants simply re-route their shipments to another facility using a different registration number—of which they maintain multiple.

365.    The Wholesale Distributor Defendants have abandoned their duties imposed under Kentucky law, taken advantage of a lack law enforcement resources, and abused the privilege of distributing controlled substances in the Commonwealth of Kentucky.

**D.     The Manufacturer ("Marketing") Defendants Unlawful Failure to Prevent Diversion and Failure to Monitor, Report, and Prevent Suspicious Orders.**

366.    The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescription opioids that were incumbent upon the Wholesale Distributor Defendants were also legally required of the Manufacturer ("Marketing") Defendants under Kentucky law.

367.    The Manufacturer ("Marketing") Defendants were required to comply with the same licensing and permitting requirements as the Wholesale Distributor Defendants.

368.    Like the Wholesale Distributor Defendants, the Manufacturer ("Marketing") Defendants were required to register with Kentucky regulators with respect to their manufacture, sale, and distribution of opioids.

369.    Additionally, the Manufacturer ("Marketing") Defendants were also required to monitor, report, and prevent suspicious orders of controlled substances. Like the Wholesale

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000089 of 000157

- 83 -

Filed                    21-CI-00515      06/25/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Distributor Defendants, the Manufacturer ("Marketing") Defendants breached these duties.

370.    The Manufacturer ("Marketing") Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.

371.    The Manufacturer ("Marketing") Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate.

372.    After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer ("Marketing") Defendants knew—just as the Wholesale Distributor Defendants knew—the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer ("Marketing") Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

373.    Kentucky law is clear that just like opioid distributors, opioid manufacturers are required to "design and operate a system to disclose . . . suspicious orders of controlled substances" and to maintain "effective controls against diversion."

374.    The knowing, reckless and intentional illegal wrongful actions and omissions by the Manufacturer ("Marketing") Defendants, including that:

- they failed to monitor, report, and halt suspicious orders of opioids as required by federal law;

- their failures to monitor, report, and halt suspicious orders of opioids were intentional and unlawful;

- they misrepresented their compliance with Kentucky law; and

- they enabled the supply of prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of opioids,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000090 of 000157

- 84 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

> aided criminal activity, and disseminated massive quantities of
> prescription opioids into the black market.

contributed to and caused the diversion of opioids throughout the Commonwealth of Kentucky—

resulting in significant financial hardship to the Plaintiffs burdened with the foreseeable effects

of the opioid epidemic.

375.    The Manufacturer ("Marketing") Defendants' knowing, reckless and intentional

illegal wrongful actions and omissions in failing to prevent diversion and failing to monitor,

report, and prevent suspicious orders have enabled the unlawful diversion of opioids into the

Commonwealth of Kentucky—warranting the imposition of punitive damages.

**E.      All Defendants Engaged in Unlawful Conduct and Breached their Legal Duties
         thereby Causing the Harm and Substantial Damages Alleged Herein.**

376.    As the Manufacturer ("Marketing") Defendants' efforts to expand the market for

opioids increased, so have the rates of prescription and sale of their products — and the rates of

opioid-related substance abuse, hospitalization, and death among the people of the

Commonwealth of Kentucky.

377.    The Wholesale Distributor Defendants have continued to unlawfully ship these

massive quantities of opioids throughout the Commonwealth of Kentucky thereby fueling the

opioid epidemic.

378.    There is a "parallel relationship between the availability of prescription opioid

analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

associated adverse outcomes."

379.    Opioid analgesics are widely diverted and improperly used, and the widespread

use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.

The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000091 of 000157

- 85 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

medications."

380.    The increased abuse of prescription painkillers along with growing sales has contributed to a large number of overdoses and deaths.

381.    The opioid epidemic has escalated throughout the Commonwealth of Kentucky with devastating effects. Substantial opiate-related substance abuse, hospitalization and death that mirrors Defendants 'continued unlawful distribution of opiates.

382.    Because of the well-established relationship between the use of prescription opiates and the use of non-prescription opioids, like heroin, the massive distribution of opioids throughout the Commonwealth of Kentucky and areas from which such opioids are being diverted, Defendants' actions have resulted in significant increases in addiction, abuse, and death.

383.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety throughout the Commonwealth of Kentucky.

384.    Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety throughout the Commonwealth of Kentucky.

385.    Defendants repeatedly and purposefully breached their duties under Kentucky law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes throughout the Commonwealth of Kentucky.

386.    The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity, and mortality throughout the Commonwealth of Kentucky. This diversion and the epidemic are direct causes of foreseeable harms incurred by the Plaintiffs.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000092 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

387. Defendants' intentional and/or unlawful conduct resulted in direct and foreseeable, past, and continuing, economic damages for which Plaintiffs seek relief, as alleged herein. Plaintiffs also seek the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

388. Plaintiff seeks economic damages from the Defendants as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

389. Plaintiff seeks economic damages from the Defendants to pay for the cost to permanently eliminate the hazards to public health and safety and abate the temporary public nuisance. To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."

390. A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the needs of patients experiencing pain. These community-based problems require community-based solutions that have been limited by "budgetary constraints at the state and Federal levels."

391. Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opiates, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted throughout the Commonwealth of Kentucky—such relief includes legal and equitable relief, declaratory, and injunctive relief, and disgorgement.

**F. The Retail Pharmacy Defendants Were on Notice of and Contributed to the Illegal Diversion of Prescription Opioids.**

392. As with the Manufacturer ("Marketing") and Wholesale Distributor Defendants, the Retail Pharmacy Defendants earned enormous profits by flooding the Commonwealth of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000093 of 000157

- 87 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Kentucky with prescription opioids.

393. Similarly, as with the Manufacturer ("Marketing") and Wholesale Distributor Defendants, the Retail Pharmacy Defendants were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as dispensaries—and in some instances also as Distributors. *See supra*. Yet, instead of taking any meaningful action to stem the flow of opioids into Kentucky communities, the Retail Pharmacy Defendants continued to participate in the oversupply of opioids and profit from it.

394. Each of the Retail Pharmacy Defendants does substantial business throughout the Commonwealth of Kentucky and, as such, were fully aware both of their legal obligations under Kentucky law and of the devastating impact opioids would have—on the end-users, the public, and ultimately the Plaintiffs—if left unchecked and allowed to be diverted and/or abused. Yet, the Retail Pharmacy Defendants failed to take meaningful action to stop opioid diversion despite their knowledge which in turn contributed substantially to the diversion problem in the Commonwealth of Kentucky.

395. The Retail Pharmacy Defendants developed and maintained extensive data on opioids they distributed and dispensed. Through this data, the Retail Pharmacy Defendants had direct and intimate non-public knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout Kentucky.

396. The Retail Pharmacy Defendants used this detailed and non-public data not to fulfill their legal obligations to stem the flow of opioid abuse and diversion, but instead to evaluate and to improve their own sales activities and workforce.

397. On information and belief, the Retail Pharmacy Defendants also provided the Manufacturer ("Marketing") and Wholesale Distributor Defendants with data regarding, inter

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000094 of 000157

- 88 -

Filed                                                                              NOT ORIGINAL DOCUMENT
                                                                                    07/19/2021 11:38:38 AM
                                                                                    65730-7

alia, individual doctors in exchange for rebates or other forms of consideration. The Retail

Pharmacy Defendants' data was and remains a high value resource that they could have used to

help prevent opioid abuse and diversion—the opioid epidemic—but they made the deliberate

choice not to do so and to instead focus on their own financial interests.

### 1. The Retail Pharmacy Defendants Have a Duty to Prevent Diversion.

398.    Each participant in the supply chain of opioid distribution, including the Retail

Pharmacy Defendants, is responsible for preventing the diversion of prescription opioids into the

illegal market by, among other things, monitoring, and reporting suspicious activity.

399.    The Retail Pharmacy Defendants, like the Manufacturer ("Marketing") and

Wholesale Distributor Defendants, are registrants under Kentucky's CSA. Under Kentucky law,

pharmacy registrants are required to "provide effective controls and procedures to guard against

theft and diversion of controlled substances."

400.    The regulations expressly state that "[t]he responsibility for the proper prescribing

and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding

responsibility rests with the pharmacist who fills the prescription." Because the Retail Pharmacy

Defendants themselves are registrants under Kentucky's CSA, they have the corresponding duty

to prevent diversion.

401.    Suspicious pharmacy orders include orders of unusually large size, orders that are

disproportionately large in comparison to the population of a community served by the

pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and

duration, among others. Additional types of suspicious orders include:

- prescriptions written by a doctor who writes significantly more
  prescriptions (or in larger quantities or higher doses) for controlled
  substances compared to other practitioners in the area;

Filed              21-CI-00515         06/25/2021         Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000095 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis;

- prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time;

- prescriptions that look "too good" or where the prescriber's handwriting is too legible;

- prescriptions with quantities or doses that differ from usual medical usage;

- prescriptions that do not comply with standard abbreviations and/or contain no abbreviations;

- photocopied prescriptions; and/or

- prescriptions containing different handwriting.

402. Suspicious pharmacy orders are red flags for, if not direct evidence of, diversion.

403. Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Retail Pharmacy Defendants themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

404. According to industry standards, if a pharmacy finds evidence of prescription diversion, the Kentucky Board of Pharmacy must be contacted.

405. Despite their legal obligations as registrants under Kentucky CSA, the Retail Pharmacy Defendants allowed widespread diversion to occur—and they did so knowingly.

406. Performance metrics and prescription quotas adopted by the Retail Pharmacy Defendants for their retail stores contributed to their failure. Under CVS's Metrics System, for example, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000096 of 000157

- 90 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many

prescriptions that pharmacist fills within a year. The resulting focus on quantity, versus quality,

led to a steep and unfettered increase in the flow of opioids throughout the Commonwealth of

Kentucky.  Yet, the Retail Pharmacy Defendants' policies remained in place even as the opioid

epidemic flourished.

407.    Upon information and belief, this problem was compounded by the Retail

Pharmacy Defendants' failure to adequately train their pharmacists and pharmacy technicians on

how to properly and adequately handle prescriptions for opioid painkillers, including what

constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is

likely for a condition has been approved for treatments with opioids, and what measures and/or

actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or

when suspicious circumstances are present, including when prescriptions are procured and pills

supplied for the purpose of illegal diversion and drug trafficking.

408.    Upon information and belief, the Retail Pharmacy Defendants also failed to

adequately use data available to them to identify doctors who were writing suspicious numbers

of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data

available to them to do statistical analysis to prevent the filling of prescriptions that were

illegally diverted or otherwise contributed to the opioid crisis.

409.    Upon information and belief, the Retail Pharmacy Defendants failed to analyze:

- the number of opioid prescriptions filled by individual pharmacies
relative to the population of the pharmacy's community;

- the increase in opioid sales relative to past years;

- the number of opioid prescriptions filled relative to other drugs; and

- the increase in annual opioid sales relative to the increase in annual

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

sales of other drugs.

410.     Upon information and belief, the Retail Pharmacy Defendants also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

411.     Upon information and belief, the Retail Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

412.     The Retail Pharmacy Defendants were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas clearly and facially inappropriate.  Yet, the Retail Pharmacy Defendants did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

### 2.     Multiple Enforcement Actions against the Retail Pharmacy Defendants Confirms their Compliance Failures.

413.     The Retail Pharmacy Defendants have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the Retail Pharmacy Defendants have been repeatedly penalized for their illegal prescription opioid practices. Upon information and belief, based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the Retail Pharmacy Defendants.

### a.     CVS.

414.     CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000098 of 000157

- 92 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

customers at 9,700 retail locations. As such, CVS was and remains uniquely positioned to serve a a as a gatekeeper to step the diversion and abuse of opioids. But, like the other Defendants herein, CVS put its profit goals over its obligations to safeguard the public.

415.     Notably, CVS has been a repeat offender, having paid fines totaling over $40 million as the result of a series of investigations by governmental entities.

416.     CVS' did not alter its conduct, and instead appears to have treated these fines as the cost of doing business—allowing its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing legal obligations.

417.     As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances. This fine was preceded by numerous others throughout the country.

418.     In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

419.     In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

420.     In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

421.     In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000099 of 000157

- 93 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

50 of its stores violated the CSA by filling forged prescriptions for controlled substances—

mostly addictive painkillers—more than 500 times between 2011 and 2014.

422.    In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's

Office for the District of Rhode Island to resolve allegations that several of its Rhode Island

stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The

United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged

prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric

nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally

permitted to prescribe that drug. Additionally, the government alleged that CVS had

recordkeeping deficiencies.

423.    In May 2015, CVS agreed to pay a $22 million penalty following a DEA

investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed

prescription opioids, "based on prescriptions that had not been issued for legitimate medical

purposes by a health care provider acting in the usual course of professional practice. CVS also

acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions

that were issued based on legitimate medical need."

424.    In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve

allegations it filled prescriptions written by a doctor whose controlled-substance registration had

expired.

425.    In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for

improperly selling prescription narcotics in at least five locations in the Oklahoma City

metropolitan area.

426.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000100 of 000157

- 94 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

### b. Walgreens.

427. Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

428. Walgreens has also been penalized for serious and flagrant violations. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.

429. The settlement resolved investigations into and allegations of violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

430. Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the national average.

431. They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers not only turned a blind eye but provided pharmacists with incentives through a bonus program that compensated them

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000101 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

based on the number of prescriptions filled at the pharmacy.

432. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with its legal reporting obligations.

433. Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales.

434. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

435. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000). The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

436. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and did not use

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000102 of 000157

- 96 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

### c. Rite Aid.

437. With approximately 4,600 stores in 31 states and the District of Columbia, Rite Aid is the largest drugstore chain on the East Coast and the third largest in the United States, with annual revenue of more than $21 billion.

438. In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations.

439. The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with regulatory requirements that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify regulators of losses of controlled substances—Kentucky similarly requires reporting of employee or other theft of opioids.

440. Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from Retail Pharmacy Defendants. The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

441. The litany of state and federal actions against the Retail Pharmacy Defendants demonstrates that they routinely, and as a matter of standard operation procedure, violate their legal obligations under Kentucky laws and regulations that govern the distribution and dispensing of prescription opioids.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000103 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed                                             NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

442. Throughout the Commonwealth of Kentucky, the Retail Pharmacy Defendants were or should have been aware of numerous red flags of potential suspicious activity and diversion.

443. On information and belief, the Retail Pharmacy Defendants knew or reasonably should have known about the disproportionate flow of opioids into Kentucky and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion. Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

444. On information and belief, the Retail Pharmacy Defendants knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in the community.

445. On information and belief, because of (among other sources of information) regulatory and other actions taken against the Retail Pharmacy Defendants directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and monitored, the Retail Pharmacy Defendants were well aware that their distribution and dispensing activities fell far short of legal requirements.

446. The Retail Pharmacy Defendants' actions—or inaction and omissions—in failing to effectively prevent the diversion and abuse of opioids, and in failing to monitor, report, and prevent suspicious opioid orders contributed significantly to the opioid epidemic throughout the Commonwealth of Kentucky and for which the Plaintiffs seek relief herein.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000104 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed                                        NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

**G.    The Opioid ("Marketing") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids.**

**1.    The Opioid Conspiracy's Purpose—Increased Sales & Profit.**

447.    The Opioid ("Marketing") Defendants are defined to include Endo, J&J, and Teva.

448.    The Opioid ("Marketing") Defendants initial collusion began with the development of a stronger and more additive poppy strain—the key precursor to creating opioid drugs.

449.    Again, as already noted, to increase demand, market share, and ultimately the Opioid ("Marketing") Defendants, J&J began a project to develop a *high* thebaine poppy[5]—subsequently named the *Norman Poppy*.  J&J described the *Norman Poppy* as a *transformational* technology that would drive the significant growth of the oxycodone market.

450.    With specifically enhanced *Norman Poppy* product, the Opioid ("Marketing") Defendants had their opioid API necessary to produce mass quantities of highly addictive opioid drugs—e.g., oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone.

451.    J&J's efforts resulted in their "pain management franchise" becoming the number one (#1) supplier of narcotic API's in the U.S.  By effectively cornering the market with its API production—using opium poppy plant production, extraction, and importation—the Johnson & Johnson Entities were uniquely positioned to provide U.S. opioid manufacturers with what it deemed "Security of Supply" and "Direct Access to Narcotic Raw Material - From Our Fields to Your Formulations."  Using its franchise, the Johnson & Johnson Entities supplied the necessary

---

[5]    Thebaine, also known as codeine methyl enol ether, is an opiate alkaloid.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000105 of 000157

Filed

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioid component—oxycodone API—to U.S. opioid manufacturers.

452.     With the knowledge of that their opioid products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, the Opioid ("Marketing") Defendants formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain—the "Opioid Conspiracy."

453.     In order to unlawfully increase the demand for opioids, the Opioid ("Marketing") Defendants formed an association-in-fact enterprise with the "Front Groups" and KOLs described above.

454.     Through their personal relationships, the Manufacturer ("Marketing") Defendants had the opportunity to form and take actions in furtherance of their common purpose and objective—to significantly increase the public consumption of opioids for their collective and individual financial gain.

455.     The Opioid ("Marketing") Defendants, through their collective and joint enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including the Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.

456.     The Opioid Conspiracy's misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid ("Marketing") Defendants named "pseudo addiction"; (4) that withdrawal is easily managed; (5) that increased dosing present no significant risks; (6) that long-term use of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000106 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

457. The Opioid Conspiracy devised, implemented and conducted by the Opioid ("Marketing") Defendants was a common course of conduct designed to ensure that the Opioid ("Marketing") Defendants unlawfully increased their sales and profits through active concealment and public misrepresentations about the addictive nature and effective use of opioids—including their own branded opioids.

458. The Opioid ("Marketing") Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated their Opioid Conspiracy, including through the unbranded promotion and marketing network as described above.

459. There was regular communication between the Opioid ("Marketing") Defendants, Front Groups and KOLs, in which information was shared, misrepresentations were coordinated, and payments were exchanged. Typically, the coordination, communication and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the Opioid ("Marketing") Defendants, Front Groups, and KOLs share information regarding overcoming public objections and resistance to the long-term use of opioids for chronic pain.

460. The Opioid ("Marketing") Defendants, Front Groups and KOLs functioned as a continuing and cooperate enterprise for the express purpose of implementing the Opioid Conspiracy's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

461. At all relevant times, the Front Groups were aware of the Opioid ("Marketing")

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Defendants' conduct, were knowing and willing participants in and beneficiaries of that conduct. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same Opioid Conspiracy scheme, to the detriment of the public and end-users, prescribers, and the Plaintiffs.

462.    At all relevant times, the KOLs were aware of the Opioid ("Marketing") Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct.

463.    The Opioid ("Marketing") Defendants selected KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Opioid ("Marketing") Defendants' financial support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Opioid ("Marketing") Defendants by advancing their marketing goals.

464.    The KOLs also knew, but did not disclose, that the other KOLS and Front Groups were engaged in the same Opioid Conspiracy scheme, to the detriment of the pubic and end-users, prescribers, and the Plaintiffs.

465.    As public scrutiny and media coverage focused on how opioids ravaged communities in the Commonwealth of Kentucky and throughout the United States, the Front Groups and KOLS did not challenge the Opioid ("Marketing") Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Conspiracy scheme, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

466.    The Opioid ("Marketing") Defendants, Front Groups and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000108 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Conspiracy scheme—to dramatically increase the use of opioids. As described herein, the Opioid ("Marketing") Defendants' conduct in furtherance of the common purpose of the Opioid Conspiracy involved: (1) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (2) lobbying to defeat measures to restrict over-prescription; (3) efforts to criticize or undermine regulatory requirements; and (4) efforts to limit prescriber accountability.

467.    In addition to disseminating misrepresentations about the risks and benefits of opioids, the Opioid Marketing Enterprise also furthered its common purpose by criticizing or undermining regulatory guidelines applicable to Kentucky. Members of the Opioid Marketing Enterprise criticized or undermined regulatory guidelines, which represented "an important step—and perhaps the first major step from the federal government—toward limiting opioid prescriptions for chronic pain."

468.    The Opioid ("Marketing") Defendants alone could not have accomplished the purpose of the Opioid Conspiracy without the assistance of the Front Groups and KOLs, who were perceived as "neutral" and more "scientific" than the Opioid ("Marketing") Defendants themselves. Without the work of the Front Groups and KOLs in spreading misrepresentations about opioids, the Opioid Conspiracy could not have achieved its common purpose— underscoring the Opioid ("Marketing") Defendants need to both create, manipulate, and control the public messages.

469.    The impact of the Opioid Conspiracy remains in place—i.e., the opioids continue to be prescribed and used for long-term treatment of chronic pain throughout the Commonwealth of Kentucky and the resulting opioid epidemic continues unabated—injuring the end-users, the public and the Plaintiffs.

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

470. As a result, it is clear that Opioid ("Marketing") Defendants were each willing participants in the Opioid Conspiracy, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Opioid Conspiracy's purpose—the significant and exponential increase in the sale of opioids and resulting profits, at the expense of the end-users, the public, and the Plaintiffs.

### 2. The Opioid Marketing Conspiracy.

471. From approximately the late 1990s to the present, each of the Opioid ("Marketing") Defendants exerted control over the Opioid Conspiracy and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

- Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, end-users, and payors;

- Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

- Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

- Creating and providing a body of deceptive, misleading and unsupported CMEs and speaker presentations about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000110 of 000157

- 104 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

payors;

- Selecting, cultivating, promoting and paying KOLs based solely on their willingness to communicate and distribute the Opioid ("Marketing") Defendants' messages about the use of opioids for chronic pain;

- Providing substantial opportunities for KOLs to participate in research studies on topics the Opioid ("Marketing") Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

- Paying KOLs to serve as consultants or on the Opioid ("Marketing") Defendants' advisory boards, on the advisory boards and in leadership positions on Front Groups, and to give talks or present CMEs, typically over meals or at conferences;

- Selecting, cultivating, promoting, creating and paying Front Groups based solely on their willingness to communicate and distribute the Opioid ("Marketing") Defendants' messages about the use of opioids for chronic pain;

- Providing substantial opportunities for Front Groups to participate in and/or publish research studies on topics the Opioid ("Marketing") Defendants suggested or chose (and paid for), with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

- Paying significant amounts of money to the leaders and individuals associated with Front Groups;

- Donating to Front Groups to support talks or CMEs, that were typically presented over meals or at conferences;

- Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

- Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

- Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters, and the help of the Front Groups as publishers, and supporters;

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000111 of 000157

- Concealing their relationship to and control of Front Groups and KOLs from the Plaintiff and the public at large; and

- Intending that Front Groups and KOLs would distribute through the U.S. mail and interstate wire facilities, promotional and other materials that claimed opioids could be safely used for chronic pain.

472. The Opioid Conspiracy had a hierarchical decision-making structure that was headed by the Opioid ("Marketing") Defendants and corroborated by the KOLs and Front Groups. The Opioid ("Marketing") Defendants controlled representations made about their opioids, doled out funds to insurance intermediaries, made payments to KOLs, and ensured that representations made by KOLs, Front Groups, and the Opioid ("Marketing") Defendants' sales detailers were consistent with the messaging throughout the United States and the Commonwealth of Kentucky. The Front Groups and KOLS in the Opioid Conspiracy were dependent on the Opioid ("Marketing") Defendants for their financial structure and for career development and promotion opportunities.

473. As the behest of the Opioid ("Marketing") Defendants, the Front Groups also conducted and participated in the conduct of the Opioid Conspiracy, directly or indirectly, in the following ways:

- The Front Groups promised to, and did, make representations regarding opioids and the Opioid ("Marketing") Defendants' opioids that were consistent with the Opioid ("Marketing") Defendants' marketing messages;

- The Front Groups distributed promotional and other materials which claimed that opioids could be safely used long-term for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain outweighed the risks;

- The Front Groups echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Opioid ("Marketing") Defendants;

- The Front Groups issued guidelines and policies minimizing the risk of

- 106 -

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

opioid addiction and promoting opioids for chronic pain; and

- The Front Groups concealed their connections to the KOLs and the Opioid ("Marketing") Defendants.

474.    The Opioid ("Marketing") Defendants' Front Groups, "with their large numbers and credibility with policymakers and the public—have 'extensive influence in specific disease areas.'" The larger Front Groups "likely have a substantial effect on policies relevant to their industry sponsors." "By aligning medical culture with industry goals in this way, many of the groups described in the [Fueling an Epidemic] report may have played a significant role in creating the necessary conditions for the U.S. opioid epidemic."

475.    At the behest of the Opioid ("Marketing") Defendants, the KOLs participated in the conduct of the affairs of the Opioid Conspiracy, directly or indirectly, in the following ways:

- The KOLs promised to, and did, make representations regarding opioids that were consistent with the Opioid ("Marketing") Defendants' marketing messages;

- The KOLs distributed promotional and other materials which claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for long-term chronic pain outweighed the risks;

- The KOLs echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of the Opioid ("Marketing") Defendants;

- The KOLs issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain; and

- The KOLs concealed their connections to the Front Groups and the Opioid ("Marketing") Defendants, and their sponsorship by the Opioid ("Marketing") Defendants.

476.    The scheme devised and implemented by the Opioid ("Marketing") Defendants amounted to a common course of conduct intended to increase the Opioid ("Marketing") Defendants' sales and profits from the distribution, sale, and dispensing of prescription opioids

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000113 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

by deceptively encouraging the use of opioids for long-term chronic pain. The Opioid

Conspiracy was a continuing course of conduct, and many aspects of it continue through to the

present.

> **3.** **The Opioid ("Marketing") Defendants Controlled and Paid Front
> Groups and KOLs to Promote and Maximize Opioid Use.**

477. As previously noted, the Opioid ("Marketing") Defendants funded and controlled

multiple Front Groups, including APF, AAPM/APS, FSMB, Alliance for Patient Access, USPF,

and AGS. The Front Groups, which from a public perspective were falsely presented as

independent, provided a conduit for the Opioid ("Marketing") Defendants' false messages.

478. The Opioid ("Marketing") Defendants clandestinely worked through each of the

Front Groups—providing funding, support, and ultimately the precise messaging to be presented

to the public.

479. Again, as previously noted, the Opioid ("Marketing") Defendants paid KOLs,

including Drs. Portenoy and Webster, to spread their false marketing messages, to misrepresent

the efficacies and dangers of opioids, and to ultimately sell more of their opioid products.

> **4.** **Additional Evidence of the Opioid Conspiracy.**

480. The Opioid ("Marketing") Defendants devised and knowingly carried out the

illegal Opioid Conspiracy scheme to defraud by means of materially false or fraudulent

pretenses, representations, promises, or omissions of material facts regarding the efficacies and

dangers associated with using opioids for long-term chronic, non-acute and non-cancer pain.

481. The Opioid ("Marketing") Defendants knew that these representations violated

the approved use of these drugs, and were not supported by actual evidence, which in turn

violated Kentucky's laws.

482. The Opioid ("Marketing") Defendants intended that that their common Opioid

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000114 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Conspiracy scheme to deceive prescribers, regulators, end-users, the public, and the Plaintiffs.

483.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for long-term chronic pain to prescribers, regulators, end-users, the public, and the Plaintiffs, the Opioid ("Marketing") Defendants engaged in a fraudulent and unlawful course of conduct constituting a conspiracy in violation of Kentucky law.

484.    The Opioid ("Marketing") Defendants' efforts to perpetuate and to accomplish the goals of their Opioid Conspiracy relied in part on thousands of communications, publications, representations, statements, electronic transmissions, payments, including, inter alia:

- Marketing materials about opioids, and their risks and benefits, which the Opioid ("Marketing") Defendants sent to health care providers, transmitted through the internet and television, published, and transmitted to Front Groups and KOLs;

- Written representations and telephone calls between the Opioid ("Marketing") Defendants and Front Groups regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

- Written representations and telephone calls between the Opioid ("Marketing") Defendants and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

- E-mails, telephone and written communications between the Opioid ("Marketing") Defendants and the Front Groups agreeing to or implementing the Opioid Conspiracy;

- E-mails, telephone and written communications between the Opioid ("Marketing") Defendants and the KOLs agreeing to or implementing the Opioid Conspiracy;

- Communications between the Opioid ("Marketing") Defendants, Front Groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Conspiracy;

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- Communications between the Opioid ("Marketing") Defendants, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Conspiracy; and

- Written and oral communications directed to State agencies, federal and state courts, and private insurers throughout Plaintiff's community that fraudulently misrepresented the risks and benefits of using opioids for long-term treatment of chronic pain.

485. To achieve the common goal and purpose of the Opioid Conspiracy, Opioid ("Marketing") Defendants hid from the prescribers, regulators, end-users, the public, and ultimately the Plaintiffs:

- the fraudulent nature of the Opioid ("Marketing") Defendants' marketing scheme;

- the fraudulent nature of statements made by the Opioid ("Marketing") Defendants and by their KOLs, Front Groups and other third parties regarding the safety and efficacy of prescription opioids; and

- the true nature of the relationship between the Opioid ("Marketing") Defendants, the KOLs, Front Groups, and other third parties participating—at the Opioid ("Marketing") Defendants' direction and control—in the false messages and marketing in furtherance of the Opioid Conspiracy.

486. The Opioid ("Marketing") Defendants agreed, with knowledge and intent, to the overall objective of the Opioid Conspiracy, and to actively participate in the common course of conduct necessary to fulfill the objectives of the conspiratorial scheme—thereby committing acts of fraud, deception, and illegal marketing of prescription opioids solely for financial gain with reckless disregard and wholesale indifference to the devastating damage to the end-user, the public, and the Plaintiffs.

487. Indeed, for the Opioid ("Marketing") Defendants fraudulent Opioid Conspiracy to work, each of them had to absolutely cooperate and agree to implement the same fraudulent, deceptive, and illegal tactics. This conclusion is further supported by the fact that the Opioid

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000116 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

("Marketing") Defendants each financed, supported, and worked to advance the Opioid

Conspiracy through the same KOLs and Front Groups, and often collaborated on and mutually

supported the same publications, CMEs, presentations, and prescription guidelines.

488.    The Opioid ("Marketing") Defendants' conspiratorial actions all had the express

purpose of dramatically and exponentially increasing the demand for opioids—thereby creating

the very opioid epidemic that now plagues the Commonwealth of Kentucky and that has

significantly damaged the end-users, the public, and the Plaintiffs—from which the Opioid

("Marketing") Defendants simultaneously generating billion-dollar revenue and profits.

## H.    The Manufacturer and Distributer ("Opioid Supply") Defendants Colluded and Conspired in the Marketing, Promotion, Distribution, Sale, and Dispensing of Opioids.

489.    The Opioid Supply Defendants are defined to include: (i) the Manufacture

("Marketing") Defendants: Allergan, Endo, and Teva; and (ii) the Wholesale Distributor

Defendants: Amerisource Bergen Entities, Cardinal Health, and McKesson (collectively, the

"Opioid Supply Defendants").

490.    Faced with the reality that they will now be held accountable for the

consequences of the opioid epidemic they created, a number of opioid defendants resorted to

making a public "categorical denial of any criminal behavior or intent."  The denials are not

supported by the factual history of the Opioid Supply Defendants' collaborative actions.

491.    For more than a decade, the Opioid Supply Defendants collaborated in an illicit

enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive,

with the common purpose and achievement of vastly increasing their respective profits and

revenues by exponentially expanding the opioids market.

492.    Recognizing that dangerous opioids only have a very limited place in our society,

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000117 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

and that their dissemination and use must be vigilantly monitored and policed to prevent the

harm that drug abuse and addiction causes to individuals, society and governments, Kentucky

enacted its opioid related laws and regulations.

493. Relevant to this lawsuit, Kentucky's laws and regulations created a closed system

of distribution for controlled substances. They imposed a reporting duty that cuts across the

Opioid Supply Defendants' company lines.

494. Regulations adopted under the Kentucky law mandates that companies—

including the Opioid Supply Defendants—who are entrusted to operate with this system must

safeguard the public good and safety. Private companies cannot simply operate as an

unregulated "anything goes" profit-maximizing business model. Instead, the Kentucky requires

companies—again, including the Opioid Supply Defendants—to self-regulate not just

themselves, but all other companies operating in the manufacture, distribution, sale and

dispensing of opioids. Kentucky created a mandatory self-reporting mechanism to police the

opioid marketplace with the ultimate goal of protecting the end-user and the public.

495. Kentucky incorporated reporting requirements, as well as created additional

standards of conduct for opioid manufacturers, distributors, and pharmacies.

496. The Opioid Supply Defendants wholly failed to comply with their Kentucky legal

obligations. The Opioid Supply Defendants Driven did not fulfill their obligations to protect

their end-users, the public, or the Plaintiffs. Instead, driven by greed, the Opioid Supply

Defendants the public trust and instead subverted the constraints of Kentucky's closed reporting

system to create and conduct their own Opioid Diversion Conspiracy.

497. As registrants under Kentucky's regulatory agencies, the Opioid Supply

Defendants were and remain duty bound to identify and report orders of unusual size, orders

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000118 of 000157

Filed                21-CI-00515              06/25/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

deviating substantially from a normal pattern, and orders of unusual frequency. Critically, their

obligations did not end with the products they manufactured or distributed. Thus, when the

Opioid Supply Defendants obtained information about the sales and distribution of other

companies' opioid products, as they did through data mining companies like IMS Health, they

were legally obligated to report that activity to Kentucky regulators.

498.    In the normal course of business, and absent conspiratorial collusion, competition

dictates that the Opioid Supply Defendants would report their opioid competitors for any

wrongful or suspicious conduct. This would in turn logically lead to an increasing market share

as bad apples are removed.

499.    The Opioid Supply Defendants elected not to comply with their legal

requirements. Instead, recognizing that increased regulatory attention—even for a competitor—

would serve to drive down the entire market—resulting in lower sales and corresponding profits.

As such, applying more of a macro, as opposed to a micro, view of the opioid market, the Opioid

Supply Defendants elected to collaborate and conspire to do nothing—to engage in silence

regardless of their obligations, in this case, under Kentucky law.

500.    The Opioid Supply Defendants is an enterprise—the Opioid Supply Conspiracy—

that began in the mid-90s and developed over the ensuing years to grow into a tightly knit

network of multi-billion-dollar companies profiting from branded and generic opioid sales.

501.    The formation and existence of the Opioid Supply Conspiracy was originally

facilitated by direct interactions between the Opioid Supply Defendants. As the Opioid Supply

Conspiracy grew, the Opioid Supply Defendants eventually incorporated other resources that

allowed them to deepen their relationships and coordinated efforts to avoid federal and state

regulatory scrutiny and thereby avoid their regulatory obligations. Some of these additional

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000119 of 000157

- 113 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

resources, like the Healthcare Distribution Alliance (together with its predecessors, the "HDA")
were formally organized businesses that existed separate and apart from the Opioid Supply
Conspiracy, but were controlled by the Opioid Supply Defendants (through their membership on
the Board of Directors and Executive Committee, and substantial financial contributions) to
achieve the common purpose of Opioid Supply Conspiracy.

502.     Other resources, like the Pain Care Forum ("PCF"), the New Jersey
Pharmaceutical Industry Working Group ("NJPIG"), and the Anti-Diversion Industry Working
Group ("ADIWG"), were informal associations created by the Opioid Supply Conspiracy.
Specifically, these groups were developed to serve the Opioid Supply Defendants' mutual
interests, allowing them to coordinate their efforts.

503.     HDA is of particular importance to the Opioid Supply Conspiracy. HDA (through
its predecessor entities) was initially formed to "remedy the existing evils in the wholesale drug
business and enable the merchants to carry on business on a more profitable basis." It has strayed
from its mission and now serves as a powerful tool for the opioid distributor industry to influence
the media, the marketplace, state and federal regulators and elections across the country.

504.     Now headquartered in Arlington, Virginia, HDA represents 36 opioid distribution
companies — national, regional and specialty — as well as more than 130 manufacturer and
more than 50 service provider/international members, respectively. These members serve more
than 200,000 licensed healthcare providers, delivering over 15 million products to these outlets
every day. Just as in 1876, HDA's publicly stated mission has remained the same: to protect
patient safety and access to medicines through safe and efficient distribution; to advocate for
standards, public policies and business processes that enhance the safety, efficiency and value of
the healthcare supply chain; and to create and exchange industry knowledge and best practices.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000120 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

505.     HDA is controlled by an Executive Committee which, for all time relevant, included the largest of the Wholesale Distributor Defendants: AmerisourceBergen, Cardinal Health, and McKesson. No decision is made at HDA without the blessing, permission, and endorsement of AmerisourceBergen, Cardinal Health, and McKesson.

506.     The first nexus of communication that led to the formation of the Opioid Supply Conspiracy began in the mid-90s when the Opioid Supply Defendants began working together on their approach to suspicious order monitoring and the release of Oxycontin.

507.     As documents produced from the HDA indicate, the supply chain industry was concerned about "the intensity and impact of the Drug Enforcement Administration's recent actions" in 2007. As a result, there was a significant increase in related communications between the Opioid Supply Defendants, in participation in the HDA, PCF, NJPIG, and ADIWG, and interaction between the HDA and PCF. One goal was to "develop a comprehensive DEA strategy."

508.     In addition to direct meetings, communications, and interactions of the Opioid Supply Defendants, further collaboration occurred with the HDA, PCF, NJPIG, and ADIWG. These groups were centrally important in the Opioid Supply Defendants' efforts to counter regulator's attempts to enforce the suspicious order monitoring provisions.

509.     Through their connections in these groups, the Opioid Supply Defendants managed to avoid their obligations under the closed system designed to protect the citizens. Through their work with the HDA in particular, the Opioid Supply Defendants were able to formulate a comprehensive and joint regulatory strategy—part of the Opioid Supply Conspiracy—in response to the suspension of AmerisourceBergen's registration and the subsequent suspensions of the McKesson's and Cardinal Health's registrations.

- 115 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000121 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

510.     The Opioid Supply Conspiracy included scheduling meetings with regulators so that HDA's members could argue they were taking action to combat opioid diversion. These meetings led to the recommendation from Cardinal Health that the HDA should develop a set of Industry Compliance Guidelines ("ICGs") for complying with the suspicious order monitoring obligations under the CSA.

511.     The ICGs are important. First, the HDA worked extremely closely with its members to draft the ICGs, including obtaining copies of its members' suspicious order monitoring policies and procedures, and interviewing members' employees about the members' practices. Eventually, the ICGs were ratified by the Executive Committee of the HDA reflecting an agreement among at least the Opioid Supply Defendants to a course of conduct that should have been utilized as a basis for complying with the CSA that was achieved by reviewing and sharing suspicious order monitoring policies and procedures.

512.     The HDA also worked extremely closely with regulators, including receiving detailed comments and suggestions about what must be included in the ICGs. As such, HDA and the Opioid Supply Defendants were aware of very specific guidance from the DEA about what was required to comply with the CSA.

513.     During the drafting of the ICGs, the HDA represented to the DEA that it would work with HDA members to ensure that they implemented the ICGs as part of the HDA's commitment to protecting patient safety.  However, the HDA was on already on notice the Opioid Supply Defendants did not intend to implement the ICGs.

514.     Finally, the HDA represented to regulators that it would work with other supply chain industry stakeholders like the PCF, and other trade associations' manufacturers and pharmacists, to help their members implement the ICGs. Moreover, the HDA presented to

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000122 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

members of the PCF about the ICGs in order to educate them about the efforts HDA was undertaking in that regard.

515.    HDA's work on the ICGs is strong evidence of the existence of the Opioid Supply Conspiracy, and the Opioid Supply Defendants willing participating and common purpose. Notably, the HDA publicly represented that it hoped the "DEA would find the guidelines acceptable as a voluntary 'consent decrees'," but "did not expect these guidelines to result in weakening DEA's enforcement prerogatives." Yet, in private conversations with the Opioid Supply Defendants, HDA admitted that the "Purpose of ICG and DEA Communications" was to "'Head-off' further enforcement or regulatory action."

516.    Further evidence of the Opioid Supply Conspiracy's common purpose related to the ICGs occurred in 2012 when the ICGs were relied on by the DEA in a regulatory enforcement action against Walgreens. After the HDA learned of this information, the Executive Committee instructed HDA to immediately take the ICGs off of the HDA's website because they were never meant to be used as an industry standard to be used against companies in the pharmaceutical supply chain.

517.    This action by the HDA is particularly indicative of the common purpose of the Opioid Supply Conspiracy because when the HDA originally presented the ICGs to the DEA and analogized them to a similar situation "where a set of voluntary standards were reviewed by FDA and eventually became a standard practice." But when the HDA pulled the ICGs from the website in 2013 they internally discussed that the "guidelines were never intended to constitute a standard" so "they [were] taken down from the HDMA website, at the direction of the [Government & Public Policy Council]" of the HDA.

518.    Publicly, in 2008, the Opioid Supply Defendants announced the formulation of

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000123 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

"Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances." But privately, the Opioid Supply Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of the CSA and corresponding state law mandates. Indeed, despite the issuance of these Industry Compliance Guidelines, which actually acknowledge the Opioid Supply Defendants' legal duties, the Opioid Supply Defendants did not comply.

519.    Aside from the ICGs, the Opioid Supply Defendants used the HDA to accomplish other goals of the Opioid Supply Conspiracy.  By way of example, the HDA lobbied in favor of issues that undermined DEA and its attempts to enforce the CSA, including engaging in negative attacks on the DEA before the Government Accountability Office. The HDA's efforts to combat and to undermine the Opioid Supply Defendants' regulatory obligations have continued unabated.

520.    The sheer volume of prescription opioids distributed, sold, and dispensed through the collaborative efforts of the Opioid Supply Defendants—in furtherance of the Opioid Supply Conspiracy—is overwhelming and now thoroughly documented.

521.    There is no reasonable answer or excuse for the Opioid Supply Defendants' complete failure to stem the flood of opioids in the Commonwealth of Kentucky other that it was done with extent—to accomplish the goals of the Opioid Supply Conspiracy.

522.    Given their controlling position, and intimate knowledge of each opioid ultimately dispensed to an end-user, the Opioid Supply Defendants were uniquely and unquestionably best suited to identify each and every suspicious transaction in the Commonwealth of Kentucky.  The Opioid Supply Defendants simply elected not to take any action and to instead focus on maintain and increasing their sales and corresponding profits.

- 118 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

523.    As described above, at all relevant times, the Opioid Supply Defendants operated

as an association-in-fact enterprise formed for the express purpose of unlawfully increasing

sales, revenues and profits.

524.     In support of this common purpose and fraudulent scheme, the Opioid Supply

Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt and

report suspicious orders of opioids and diversion of their drugs into the illicit market so that

those orders would not result in a decrease, or prevent an increase in, their allowable sales

quotas.

525.    At all relevant times, as described above, the Opioid Supply Defendants exerted

control over, conducted and/or participated in the Opioid Supply Conspiracy by fraudulently

claiming that they were complying with their duties to identify, investigate and report suspicious

orders of opioids in order to prevent diversion of those highly addictive substances into the illicit

market, and to halt such unlawful sales, so as to increase production quotas and generate

unlawful profits.

526.    The Opioid Supply Defendants disseminated false and misleading statements to

regulators claiming that:

- the quotas for prescription opioids should be increased;

- they were complying with their obligations to maintain effective
  controls against diversion of their prescription opioids;

- they were complying with their obligations to design and operate a
  system to disclose to the registrant suspicious orders of their
  prescription opioids;

- they were complying with their obligation to notify the DEA of any
  suspicious orders or diversion of their prescription opioids; and

- they did not have the capability to identify suspicious orders of
  controlled substances.

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000125 of 000157

- 119 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

527. During the relevant time period, each Opioid Supply Defendants exerted control over and participated in the operation and management of the Opioid Supply conspiracy directly or indirectly, in the following ways:

- the Opioid Supply Defendants were required to each obtain a license from the Kentucky Board of Pharmacy;

- the Opioid Supply Defendants, contrary to Kentucky law, failed to take necessary action to prevent the diversion of dangerously addictive prescription opioids;

- the Opioid Supply Defendants, contrary to Kentucky law, and in dereliction of non-delegable duties, distributed and sold opioids to their retail pharmacy customers without regard to the frequency, quantity, or any other serious red flags;

- the Opioid Supply Defendants misrepresented their compliance with their Kentucky legal obligations, making false assurances that their distribution complied with Kentucky law, when they were instead distributing and selling as many opioids as possible;

- the Opioid Supply Defendants violated their legal duties to guard against diversion of the opioids for illicit purposes, disregarding regulatory warnings;

- the Opioid Supply Defendants refused to abide by the terms of regulatory enforcement actions and settlements, and instead continued to violate their statutory and regulatory obligations;

- the Opioid Supply Defendants did not monitor, detect, investigate, refuse and report suspicious orders to the Kentucky Board of Pharmacy; and

- the Opioid Supply Defendants intentionally sold the opioids unlawfully, purely for profit and without regard to the resulting and growing opioid epidemic, notwithstanding their knowledge that substantial and irreversible harm would occur to the end-user and the public.

528. The Opioid Supply Defendants did not undertake the practices described herein in isolation, but as part of a common scheme—the Opioid Supply Conspiracy.

529. The Opioid Supply Defendants' collaborative and organized actions encompassed

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000126 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

a litany of unlawful activities, each conducted with advancing the Opioid Supply Conspiracy's common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous opioids.

530. The Opioid Supply Defendants' actions had the same or similar detrimental effects on prescribers, end-users, the public and the Plaintiffs. Again, the Opioid Supply Defendants' actions were not separate and distinct, but rather were taken in furtherance of the Opioid Supply Conspiracy.

531. Despite being repeatedly warned, fined, and found to be in violation of applicable law and regulations, the Opioid Supply Defendants' wrongful conduct and furtherance of their Opioid Supply Conspiracy continued unabated and undeterred.

532. The Opioid Supply Defendants elected to put their own financial interests—the billions of dollars in profits they collected from dumping opioids into the Commonwealth of Kentucky—over their legal obligations to protect the public.

### CLASS ALLEGATIONS

533. The Plaintiffs seek to represent the following class of Kentucky cities: "All Kentucky Home Rule cities with populations less than four thousand (4,000)."

534. The Plaintiffs and all others similarly situated are entitled to have this case maintained as a class action pursuant to Kentucky Rules of Civil Procedure.

535. The Plaintiff Class is so numerous that joinder of all persons is impracticable and inefficient.

536. There are common issues of law and fact applicable to the Plaintiff Class' claims and Defendants' individual and collective liability thereunder. The same facts, the same Kentucky laws and regulations, and the same issues are at issue—concerning the Defendants

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000127 of 000157

- 121 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

individual and collective manufacture, marketing, distribution, sale and dispensing of opioids throughout the Commonwealth.

537. Resolution of the common question(s) will advance resolution of the Plaintiff Class' claims. Defendants' individual and collective conduct presents common factual questions that predominate. As such, the Plaintiff Class is necessarily bound together by the common factual questions relating to whether the Defendants' individual and collective conduct violated Kentucky law.

538. The Plaintiff Class' claims are typical. Each putative class member experienced the same injuries and corresponding damages as the direct and consequential result of the Defendants individual and collective manufacture, marketing, distribution, sale and dispensing of opioids throughout the Commonwealth of Kentucky. The Plaintiff Class' claims are subject to the same facts, law, and defenses.

539. The Plaintiff Class' interests are directly aligned amongst themselves and, as such, they will fairly and adequately represent and protect the interests of the Class members. Further, the Plaintiff Class have retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the Plaintiff Class and its members. The Plaintiff Class further are unaware of any conflicts of interests between the Plaintiffs and the absent Plaintiff Class members.

540. The Plaintiff Class further have, or can acquire, adequate financial resources to assure that the interests of Plaintiff Class members will be protected. Further, the Plaintiff Class representatives are knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

541. The prosecution of the Plaintiff Class' claims on an individual ad hoc basis would

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000128 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

create a substantial risk of inconsistent and/or varying legal outcomes that would establish

incompatible standards of conduct.  Similarly, such an ad hoc litigation process would create a

further substantial risk of a single legal outcome that would as a practical matter be dispositive of

other Plaintiff Class members thereby substantially prejudicing their respective interests.  Class

certification would alleviate these issues and provide for an orderly and efficient resolution for

all parties and the Court.

542.    The prosecution of the Plaintiff Class' claims on an individual ad hoc basis is

inappropriate where the Defendants have acted, or in this case refused to act, in such a manner

that final injunctive relief is both necessary and required.  Similarly, ad hoc litigation is

inappropriate where declaratory relief is warranted to a large number of affected persons—the

Plaintiff Class.  Defendants' individual and collective improper actions in the manufacture,

marketing, distribution, sale and dispensing of opioids throughout the Commonwealth of

Kentucky warrants and supports relief to the Plaintiff Class—injunctive and declaratory—to

remedy the harm and to halt the ongoing harm.

543.    Finally, the Plaintiff Class' claims present common questions of law and fact that

predominates over all alleged questions affecting individual class members.  The same facts and

the same Kentucky laws and regulations will dictate the extent and the scope of the Defendants'

individual and collective liability to the Plaintiff Class—thus making the procedural class action

mechanism the fairest and, more importantly, efficient means for timely and expeditiously

resolving the Plaintiff Class' claims.

544.    Given the Plaintiff Class is limited to Kentucky Home Rule cities, and there is

little interest in absent class members pursuing separate individual actions the class action

procedural mechanism is appropriate and a superior means of resolution.  That the Plaintiff Class

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000129 of 000157

- 123 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

is comprised of governmental entities, the resolution of their claims would occur in this Court

regardless thereby satisfying any forum concerns, as well as alleviating any case management

issue.

## CLAIMS FOR RELIEF

### A.   Public Nuisance (All Defendants).

545.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if

fully set forth here, and further alleges as follows.

546.    Each Defendant is liable for public nuisance because its conduct at issue has

caused an unreasonable and substantial interference with a right common to the general public,

which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.

547.    Kentucky has declared that "[t]he regulation of controlled substances in this

Commonwealth is important and necessary for the preservation of public safety and public

health." Kentucky has further declared "effective control and regulation" of all "persons who are

required to obtain a license, certificate, or permit from the Board of Pharmacy, whether located

in or outside the Commonwealth, that distribute, manufacture, or sell drugs within the

Commonwealth" is necessary in order to "promote, preserve, and protect public health, safety,

and welfare." The Kentucky Board of Pharmacy regulations state that "[a] wholesale distributor

shall not . . . operate in a manner that endangers the public health."

548.    By causing dangerously addictive drugs to flood the community, and to be

diverted for illicit purposes, in contravention of Kentucky law, each Defendant has injuriously

affected rights common to the general public, specifically including the rights of the Plaintiffs to

public health, public safety, public peace, public comfort, and public convenience. The public

nuisance caused by Defendants' diversion of dangerous drugs has caused substantial annoyance,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000130 of 000157

- 124 -

Filed                                                                                                    NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

inconvenience, and injury to the public.

549.    By selling dangerously addictive opioid drugs diverted from a legitimate medical,

scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously

affects the safety, health, and morals of the people throughout the Commonwealth of Kentucky.

550.    By failing to create, maintain, and enforce a closed system that guards against

diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected

public rights, including the right to public health, public safety, public peace, and public comfort

of the people throughout the Commonwealth of Kentucky.

551.    Defendants' collective and individual wrongful and illegal actions have created a

public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has

caused an unreasonable interference with a right common to the people throughout the

Commonwealth of Kentucky.

552.    The Defendants have intentionally and/or unlawfully created an absolute

nuisance.

553.    The people throughout the Commonwealth of Kentucky have a common right to

be free from conduct that creates an unreasonable jeopardy to the public health, welfare and

safety, and to be free from conduct that creates a disturbance and reasonable apprehension of

danger to person and property.

554.    Defendants intentionally, unlawfully, and recklessly manufactured, marketed,

distributed, sold, and dispensed opioids that Defendants knew, or reasonably should have known,

would be diverted, causing widespread distribution of prescription opioids the people throughout

the Commonwealth of Kentucky, resulting in addiction and abuse, an elevated level of crime,

death and injuries, a higher level of fear, discomfort and inconvenience, and direct costs to

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000131 of 000157

Filed              21-CI-00515        06/25/2021        Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Plaintiffs.

555.    Defendants have unlawfully and/or intentionally caused and permitted dangerous

drugs under their control to be diverted such as to injure the people throughout the

Commonwealth of Kentucky.

556.    Defendants have unlawfully and/or intentionally distributed opioids or caused

opioids to be distributed without maintaining effective controls against diversion. Such conduct

was illegal. Defendants' failures to create, maintain, and enforce effective controls against

diversion include Defendants' failure to effectively monitor for suspicious orders, report

suspicious orders, and/or stop shipment of suspicious orders.

557.    Defendants have caused a significant and unreasonable interference with the

public health, safety, welfare, peace, comfort and convenience, and ability to be free from

disturbance and reasonable apprehension of danger to person or property.

558.    Defendants' conduct—in illegally distributing and selling prescription opioids, or

causing such opioids to be distributed and sold, where Defendants knew, or reasonably should

have known, such opioids would be diverted and possessed and/or used illegally throughout the

Commonwealth of Kentucky—is of a continuing and ongoing nature.

559.    A violation of any rule or law controlling the distribution of opioids throughout

the Commonwealth of Kentucky is a public nuisance.

560.    Defendants' distribution of opioids while failing to maintain effective controls

against diversion was proscribed by statute and regulation.

561.    Defendants' ongoing conduct produces an ongoing public nuisance, as the

prescription opioids that they allow and/or cause to be illegally distributed and possessed

throughout the Commonwealth of Kentucky will in turn be diverted, leading to abuse, addiction,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000132 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

crime, and public health costs.

562.    Because of the continued use and addiction caused by these illegally distributed opioids, the public will continue to fear for its health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

563.    Defendants knew, or reasonably should have known, that their conduct would have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

564.    Defendants knew, or reasonably should have known, that their conduct would cause an unreasonable invasion of the public's right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

565.    Defendants were aware, and at a bare minimum certainly should have been aware, of the unreasonable interference that their conduct would cause throughout the Commonwealth of Kentucky.  Defendants are in the business of manufacturing, marketing, distributing, selling, and dispensing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous under Kentucky law.

566.    Defendants' conduct in marketing, distributing, and selling prescription opioids which they knew, or should have known, would likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids would cause death and injuries throughout the Commonwealth of Kentucky.  Moreover, there would be significant and unreasonable interference with the public's health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000133 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

and property.

567. The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes throughout the Commonwealth of Kentucky not only caused unnecessary deaths and injuries, but also created a palpable climate of fear among residents where opioid diversion, abuse, addiction were prevalent and where diverted opioids tend to be used frequently.

568. Defendants' conduct made, and continues to make, it easier for persons to divert prescription opioids throughout the Commonwealth of Kentucky, thereby constituting a dangerous and ongoing threat to the public.

569. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

570. The presence of diverted prescription opioids throughout the Commonwealth of Kentucky, and the consequence of prescription opioids having been diverted, proximately results in and/or substantially contributing to the creation of significant costs to the Plaintiffs to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

571. Stemming the flow of illegally distributed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make the Commonwealth of Kentucky a safer place to live.

572. Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse throughout the Commonwealth of Kentucky,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000134 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

the costs borne by Plaintiffs, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

573.     Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of the Commonwealth of Kentucky, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. Plaintiffs have a clear and ascertainable right to abate any and all such conduct that perpetuates this nuisance.

574.     Defendants created an absolute public nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create throughout the Commonwealth of Kentucky. Despite this, Defendants intentionally and/or unlawfully failed to create, maintain, and enforce effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids or caused opioids to be distributed without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids or caused such orders to be shipped. Defendants intentionally and/or unlawfully marketed opioids in manners they knew to be false and misleading. Such actions were inherently dangerous.

575.     Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids or caused such opioids to be distributed without maintaining effective controls against diversion,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000135 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids

would be diverted, and create an opioid abuse nuisance throughout the Commonwealth of

Kentucky.

576.    Defendants' actions also created a qualified nuisance. Defendants acted

recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls

against diversion, thereby creating an unreasonable risk of harm.

577.    Defendants acted with actual malice because Defendants acted with a conscious

disregard for the rights and safety of other persons, and said actions have a great probability of

causing substantial harm.

578.    The damages available to the Plaintiffs include, inter alia, recoupment of

governmental costs, flowing from an ongoing and persistent public nuisance which the

government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiffs seek

all damages flowing from Defendants' conduct. The Plaintiffs further seeks to abate the nuisance

and harm created by Defendants' conduct.

579.    As a direct result of Defendants' conduct, the Plaintiffs have suffered actual

injury and damages including, but not limited to, significant expenses for police, emergency,

health, prosecution, corrections and other services. The Plaintiffs therefore seek recovery for this

harm.

580.    The Plaintiffs have sustained specific and special injuries because their damages

include, inter alia, health services, law enforcement expenditures, and costs related to opioid

addiction treatment and overdose prevention.

581.    The Plaintiffs further seek to abate the nuisance created by the Defendants'

unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000136 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

and interference with a right common to the public.

582.     The Plaintiffs seek all legal and equitable relief as allowed by Kentucky law, including inter alia, abatement, compensatory damages, disgorgement, and punitive damages from the Defendants for the creation of a public nuisance, attorneys' fees and costs, and pre- and post-judgment interest.

583.     Defendants' intentional and unlawful actions, and omissions and unreasonable interference with a right common to the public, are of a continuing nature—thereby justifying the Plaintiffs seeking and obtaining declaratory and injunctive relief.

584.     Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused throughout the Commonwealth of Kentucky. Defendants are in the business of manufacturing or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because, inter alia, these drugs are defined under Kentucky law as substances posing a high potential for abuse and severe addiction. Defendants created an absolute public nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

585.     The public nuisance created by Defendants' actions is substantial and unreasonable.  It has caused and continues to cause significant harm to the Plaintiffs' cities, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid and heroin use resulting from the Defendants' abdication of their gatekeeping and diversion prevention duties, and the Manufacturer Defendants' fraudulent marketing activities, have caused harm to the Plaintiffs' cities that includes, but is not limited to, the following:

- The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000137 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- Children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

- Members of the public who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

- The opioid epidemic has increased health care costs, including the cost of obtaining insurance coverage.

- The Plaintiffs have lost the value of productive and healthy employees.

- Defendants' conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

- Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. More prescription opioids sold by Defendants led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

- Addiction rates have dramatically increased, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

- The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement.

- The significant and unreasonable interference with the public rights caused by Defendants' conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiffs.
- Defendants' interference with the comfortable enjoyment of life throughout the Commonwealth of Kentucky is unreasonable because

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000138 of 000157

- 132 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

there is little social utility to opioid diversion and abuse, and any
potential value is outweighed by the gravity of the harm inflicted by
Defendants' actions.

586.    The Plaintiffs have sustained specific and special injuries as described in this

Complaint and should be permitted to recover relief for their damages—direct, incidental, and

consequential pecuniary—resulting from and relating to Defendants' creation of a public

nuisance.

587.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law,

including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive

damages, and all damages allowed by Kentucky law to be paid by the Defendants, as well as

their attorneys' fees and costs, and pre- and post-judgment interest.

**B.     Negligence (All Defendants).**

588.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

589.    In Kentucky, a recovery for negligence requires establishment of the elements of

duty, breach of duty, causation, and damages.[6]  Duty is a fluid and elusive concept, and the

court's decision regarding the existence of a duty is described as a "Policy determination."

Kentucky law has adopted a "universal duty of care," which requires every person to exercise

ordinary care in his activities to prevent foreseeable injury.[7]

590.    The applicable statutes and administrative regulations, as previously referenced

herein, impose a duty on each Defendant—manufacturer, distributor, and pharmacy— to

maintain, report data, and take affirmative action to prevent the abuse and diversion of opioids.

Defendants' respective obligations exist both as a matter of common law, as well as statutory.

---

[6]    *See Lewis v. B & R Corp.*, 56 S.W.3d 432, 436-37 (Ky.App.2001); *Mullins v. Commonwealth
Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky. 1992).
[7]    *See T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526 (Ky. 2006).

- 133 -

Presiding Judge: HON. THOMAS  DAWSON  WINGATE (648243)

COM : 000139 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

*See infra.*

591.     Given the nature of Defendants' product—opioids—coupled with known and foreseeable dangers inherent in their use—e.g., addition, overdose, abuse, and diversion—each Defendant undertook and accepted a duty to protect the end-user, the public, and the Plaintiffs from harm.

592.     Paramount to Defendants' duty was to monitor the manufacture, distribution sale, and dispensing of opioids throughout the Commonwealth of Kentucky—to ensure the supply of opioids was both reasonable, necessary, and appropriate.  Defendants' monitoring duty, when fulfilled in good faith, would ensure that opioids did not harm the end-user, the public, and the Plaintiffs.

593.     Defendants collectively and individually failed to fulfill their respective duty to monitor the manufacture, distribution sale, and dispensing of opioids throughout the Commonwealth of Kentucky.

594.     As detailed herein, Defendants collectively and individually knowingly and intentionally breached their duty to monitor—to identify, report, and prevent suspicious orders. Instead, Defendants focused on their own financial interests despite the foreseeable harm an uncontrolled and unmonitored flow of opioids into Kentucky would cause.

595.     The resulting flow of opioids resulted in significant damages to the end users, the public, and ultimately the Plaintiffs.  *See supra.*

596.      Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000140 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

**C.     Negligence *Per Se*—Statutory Reporting Violation (All Defendants).**

597.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

598.    Violation of a Kentucky statute gives rise to a private right of action where the injured is within the class of persons the statute intended to be protected. This is true even where the statute is penal in nature and provides no civil remedy and extends to administrative regulations concerning public safety.

599.    Defendants collectively and individually violated their statutory obligations under KRS 218A Controlled Substances, KRS 315 Pharmacists and Pharmacies, 201 KAR Chapter 2, and 902 KAR Chapter 55, respectively.

600.    In particular, the Kentucky Board of Pharmacy requires coordination and use of reported opioid distribution and sale data, and continued demonstration of, "Acceptable operational procedures, including . . . compl[iance]." 201 KAR 2:105 Section (4)(d).

601.    To promote and to protect the public health and welfare with regards to the use of opioids, the Kentucky Agency for Substance Abuse Policy (KY-ASAP) provides a statewide framework for anti-abuse and anti-diversion practices across the Commonwealth. KY-ASAP is currently being used in many of Kentucky communities as the primary component of a comprehensive drug education/prevention, treatment, and law enforcement programs.

602.    Defendants, whether as a manufacturer, distributor, or pharmacy, each had separate and distinct reporting requirements regarding dispensing and ordering of opioids.

603.    The Kentucky Legislature promulgated the opioid related legislation for the "[p]reservation of public safety and public health." KRS 218A.005(1). The law requires Defendants—given their involvement with the supply and flow of opioids throughout the Commonwealth of Kentucky—to record all incidences of diversion of controlled substances,

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000141 of 000157

- 135 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

including opioids and forward the record to the Cabinet for Health and Family Services. *See e.g.,* KRS 218A.200; KRS 218A.170; 902 KAR 55:010.

604.    Kentucky law further requires that Defendants create, maintain, and adhere to policies and procedures that protect against public health crisis, such as the Opioid Epidemic. This obligation includes ensuring that opioid prescriptions are provided for legitimate medical needs and not likely to be diverted for illicit use.

605.    Kentucky law creates a broad duty on the part of Defendants to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids. Again, Kentucky's legislature enacted these laws expressly to protect the public from the dangers and foreseeable harm from dangerous opioids. *See* KRS 218A.200 (record keeping); KRS 218A.160(1)(a) (repealed); 218A.170; 902 KAR. 55:010 Section 4(2)(b); 201 KAR 2:105 Section 2(4)(d)).

606.    Defendants had a significant legal duty—a mandatory obligation and trust to protect the public—from the harm and dangers known to opioids, including abuse and diversion. Defendants were required to create, maintain, and enforce policies and procedures to identify— to flag—problematic opioid orders and patterns.  Defendants were further required to report these suspicious orders—a statutory duty.

607.    As discussed in detail herein, the Defendants collectively and individually failed to fulfill their mandatory obligations under Kentucky law.  Their respective failure constitutes prima facie evidence of negligence per se for which the Plaintiffs are entitled to seek relief for the corresponding damages and harm caused by each Defendant.

608.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000142 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

their attorneys' fees and costs, and pre- and post-judgment interest.

**D.    Negligence *Per Se*—False Advertising Violation (Opioid ("Marketing") Defendants and Opioid Supply Defendants).**

609.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

610.    Again, a violation of a Kentucky statute gives rise to a private right of action where the injured is within the class of persons the statute intended to be protected. This is true even where the statute is penal in nature and provides no civil remedy and extends to administrative regulations concerning public safety.

611.    The Opioid ("Marketing") Defendants and Opioid Supply Defendants, collectively and individually, violated their statutory obligations under KRS 517.030(1) which expressly prohibits "false advertising."

> A person is guilty of false advertising when, in connection with the promotion of the sale of or to increase the consumption of property or services, he knowingly makes or causes to be made a false or misleading statement in any advertisement addressed to the public or to a substantial number of persons.

612.    As discussed herein, the Opioid ("Marketing") Defendants and Opioid Supply Defendants knowingly and willfully promoted the manufacture, distribution, sale and dispensing of opioids throughout the Commonwealth of Kentucky.

613.    Through multiple marketing channels, the Opioid ("Marketing") Defendants and Opioid Supply Defendants advertised—both to the public and to large groups—that opioids were not addictive and that opioids were appropriate for long-term treatment of chronic pain.  The advertisements were knowingly and intentionally false in violation of KRS 517.030.

614.    The Opioid ("Marketing") Defendants and Opioid Supply Defendants actions constitute prima facie evidence of negligence per se for which the Plaintiffs are entitled to seek

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000143 of 000157

- 137 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

relief for the corresponding damages and harm caused by each Defendant.

615. Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

### E.    Negligent Misrepresentation (All Defendants).

616. Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

617. Kentucky recognizes, and has adopted, Restatement (Second) of Torts § 552 – Negligent Misrepresentation.[8]  In relevant part, the tort elements are as follows:

> (1) One who, in the course of his business … or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> * * * * *
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

618. As discussed in detail herein, the Manufacturer ("Marketing") Defendants and the Wholesale Distributor Defendants collectively and individually had a duty to supply truthful information concerning opioids—specifically the efficacy and risks associated with long-term use for chronic pain.

619. Despite this duty, the Manufacturer ("Marketing") Defendants and the Wholesale

---

[8]    *See Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575 (Ky. 2004).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000144 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Distributor Defendants collectively and individually knowingly and intentionally provided false information to prescribers, end-users, the public, and the Plaintiffs concerning the use of opioids.

620.    The Manufacturer ("Marketing") Defendants and the Distributor failed to exercise reasonable care in communicating accurate and truthful information concerning opioids—instead, as detailed herein, spreading misinformation and misleading marketing messages for their own respective financial gain.

621.    As the direct consequence of the Manufacturer ("Marketing") Defendants' and the Wholesale Distributor Defendants' actions, the Plaintiffs have suffered pecuniary damages for which relief is both warranted and necessary.

622.    Also as discussed in detail herein, all of the Defendants collectively and individually had a public duty—common law and statutory—to monitor the manufacture, distribution, sale, and dispensing of opioids throughout the Commonwealth of Kentucky.

623.    Despite this duty, all of the Defendants collectively and individually failed to fulfill their respective duties relating to suspicious orders.

624.    As the direct consequence of all of the Defendants' actions—or inactions— the Plaintiffs have suffered damages for which relief is both warranted and necessary.

625.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

**F.    Civil Conspiracy (Opioid ("Marketing") Defendants).**

626.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

627.    Kentucky recognizes the tort of civil conspiracy which it defines as a "corrupt or

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000145 of 000157

- 139 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

unlawful combination or agreement between two or more persons to do by concert of action an

unlawful act, or to do a lawful act by unlawful means."[9]

628.    In order to prevail on a claim of conspiracy, the Plaintiffs need only show an

unlawful or corrupt agreement between the Defendants to engage in, by some concerted action,

the unlawful act. Concerted action has been taken to mean that the parties undertook some "overt

act done pursuant to or in furtherance of conspiracy."[10]

629.    As detailed herein, the Opioid ("Marketing") Defendants engaged in a civil

conspiracy to create a public nuisance—demonstrated in large part by their concerted efforts to

avoid their reporting obligations for suspicious orders and to violate Kentucky law by

disseminating false and misleading information concerning the efficacy and risks of long-term

opioid use for chronic pain.

630.    The Opioid ("Marketing") Defendants acted with a common understanding and

orchestrated plan to commit unlawful acts, as alleged herein, and acted purposely, without a

reasonable or lawful excuse, to create the Plaintiffs' injuries alleged herein.

631.    As the direct consequence of all of the Opioid ("Marketing") Defendants'

concerted actions, the Plaintiffs have suffered damages for which relief is both warranted and

necessary.

632.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law,

including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive

damages, and all damages allowed by Kentucky law to be paid by each of the Opioid

("Marketing") Defendants, as well as their attorneys' fees and costs, and pre- and post-judgment

---

[9]    *See Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d
255, 261 (Ky.App.2008).
[10]    *See Davenport's Adm'x v. Crummies Creek Coal Co*., 184 S.W.2d 887 (1945).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000146 of 000157

Filed

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

interest.

## G. Civil Conspiracy (Opioid Supply Defendants).

633. Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

634. As detailed herein, the Opioid Supply Defendants engaged in a civil conspiracy to create a public nuisance—largely in part by their concerted efforts to avoid their reporting obligations for suspicious orders and to violate Kentucky law by using false and misleading information concerning the efficacy and risks of long-term opioid use for chronic pain.

635. The Opioid Supply Defendants acted with a common understanding and orchestrated plan to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, to create the Plaintiffs' injuries alleged herein.

636. As the direct consequence of all of the Opioid Supply Defendants' concerted actions, the Plaintiffs have suffered damages for which relief is both warranted and necessary.

637. Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each of the Opioid Supply Defendants, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

## H. Consumer Protection (All Defendants).

638. Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

639. Kentucky's Legislature enacted the Consumer Protection Act to protect the public against predatory or inappropriate actions from those businesses—e.g., Defendants—engaged in selling their products within the Commonwealth.

> The General Assembly finds that the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000147 of 000157

- 141 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

sellers of goods and services…[11]

640.     The primary focal point of Kentucky's Consumer Protection Act was to prevent abuses in the sales process.  To that end, Kentucky's Legislature defined what constitutes an unlawful act what would violate the Act and be contrary to the public good.

> Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.[12]

641.     Moreover, to underscore the importance of businesses not engaging in any unlawful act, Kentucky's Legislature further defined an unfair to mean unconscionable.[13]

642.     As discussed herein in detail, Defendants collectively and individually committed unfair, false, misleading, and/or deceptive acts with regard to the manufacture, distribution, sale, and dispensing of opioids throughout the Commonwealth of Kentucky.

643.     Pursuant to KRS 367.200, "[t]he court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been paid out as a result of any practice declared to be unlawful by KRS 367.130 to 367.300." The Plaintiffs are a "person" for purposes of this statute.

644.     The unfair, false, misleading, and/or deceptive acts committed by Defendants collectively and individually constitute a breach of the duties enumerated under Kentucky law, including but not limited to the Consumer Protection Act.

645.     As the direct consequent of Defendants' collective and individual actions, the end-users, the public, and ultimately the Plaintiffs were damaged.  By way of example, inter alia,

- The resulting high rates of opioid use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

---

[11]  *See* KRS 367.120(1).
[12]  *See* KRS 367.170(1).
[13]  See KRS 367.170(2).

- 142 -

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000148 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- Children have fallen victim to the opioid epidemic, with infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts (e.g., NAS babies).

- Residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

- The opioid epidemic has increased health care costs, including the cost of obtaining insurance coverage.

- Employers have lost the value of productive and healthy employees.

- Diversion of opioids has led to increased criminal activity and fueled a new wave of addiction, abuse, and injury.

646.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

**I.    Fraud by Omission (All Defendants).**

647.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

648.    Under Kentucky law, fraud by omission includes the following four elements:

- a duty to disclose a fact or facts;

- a failure to disclose such fact;

- the failure to disclose induced action; and

- resulting damages from the failure to disclose.[14]

649.    As previously discussed in detail herein, each Defendant was under a legal duty to

---

[14]    *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc*., 113 S.W.3d 636, 641 (Ky.App.2003).

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000149 of 000157

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

investigate, to flag, and to report suspicious orders. Defendants were required by Kentucky law

to disclose or report orders of unusual size, orders deviating substantially from a normal pattern,

or orders of unusual frequency.

650.    Also as previously discussed herein, Defendants knowingly failed to comply with

their legal obligations in Kentucky.

651.    Contrary to their obligations under Kentucky law, Defendants collectively and

individually marketed, distributed, sold, and dispensed opioids throughout the Commonwealth of

Kentucky without adequate policies and procedures to prevent the abuse and/or the diversion of

opioids—resulting in the opioid epidemic.

652.    Despite having full access to opioid sales data information—e.g., the opioid type,

dosage, quantity, date, purchaser, and prescriber—the Defendants collectively and individually

intentionally and/or recklessly failed to disclose suspicious orders and failed to confirm the order

was for a legitimate medical purpose.

653.    As the direct consequent of Defendants' collective and individual actions, the

end-users, the public, and ultimately the Plaintiffs were damaged. By way of example, inter alia,

- The resulting high rates of opioid use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

- Children have fallen victim to the opioid epidemic, with infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts (e.g., NAS babies).

- Residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

- The opioid epidemic has increased health care costs, including the cost of obtaining insurance coverage.

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000150 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

- Employers have lost the value of productive and healthy employees.

- Diversion of opioids has led to increased criminal activity and fueled a new wave of addiction, abuse, and injury.

654.    Therefore, the Plaintiffs seek all legal and equitable relief as allowed by law, including injunctive and declaratory relief, restitution, disgorgement, compensatory and punitive damages, and all damages allowed by Kentucky law to be paid by each Defendant, as well as their attorneys' fees and costs, and pre- and post-judgment interest.

**J.    Unjust Enrichment (All Defendants).**

655.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

656.    Defendants collectively and individually created and maintained an artificial market for opioids within the Commonwealth of Kentucky that only served the purpose of spreading addiction while at the same time providing each Defendant with a significant and growing stream of revenue.

657.    Defendants collectively and individually received significant financial rewards from the improper distribution, sale, and dispensing of opioids across the Commonwealth of Kentucky.

658.    Defendants collectively and individually failed to take the necessary and regulatory required steps to stem the flow of opioids and to abate the foreseeable damages to the end-users, the public, and the Plaintiffs.

659.    Defendants collectively and individually profited at the direct expense of the end-users, the public, and the Plaintiffs.  The profits were directly tied to the funds collected from end-users—either directly paid or paid on their behalf from 3rd parties (e.g., insurers).

660.    Defendants collectively and individually have been, and continue to be, unjustly

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000151 of 000157

Filed                    21-CI-00515    06/25/2021                    Amy Feldman, Franklin Circuit Clerk
NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

enriched at the expense of the end-users, the public, and ultimately the Plaintiffs—for which no

equitable benefit has been received in exchange. To the contrary, the end-users, the public, and

the Plaintiffs have instead been significantly damaged as a result of Defendants' respective

actions.

661.    Therefore, the Plaintiffs, therefore, seek disgorgement by each Defendant of all

financial gains resulting from Defendant's respective wrongful conduct—to include,

disgorgement of all payments received from the end-users, the public, and the Plaintiffs.

## K.    Punitive Damages (All Defendants).

662.    Plaintiffs re-allege all paragraphs of this Complaint as if set forth fully herein.

663.    By engaging in the above-described intentional and/or unlawful acts or practices,

Defendants acted with actual malice, wantonly, and oppressively. Defendants acted with

conscious disregard to the rights of others and/or in a reckless, wanton, willful, or gross manner.

Defendants acted with a prolonged indifference to the adverse consequences of their actions

and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others

in a manner that had a great probability of causing substantial harm. Defendants acted toward the

Plaintiffs with fraud, oppression, and/or malice.

664.    Defendants were marketing, selling, distributing, and/or dispensing dangerous

opioid drugs statutorily categorized as posing a high potential for abuse and severe dependence.

Thus, Defendants knowingly traded in opioid drugs that presented a high degree of danger if

prescribed incorrectly or diverted to other than legitimate medical, scientific, or industrial

channels. Because of the severe level of danger posed by, and indeed visited upon the

Commonwealth of Kentucky, these opioid drugs, Defendants owed a high duty of care to ensure

that these drugs were only used for proper medical purposes. Defendants chose profit over

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000152 of 000157

Filed                    21-CI-00515    06/25/2021                    Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

prudence, and the safety of the public, making an award of punitive damages both appropriate and warranted—to serve as a punishment for Defendants' greed and to serve as a future deterrent.

665.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited a complete lack of care and concern thereby supporting a presumption of wanton and reckless indifference to the Plaintiffs.

666.    Pursuant to KRS 411.184, Defendants' collective and individual actions warrant an award of punitive damages to the Plaintiffs—assessed against each Defendant—given there is clear and convincing evidence that each Defendant acted towards the Plaintiffs with oppression, fraud, and/or malice.

667.    In addition to the litany of facts already discussed herein, each Defendant engaged in oppression by knowingly, wantonly, and willfully subjecting end-users, the public, and the Plaintiffs to cruel and unjust hardship.  Defendants collectively and individually were fully aware of, and exploited for financial gain, the overwhelming risk of opioid addiction.  The resulting addiction, and corresponding impact on Plaintiffs, was both cruel and unjust.  The deaths, injuries, and destroyed families throughout the Plaintiffs' cities, while largely irreversible, are the product of each Defendant's greed.

668.    Each Defendant knowingly, wantonly, and willfully committed fraud with respect to the end-users, the public, and the Plaintiffs.  Defendants collectively and individually:

- made intentional misrepresentations concerning the risk of opioid use, as well as the necessity and efficacy of opioids for treating chronic pain; and

- concealed material facts from the end-users, the public, the Plaintiffs, and Kentucky regulators—facts that, if disclosed, could have significantly reduced or abated the opioid epidemic.

- 147 -

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

669. Each Defendant acted with malice towards the end-users, the public, and the Plaintiffs. Defendants collectively and individually acted with flagrant indifference to its legal obligations to the end-users, the public, and the Plaintiffs despite being fully aware that its actions would likely result in significant injuries (e.g., death, bodily harm, etc.).

670. Pursuant to KRS 411.186, the amount of the punitive damages warranted against each Defendant should consider each respective Defendant's respective:

- Defendant's clear knowledge of, and intentional and willful disregard, for the serious harm to the Plaintiffs that would arise from its misconduct;

- Defendant's financial gains—profitability—resulting from its misconduct;

- Defendant's lengthy history of, and unrepentant and ongoing, misconduct; and

- Defendant's wholesale failure, and steadfast refusal, to remedy its known misconduct.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully prays that the Court grant the following relief:

671. The Court certify the Plaintiffs' claims as a Kentucky class action, name Plaintiffs as the Lead Class Plaintiffs, and appoint Plaintiff's undersigned counsel as Class Counsel.

672. Enter Judgment in favor of the Plaintiff Class, and against each Defendant, as to each and every claim asserted herein.

673. Enjoin each Defendant and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, representatives, agents, and all other persons acting in concert or participation with it, from engaging in unfair or deceptive practices in violation of law and ordering temporary, preliminary or permanent injunction.

- 148 -

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000154 of 000157

674. Enjoin each Defendant and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, representatives, agents, and all other persons acting in concert or participation with it, from violating and/or continuing to violate Kentucky laws and regulations relating to the manufacture, distribution, sale, and/or dispensing of opioids in the Commonwealth.

675. Revoke and/or suspend each Defendant's license to manufacture, distribute, sell, and/or dispense opioids in the Commonwealth of Kentucky. *See e.g.*, *inter alia*, KRS 315.990(4), KRS 367.200.

676. Order each Defendant to remit all revenues received from the manufacture, distribution, sale, and/or dispensing of opioids in the Commonwealth of Kentucky during any period in which Defendant was not licensed by, and/or did not have a permit to operate from, the Kentucky Board of Pharmacy, with said revenues to include disgorgement of all related gains and profits.

677. Order each Defendant to pay the statutorily required fine of $1,000 for each and every violation of KRS Chapter 315 occurring during the applicable period Defendant was subject to and doing business in the Commonwealth of Kentucky.

678. Order the Defendants to compensate the Plaintiff Class for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic.

679. Order the Defendants to fund an "abatement fund" for the purposes of abating the opioid public nuisance.

680. Award the Plaintiff Class, and order Defendants to pay, actual damages, compensatory damages, special damages, injunctive and equitable relief, disgorgement, and forfeiture.

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

681.     Award the Plaintiff Class, and order Defendants to pay, attorneys' fees and all costs and expenses, to include experts.

682.     Award the Plaintiff Class, and order Defendants to pay, the consequential damages caused by the opioid epidemic (e.g. social, educational, treatment, employment, law enforcement, medical, and related services), including by way of example: (i) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (ii) costs for providing treatment, counseling, and rehabilitation services; (iii) costs for providing treatment of infants born with opioid-related medical conditions; (iv) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; and (v) costs associated with law enforcement and public safety.

683.     Award the Plaintiff Class, and order Defendants to pay, punitive damages in the maximum amount permitted and in accordance with Kentucky law and due process.

684.     Award the Plaintiff Class, and order Defendants to pay, pre-judgment and post-judgment interest; and,

685.     Award the Plaintiff Class, and order Defendants to pay, all other relief as provided by law and/or as the Court deems appropriate and just.

* * * * * * * *

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

COM : 000156 of 000157

NOT ORIGINAL DOCUMENT
07/19/2021 11:38:38 AM
65730-7

Dated: June 25, 2021

**Bahe Cook Cantley & Nefzger PLC**

William D. Nefzger
*will@bccnlaw.com*
1041 Goss Avenue
Louisville, KY 40217
p (502) 587-2002
f (502) 587-2006

**Grabhorn Law | Insured Rights®**

Michael D. Grabhorn
*m.grabhorn@grabhornlaw.com*
Andrew M. Grabhorn
*a.grabhorn@grabhornlaw.com*
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
p (502) 244-9331
f (502) 244-9334

*Counsel for Plaintiffs and the Putative Class*

Filed          21-CI-00515          06/25/2021          Amy Feldman, Franklin Circuit Clerk

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

COM : 000157 of 000157

Filed 21-CI-00515 06/25/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:39:00 AM
95730-7

| AOC-105 | Doc. Code: CI |
| --- | --- |
| Rev. 1-07 | |
| Page 1 of 1 | |
| Commonwealth of Kentucky | |
| Court of Justice   www.courts.ky.gov | |
| CR 4.02; CR Official Form 1 | |



**CIVIL SUMMONS**

Case No. _____

Court ☑ Circuit ☐ District

County   Franklin

**PLAINTIFF**

City of Russell, Kentucky, et al.

**VS.**

**DEFENDANT**

Abbott Laboratories, et al.

**Service of Process Agent for Defendant:**

**THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANT(S):**

You are hereby notified a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or** by **an attorney on your behalf** within **20 days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached Complaint.

The name(s) and address(es) of the party or parties demanding relief against you are shown on the document delivered to you with this Summons.

Date: _____, 2_____          _____Clerk

By: _____ D.C.

+---------------------------------------------------------------+
| **Proof of Service**                                          |
| This Summons was served by delivering a true copy and the Complaint (or other initiating document) to: |
|                                                               |
| _____ |
| this _____ day of _____, 2_____.              |
|                          Served by: _____ |
|                          _____Title |
+---------------------------------------------------------------+

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

EXH : 000001 of 000001

AOC-E-105        Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice        Courts.ky.gov

CR 4.02; Cr Official Form 1



**NOT ORIGINAL DOCUMENT**
07/19/2021
65709.7

Case #: **21-CI-00515**

Court:        **CIRCUIT**

County:        **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO:   **ABBOTT LABORATORIES**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20_____

   _____
   Served By

   _____
   Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985035
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105     Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice     *Courts.ky.gov*

CR 4.02; Cr Official Form 1



**NOT ORIGINAL DOCUMENT**
07/23/2021
65700 P.

Case #: **21-CI-00515**

Court:   **CIRCUIT**

County: **FRANKLIN**

## CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO: **TEVA PHARMACEUTICAL INDUSTRIES LTD**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

---

Summons ID: @00000985036
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*CI : 000001 of 000001*



Page 1 of 1

**eFiled**

AOC-E-105     Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice     *Courts.ky.gov*

CR 4.02; Cr Official Form 1



**NOT ORIGINAL DOCUMENT**
07/19/2021
6578207

Case #: **21-CI-00515**

Court: **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO: **ALLERGAN PLC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title



Page 1 of 1

eFiled

*Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)*

*CI : 000001 of 000001*

AOC-E-105      Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/19/2021

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:   **CIRCUIT**

County:  **FRANKLIN**

CR 4.02; Cr Official Form 1



# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **ENDO INTERNATIONAL PLC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985038
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105      Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice      Courts.ky.gov

CR 4.02; Cr Official Form 1



**NOT ORIGINAL DOCUMENT**
07/19/2021
65700 J

Case #: **21-CI-00515**

Court: **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **JOHNSON & JOHNSON**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

CI : 000001 of 000001

Summons ID: @00000985039
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105        Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice      Courts.ky.gov

CR 4.02; Cr Official Form 1



NOT ORIGINAL DOCUMENT
07/09/2021

Case #: **21-CI-00515**

Court: **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

---

*Plaintiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **AMNEAL PHARMACEUTICALS INC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985040
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1



AOC-E-105          Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/09/2021

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:    **CIRCUIT**

County:   **FRANKLIN**

CR 4.02; Cr Official Form 1



# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **MYLAN PHARMACEUTICALS INC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985041
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A

Page 1 of 1



eFiled

AOC-E-105          Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/25/2021

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:  **CIRCUIT**

County:  **FRANKLIN**

CR 4.02; Cr Official Form 1



# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **WEST-WARD PHARMACEUTICALS CORP.**

The Commonwealth of Kentucky to Defendant:

 You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

 To: _____

☐ Not Served because: _____

 Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

---

Summons ID: @00000985042
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

# eFiled



AOC-E-105    Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/19/2021

Commonwealth of Kentucky
Court of Justice    Courts.ky.gov

CR 4.02; Cr Official Form 1

Case #: **21-CI-00515**

Court: **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **KVK TECH, INC.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

CI : 000001 of 000001

---

Summons ID: @00000985043
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105     Sum Code: CI
Rev. 9-14



NOT ORIGINAL DOCUMENT
07/09/2021

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice     *Courts.ky.gov*

Court: **CIRCUIT**

County: **FRANKLIN**

CR 4.02; Cr Official Form 1

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **ASSERTIO THERAPEUTICS INC.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985044
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

**eFiled**

AOC-E-105      Sum Code: CI
Rev. 9-14



NOT ORIGINAL DOCUMENT
07/19/2021

Case #: 21-CI-00515

Commonwealth of Kentucky
Court of Justice      Courts.ky.gov

Court:      **CIRCUIT**

County:    **FRANKLIN**

CR 4.02; Cr Official Form 1

## CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:   **DEPOMED INC.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001



Page 1 of 1

eFiled

AOC-E-105  Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice     *Courts.ky.gov*

CR 4.02; Cr Official Form 1



NOT ORIGINAL DOCUMENT
07/19/2021
65700 J

Case #: **21-CI-00515**
Court:  **CIRCUIT**
County:  **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **AMERISOURCEBERGEN DRUG CORP.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985046
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



eFiled

AOC-E-105        Sum Code: CI
Rev. 9-14



NOT ORIGINAL DOCUMENT
07/19/2021
65700.7

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

Court: **CIRCUIT**

County: **FRANKLIN**

CR 4.02; Cr Official Form 1

## CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO:  **ANDA INC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

   Date: _____, 20 _____

   _____
   Served By

   _____
   Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985047
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

**eFiled**

AOC-E-105    Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/19/2021
65749.7

Commonwealth of Kentucky
Court of Justice    Courts.ky.gov

CR 4.02; Cr Official Form 1



Case #: **21-CI-00515**

Court:    **CIRCUIT**

County:    **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **CARDINAL HEALTH INC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985048
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A





AOC-E-105      Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/09/2021
65700 J

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:    **CIRCUIT**

County:   **FRANKLIN**

CR 4.02; Cr Official Form 1



# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **CVS HEALTH CORPORATION LLC**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____ , 20 _____

_____
Served By

_____
Title

---

Summons ID: @00000985049
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001



AOC-E-105       Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/19/2021
6570047

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:   **CIRCUIT**

County:  **FRANKLIN**

CR 4.02; Cr Official Form 1

# CIVIL SUMMONS

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:  **KROGER COMPANY**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985050
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

**eFiled**

| AOC-E-105    Sum Code: CI<br>Rev. 9-14 |  | NOT ORIGINAL DOCUMENT<br>07/19/2021<br>65700 J |
|---|---|---|

AOC-E-105     Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

CR 4.02; Cr Official Form 1

**Case #: 21-CI-00515**

Court: **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO: **MCKESSON CORPORATION**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____

           _____
                              Served By

           _____
                                 Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001



**eFiled**

AOC-E-105          Sum Code: CI
Rev. 9-14

NOT ORIGINAL DOCUMENT
07/19/2021
657002

Commonwealth of Kentucky
Court of Justice     *Courts.ky.gov*

CR 4.02; Cr Official Form 1



Case #: **21-CI-00515**

Court:  **CIRCUIT**

County: **FRANKLIN**

# CIVIL SUMMONS

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO:  **RITE AID CORPORATION**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985052
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

**eFiled**

AOC-E-105    Sum Code: CI
Rev. 9-14



Commonwealth of Kentucky
Court of Justice    *Courts.ky.gov*

CR 4.02; Cr Official Form 1

NOT ORIGINAL DOCUMENT
07/19/2021
65709.7

Case #: **21-CI-00515**

Court:   **CIRCUIT**

County:   **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:   **KENTUCKY CVS PHARMACY LLC**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985053
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105        Sum Code: CI
Rev. 9-14



NOT ORIGINAL DOCUMENT
07/19/2021

Case #: **21-CI-00515**

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

Court:   **CIRCUIT**

County:   **FRANKLIN**

CR 4.02; Cr Official Form 1

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO:   **RITE AID OF KENTUCKY INC**

The Commonwealth of Kentucky to Defendant:

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons.  **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

<div style="border:1px solid">

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

   To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

</div>

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985054
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

**eFiled**

AOC-E-105   Sum Code: CI
Rev. 9-14

Commonwealth of Kentucky
Court of Justice   *Courts.ky.gov*

CR 4.02; Cr Official Form 1



**NOT ORIGINAL DOCUMENT**
07/19/2021
65700.7

Case #: **21-CI-00515**

Court:   **CIRCUIT**

County:   **FRANKLIN**

# CIVIL SUMMONS

---

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

TO:   **WALGREEN CO.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985055
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

AOC-E-105          Sum Code: CI
Rev. 9-14



NOT ORIGINAL DOCUMENT
07/19/2021

Commonwealth of Kentucky
Court of Justice      *Courts.ky.gov*

CR 4.02; Cr Official Form 1

Case #: **21-CI-00515**

Court:   **CIRCUIT**

County:  **FRANKLIN**

# CIVIL SUMMONS

*Plantiff,* **CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A**, *Defendant*

### TO:  **WALMART INC.**

The Commonwealth of Kentucky to Defendant:

You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Amy Feldman*

Franklin Circuit Clerk
Date: **6/25/2021**

---

## Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20 _____

_____
Served By

_____
Title

Presiding Judge: HON. THOMAS  DAWSON WINGATE (648243)

CI : 000001 of 000001

Summons ID: @00000985056
CIRCUIT: 21-CI-00515 Return to Filer for Service
CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A



Page 1 of 1

eFiled

NOT ORIGINAL DOCUMENT
07/19/2021 11:42:49 AM
65730-7

Commonwealth of Kentucky
Court of Justice *www.courts.ky.gov*



**FRANKLIN COUNTY**

**RANDOM JUDGE ASSIGNMENT**

Court:  Franklin County Circuit Court [FCCC]

Case Style:  TBD

Case Number:  21-CI-00515

This case has been assigned to:  HON. THOMAS DAWSON WINGATE [648243]

*Amy Feldman*

**Amy Feldman, Franklin Circuit Clerk**
**6/25/2021 3:07:48 PM**



**Commonwealth of Kentucky**

**Amy Feldman, Franklin Circuit Clerk**

NOT ORIGINAL DOCUMENT
07/19/2021 11:42:59 AM
65730-7

| | |
|---|---|
| **Case #:** 21-CI-00515 | **Envelope #:** 3605240 |
| **Received From:** MICHAEL  GRABHORN | **Account Of:** MICHAEL   GRABHORN |
| **Case Title:** CITY OF RUSSELL, KENTUCKY ET AL VS. ABBOTT LABORATORIES ET A | **Confirmation Number:** 127453383 |
| **Filed On** 6/25/2021  2:16:40PM | |

| # | Item Description | Amount |
|---|---|---|
| 1 | Access To Justice Fee | $20.00 |
| 2 | Civil Filing Fee | $150.00 |
| 3 | Money Collected For Others(Court Tech. Fee) | $20.00 |
| 4 | Library Fee | $3.00 |
| 5 | Court Facilities Fee | $25.00 |
| 6 | Money Collected For Others(Attorney Tax Fee) | $5.00 |
| 7 | Charges For Services(Jury Demand / 12) | $70.00 |
| | **TOTAL:** | $293.00 |



Franklin County

Amy Feldman

Circuit Court Clerk

**Receipt Number: 23-0013720-A**

DATE: 06/25/2021

TIME: 03:11 PM

\*\*\* (Z) OTHER TYPE RECEIPT \*\*\*

**CASE NO: 21-CI-00515**

RECEIVED FROM: MICHAEL    GRABHORN

ACCOUNT OF: CITY OF RUSSELL,
KENTUCKY ET AL VS. ABBOTT
LABORATORIES ET A
PARTY NAME: MICHAEL    GRABHORN

| | | |
|---|---|---|
| 1. | ATJ Fee (1) | $20.00 |
| 2. | Civil Filing Fee (Q) | $150.00 |
| 3. | Court Technology MCFO(K(CT)) | $20.00 |
| 4. | Library Fee (L) | $3.00 |
| 5. | Court Facilities Fee ([) | $25.00 |
| 6. | Att Tax Fee MCFO(K(Q)) | $5.00 |
| 7. | Jury Demand / 12 CS(W(M)) | $70.00 |
| | TOTAL: | $293.00 |

| | |
|---|---|
| CREDIT CARD: | $293.00 |
| \*\*\*DIFF: | $0.00 |

\*\*\* Credit Card Invoice #: 127453383

3605240

........................................................

\*\*\* MultiReceipt/MassReceipt Transaction \*\*\*

Reprint : 6/28/2021   7:47:32AM

Prepared By: Web_Payment

Pay Online Visit:

www.kycourts.gov    and click on Pay Fine/Fee.

Reprint

Filed 21-CI-00515 06/29/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:20 AM
65730-7

## COMMONWEALTH OF KENTUCKY
## FRANKLIN CIRCUIT COURT
## DIVISION II
## CASE NO. 21-CI-00515

| | |
|---|---|
| **CITY OF RUSSELL, KENTUCKY, ET AL.,** | |
| **PLAINTIFFS,** | **NOTICE of ENTRY of APPEARANCES** |
| **v.** | |
| **ABBOTT LABORATORIES, ET AL.,** | |
| **DEFENDANTS.** | |

Plaintiffs hereby give notice to the Court and all other parties of the appearance of

Michael D. Grabhorn, Andrew M. Grabhorn, and William D. Nefzger as Counsel for Plaintiffs.

Counsel's contact and electronic service information is as follows:

**Michael D. Grabhorn**
Grabhorn Law | Insured Rights®
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
p: (502) 244-9331
f: (502) 244-9334
email: *m.grabhorn@grabhornlaw.com*

**Andrew M. Grabhorn**
Grabhorn Law | Insured Rights®
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
p: (502) 244-9331
f: (502) 244-9334
email: *a.grabhorn@grabhornlaw.com*

**William D. Nefzger**
Bahe Cook Cantley & Nefzger PLC
1041 Goss Avenue
Louisville, KY 40217
p (502) 587-2002
f (502) 587-2006
email: *will@bccnlaw.com*

EA : 000001 of 000003

Filed 21-CI-00515 06/29/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:20 AM
65730-7

* * * * * * * * *

Dated: June 29, 2021      /s/ Michael D. Grabhorn

**Bahe Cook Cantley & Nefzger PLC**      **Grabhorn Law | Insured Rights®**

William D. Nefzger      Michael D. Grabhorn
*will@bccnlaw.com*      *m.grabhorn@grabhornlaw.com*
1041 Goss Avenue      Andrew M. Grabhorn
Louisville, KY 40217      *a.grabhorn@grabhornlaw.com*
p (502) 587-2002      2525 Nelson Miller Parkway, Suite 107
f (502) 587-2006      Louisville, KY 40223
     p (502) 244-9331
     f (502) 244-9334

*Counsel for Plaintiffs and the Putative Class*

EA : 000002 of 000003

Filed                    21-CI-00515        06/29/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:20 AM
65730-7

## CERTIFICATE OF SERVICE

I certify that on June 29, 2021, a copy of the foregoing was filed electronically with this Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Michael D. Grabhorn

E A · : 000003 of 000003

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:31 AM
65730-7

## COMMONWEALTH OF KENTUCKY
## FRANKLIN CIRCUIT COURT
## DIVISION II
## CASE NO. 21-CI-00515

| | |
|---|---|
| **CITY OF RUSSELL, KENTUCKY, ET AL.,** <br><br> **PLAINTIFFS,** <br><br> v. <br><br> **ABBOTT LABORATORIES, ET AL.,** <br><br> **DEFENDANTS.** | **NOTICE OF ELECTRONIC SERVICE ELECTION** |

Pursuant to **CR 5.02(2)**, Plaintiffs hereby gives notice to the Court and all other parties of Plaintiffs' election to send and receive *service via electronic means*. All parties shall serve Plaintiffs at the following electronic addresses:

- *m.grabhorn@grabhornlaw.com*
- *a.grabhorn@grabhornlaw.com*
- *will@bccnlaw.com*

Pursuant to **CR 5.02(2)**, all parties must promptly provide an electronic address at which they may be served with documents.

\* \* \* \* \* \* \* \* \*

Dated: June 29, 2021                         /s/ Michael D. Grabhorn

**Bahe Cook Cantley & Nefzger PLC**          **Grabhorn Law | Insured Rights®**

William D. Nefzger                           Michael D. Grabhorn
*will@bccnlaw.com*                           *m.grabhorn@grabhornlaw.com*
1041 Goss Avenue                             Andrew M. Grabhorn
Louisville, KY 40217                         *a.grabhorn@grabhornlaw.com*
p (502) 587-2002                             2525 Nelson Miller Parkway, Suite 107
f (502) 587-2006                             Louisville, KY 40223
                                             p (502) 244-9331
                                             f (502) 244-9334

*Counsel for Plaintiffs and the Putative Class*

Filed 21-CI-00515 06/29/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:31 AM
65730-7

## CERTIFICATE OF SERVICE

I certify that on June 29, 2021, a copy of the foregoing was filed electronically with this Court.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Michael D. Grabhorn

Filed                21-CI-00515    07/13/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:39 AM
65730-7

## COMMONWEALTH OF KENTUCKY
## FRANKLIN CIRCUIT COURT
## DIVISION 2
## CASE NO. 21-CI-00515

|  |  |
|---|---|
| **CITY OF RUSSELL, KENTUCKY, ET AL.,** | |
| **PLAINTIFFS,** | **STIPULATION to EXTEND DEFENDANTS' TIME to RESPOND to the COMPLAINT** |
| v. | |
| **ABBOTT LABORATORIES, ET AL.,** | |
| **DEFENDANTS.** | |

Plaintiffs hereby file this stipulation to extend defendants' time to respond to the complaint. Several Defendants have requested extensions of time in which to respond to the Complaint. As opposed to entering multiple extensions, and to provide a more efficient process, Plaintiffs hereby stipulate to the following extension as applicable to each Defendant.

For each Defendant *who has entered an appearance in this matter*, their respective deadline to respond to the Complaint is hereby extended to *August 23, 2021*.

\* \* \* \* \* \* \* \* \*

Dated: July 13, 2021                    /s/ Michael D. Grabhorn

**Bahe Cook Cantley & Nefzger PLC**      **Grabhorn Law | Insured Rights®**

William D. Nefzger                      Michael D. Grabhorn
*will@bccnlaw.com*                      *m.grabhorn@grabhornlaw.com*
1041 Goss Avenue                        Andrew M. Grabhorn
Louisville, KY 40217                    *a.grabhorn@grabhornlaw.com*
p (502) 587-2002                        2525 Nelson Miller Parkway, Suite 107
f (502) 587-2006                        Louisville, KY 40223
                                        p (502) 244-9331
                                        f (502) 244-9334

*Counsel for Plaintiffs and the Putative Class*

STP : 000001 of 000003

Filed 21-CI-00515 07/13/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:39 AM
65730-7

## CERTIFICATE OF SERVICE

I certify that on July 13, 2021, a copy of the foregoing was filed electronically with this Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties who have entered an appearance as indicated on the electronic filing receipt. A courtesy copy of the foregoing has also been remitted electronically to parties who have contacted the undersigned but not yet entered an appearance.

/s/ Michael D. Grabhorn

STP : 000002 of 000003

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:39 AM
65730-7

STP : 000003 of 000003

Filed                21-CI-00515        07/14/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:50 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
CASE NO. 21-CI-00515

CITY OF RUSSELL, KENTUCKY, et al.                            PLAINTIFFS

v.

ABBOTT LABORATORIES, et al.                                 DEFENDANTS

### ENTRY OF APPEARANCE AND
### NOTICE OF ELECTION TO EFFECTUATE AND
### RECEIVE SERVICE VIA ELECTRONIC MEANS

**PLEASE TAKE NOTICE** that the undersigned attorney hereby enters his appearance as

counsel for Defendant Mylan Pharmaceuticals Inc.  Pursuant to CR 5.02(2), the undersigned

elects to effectuate and receive service via electronic means to and from all other attorneys or

parties in the action.  Service shall be made upon counsel for Defendant Mylan Pharmaceuticals

Inc. at the following electronic notification address: sdickens@fmdlegal.com.  Pursuant to CR

5.02(2), all other attorneys or parties are requested to provide an electronic notification address at

which they may be served.

Respectfully submitted,

Fultz Maddox Dickens PLC

/s/ *Scott T. Dickens*
Scott T. Dickens
John David Dyche
101 South Fifth Street
2700 National City Tower
Louisville, Kentucky  40202
sdickens@fmdlegal.com
jddyche@fmdlegal.com
(o) 502.588.2000
(f) 502.588.2020

*Counsel for Mylan Pharmaceuticals Inc.*

Filed                21-CI-00515        07/14/2021        Amy Feldman, Franklin Circuit Clerk

Filed        21-CI-00515        07/14/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:50 AM
65730-7

## CERTIFICATE OF SERVICE

I certify that on July 14, 2021, notice of this filing will be sent to all parties registered to receive such notice by operation of the Court's electronic filing system.


/s/ *Scott T. Dickens*
*Counsel for Mylan Pharmaceuticals Inc.*

2

EA : 000002 of 000002

Filed                21-CI-00515      07/14/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:59 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
CASE NO. 21-CI-00515

CITY OF RUSSELL, KENTUCKY, et al.                          PLAINTIFFS

v.

ABBOTT LABORATORIES, et al.                              DEFENDANTS

## ENTRY OF APPEARANCE AND
## NOTICE OF ELECTION TO EFFECTUATE AND
## RECEIVE SERVICE VIA ELECTRONIC MEANS

**PLEASE TAKE NOTICE** that the undersigned attorney hereby enters his appearance as

counsel for Defendant Mylan Pharmaceuticals Inc.  Pursuant to CR 5.02(2), the undersigned

elects to effectuate and receive service via electronic means to and from all other attorneys or

parties in the action.  Service shall be made upon counsel for Defendant Mylan Pharmaceuticals

Inc. at the following electronic notification address: jddyche@fmdlegal.com.  Pursuant to CR

5.02(2), all other attorneys or parties are requested to provide an electronic notification address at

which they may be served.

Respectfully submitted,

Fultz Maddox Dickens PLC

/s/ *John David Dyche*
Scott T. Dickens
John David Dyche
101 South Fifth Street
2700 National City Tower
Louisville, Kentucky  40202
sdickens@fmdlegal.com
jddyche@fmdlegal.com
(o) 502.588.2000
(f) 502.588.2020

*Counsel for Mylan Pharmaceuticals Inc.*

EA : 000001 of 000002

Filed    21-CI-00515    07/14/2021    Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:43:59 AM
65730-7

## CERTIFICATE OF SERVICE

I certify that on July 14, 2021, notice of this filing will be sent to all parties registered to receive such notice by operation of the Court's electronic filing system.


/s/ *John David Dyche*
*Counsel for Mylan Pharmaceuticals Inc.*

2

EA : 000002 of 000002

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:09 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION II
CASE NO. 21-CI-515
HON. THOMAS D. WINGATE
*(ELECTRONICALLY FILED)*

CITY OF RUSSELL, KENTUCKY, et al.                          PLAINTIFFS

v.

ABBOTT LABORATORIES, et al.                          DEFENDANTS

### ENTRY OF SPECIAL APPEARANCE

PLEASE TAKE NOTICE that Mark S. Fenzel, Elisabeth S. Gray, and the law firm of Middleton Reutlinger hereby enter their special appearance as counsel for Defendants Rite Aid of Kentucky, Inc. and Rite Aid Corporation.  This Notice of Appearance is made while preserving the right to timely object for lack of jurisdiction and/or venue.   Copies of all pleadings, correspondence and things shall hereafter be served upon the below named counsel.

Respectfully submitted,

*/s/ Elisabeth S. Gray*
Mark S. Fenzel
Elisabeth S. Gray
MIDDLETON REUTLINGER
401 S. Fourth St., Suite 2600
Louisville, Kentucky  40202
Phone: (502) 584-1135
mfenzel@middletonlaw.com
egray@middletonlaw.com
**Counsel for Defendants Rite Aid of Kentucky, Inc.
and Rite Aid Corporation**

### CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing was e-filed on this the ___ day of July, 2021, utilizing the Court's KCOJ e-filing system, and a copy of same was e-mailed and/or mailed to the following counsel of record:

EA : 000001 of 000002

Filed

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:09 AM
65730-7

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Pkwy., Suite 107
Louisville, KY 40223
m.grabhorn@grabhornlaw.com
a.grabhorn@grabhornlaw.com

and

William D. Nefzger
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, KY 40217
will@bccnlaw.com
**Counsel for Plaintiffs and
the Putative Class**

Andrew L. Sparks
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone: (859) 899-8734
Facsimile: (844) 670-6009
E-Mail: asparks@dickinsonwright.com
**Counsel for Defendant Walmart Inc.**

Mark G. Arnzen (01830)
Frank K. Tremper (94095)
Arnzen, Storm & Turner, P.S.C.
600 Greenup Street
Covington, KY 41011
Telephone: 859-431-6100
Facsimile: 859-431-3778
marnzen@arnzenlaw.com
ftremper@arnzenlaw.com
**Counsel for Defendant Walgreen Co.**

Robert E. Stopher
Robert D. Bobrow
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone: (502) 589-5980
Fax: (502) 561-9400
E-mail: rstopher@bsg-law.com
       rbobrow@bsg-law.com
**Counsel for Defendants Kentucky CVS
Pharmacy,
LLC and CVS Health Corporation, LLC**

Edmund J. Benson (KBA 82691)
Benson Law Offices, PSC
450 Old Vine Street, Suite 200
Lexington, Kentucky 40507
Telephone: (859) 475-1644
ned@nedbensonlaw.com
**Counsel for Defendant Kroger**

Scott T. Dickens
John David Dyche
101 South Fifth Street
2700 National City Tower
Louisville, KY 40202
Telephone: (502) 588-2000
sdickens@fmdlegal.com
jddyche@fmdlegal.com
**Counsel for Defendant Mylan
Pharmaceuticals, Inc.**

*/s/ Elisabeth S. Gray*
**Counsel for Defendants Rite Aid of
Kentucky and Rite Aid Corporation**

EA : 000002 of 000002

2

Filed

*Electronically Filed*

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:18 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN OF CIRCUIT COURT
DIVISION:
CASE NO. 21-CI-515

CITY OF RUSSELL, ET AL                                      PLAINTIFFS

v.

KVK TECH, ET AL                                           DEFENDANTS

---

## NOTICE OF ENTRY OF APPEARANCE

---

PLEASE TAKE NOTICE that without waiver of any defense, DONALD L. MILLER, II.

Of the firm Quintairos, Prieto, Wood & Boyer P.A. 9300 Shelbyville RD, Suite 400, Louisville,

KY 40222, hereby enter his appearance for KVK Tech, INC. All parties are requested to update

their service lists accordingly, and to send all future pleadings, correspondence, discovery and

other materials in this matter to the undersigned.

Respectfully submitted,

QUITAIROS, PRIETO, WOOD & Boyer, P.A.

*/s/ Donald L. Miller, II*
Donald L. Miller
9300 Shelbyville, Rd Suite 400
Louisville, KY 40222
Telephone (502) 423-6390
Facsimile: (502) 423-6391
Email: dmiller@qpwblaw.com
*Counsel for Defendant KVK Tech, Inc.*

EA : 000001 of 000002

Electronically Filed

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing has been served, this the 15th day of July, 2021, upon the following via electronic service, pursuant to the Kentucky Court of Justice's efiling Rules, to:

William D. Nefzger
BAHE COOK CANTLEY & NEFZGER, PLC
1041 GOSS AVENUE
LOUISVILLE, KY 40217
TEL: (502) 587-2002
FAX: (502) 587-2006
will@bccnlaw.com
***Counsel for Plaintiff's and the Putative class***

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Parkway, Suite 107
Tel: (502) 244-9331
Fax: (502) 244-9334
m.grabhorn@grabhornlaw.com
a.grabhorn@grabhornlaw.com
***Counsel for Plaintiff's and the Putative class***

*/s/ Donald L. Miller, II*
***Counsel for Defendant KVK Tech, Inc.***

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:27 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
CIVIL ACTION NO. 21-CI-00515
DIVISION NO. 2

CITY OF RUSSELL, KENTUCKY, et al.,                              PLAINTIFFS

v.                          **ENTRY OF APPEARANCE**
                              (electronically filed)

ABBOTT LABORATORIES, et al.                                    DEFENDANTS

   E. Frederick Straub, Jr., Esq., and Ryan T. Polczynski, Esq., of the law firm of Whitlow,

Roberts, Houston & Straub, PLLC, 300 Broadway, P.O. Box 995, Paducah, KY 42002-0995,

hereby enter their appearance as counsel of record for the defendant Johnson & Johnson.  It is

requested that all further correspondence and pleadings be submitted and served on E. Frederick

Straub, Jr., Esq., (estraub@whitlow-law.com) and Ryan T. Polczynski, Esq., (rtp@whitlow-

law.com) Whitlow, Roberts, Houston & Straub, PLLC, 300 Broadway, P.O. Box 995, Paducah,

KY 42002-0995.

       WHITLOW, ROBERTS, HOUSTON & STRAUB, PLLC
       Attorneys for Johnson & Johnson.


      BY:   /s/ Ryan T. Polczynski
        E. Frederick Straub, Jr., Esq.
        Ryan T. Polczynski, Esq.
        300 Broadway
        Post Office Box 995
        Paducah, Kentucky 42002-0995
        Telephone:  (270) 443-4516
        Facsimile:  (270) 442-1712
        Estraub@whitlow-law.com
        rtp@whitlow-law.com

Filed          21-CI-00515     07/15/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:27 AM
65730-7

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of July, 2021, I electronically filed the foregoing with the clerk of the court by using the Kentucky Court of Justice e-filing system which will provide electronic notice to:

William D. Nefzger, Esq., Bahe, Cooke, Cantley & Nefzger, 1041 Goss Avenue, Louisville, KY 40217, *Attorney for Plaintiffs*

Michael D. Grabhorn, Esq., and Andrew M. Grabhorn, Esq., Grabhorn Law, 2525 Nelson Miller Parkway, Suite 107, Louisville, KY 40223, *Attorney for Plaintiffs*

/s/ Ryan T. Polczynski
Ryan T. Polczynski, Esq.

EA : 000002 of 000002

Filed 21-CI-00515 07/16/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:37 AM
65730-7

NO. 21-CI-00515            FRANKLIN CIRCUIT COURT
DIVISION 2
JUDGE THOMAS DAWSON WINGATE

_ELECTRONICALLY FILED_

CITY OF RUSSELL, KENTUCKY, *ET AL.*            PLAINTIFF

**NOTICE OF ENTRY OF APPEARANCE**

v.

ABBOTT LABORATORIES, *ET AL.*            DEFENDANTS

* * * * *

Notice is hereby given that Robert E. Stopher of the firm of Boehl Stopher & Graves, LLP, 400 West Market Street, Suite 2300, Louisville, Kentucky 40202, hereby enters his appearance as counsel for the defendant, Kentucky CVS Pharmacy, L.L.C.

BOEHL STOPHER & GRAVES, LLP

/s/ Robert E. Stopher
Robert E. Stopher (KBA No. 68390)
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone: (502) 589-5980
Fax: (502) 561-9400
E-mail: rstopher@bsg-law.com
COUNSEL FOR DEFENDANT,
KENTUCKY CVS PHARMACY, L.L.C.

EA : 000001 of 000002

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:37 AM
65730-7

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on the 16th day of July, 2021 the foregoing was electronically mailed and electronically filed via the Kentucky Court of Justice eFiling system and e-mailed to the following:

William D. Nefzger
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, K 40217

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223

/s/ Robert E. Stopher
Robert E. Stopher
COUNSEL FOR DEFENDANT,
KENTUCKY CVS PHARMACY, L.L.C.

EA : 000002 of 000002

Filed          21-CI-00515     07/16/2021          Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:46 AM
65730-7

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION II
CIVIL ACTION NO. 21-CI-00515

CITY OF RUSSELL, KENTUCKY, et al.                              PLAINTIFFS

v.              **NOTICE OF APPEARANCE AND CR 5.02(2) NOTICE**

ABBOTT LABORATORIES, et al.                                   DEFENDANTS

_____

Carol Dan Browning, Jeffrey S. Moad, and Carolyn Purcell Michener of the law firm

Stites & Harbison, PLLC enter their appearance on behalf of McKesson Corporation.  Pursuant

to CR 5.02(2), McKesson Corporation elects to receive and effectuate service in this action by

email.  Please direct future pleadings and other documents to these email addresses:

cbrowning@stites.com
jmoad@stites.com
cmichener@stites.com

In entering this appearance, McKesson Corporation expressly preserves and does not waive all of

its rights and defenses.

*/s/ Carol Dan Browning*_____
Carol Dan Browning
Jeffrey S. Moad
Carolyn Purcell Michener
STITES & HARBISON PLLC
400 West Market Street
Suite 1800
Louisville, KY  40202-3352
Telephone:  (502) 587-3400
cbrowning@stites.com
jmoad@stites.com
cmichener@stites.com
*Counsel for Defendant, McKesson*
*Corporation*

EA : 000001 of 000005

Filed 21-CI-00515 07/16/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:46 AM
65730-7

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2021, a true and correct copy of the foregoing has been served upon the following by U.S. First Class mail, postage prepaid, and/or electronic mail upon the following:

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
m.grabhorn@grabhornlaw.com
a.grabhorn@grabhornlaw.com
*Counsel for Plaintiffs and the Putative Class*

William D. Nefzger
BAHE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, KY 40217
will@bccnlaw.com
*Counsel for Plaintiffs and the Putative Class*

John A. McCauley
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
JMcCauley@Venable.com
*Counsel for Abbott Laboratories*

Brenton A. Rogers
Eric L. White
KIRKLAND & ELLIS LLP
300 North LaSalle Dr.
Chicago, IL 60201
brogers@kirkland.com
eric.white@kirkland.com
*Counsel for Abbott Laboratories*

Robert Franklin Duncan
Margaret Jane Brannon
JACKSON KELLY PLLC - LEXINGTON
175 E. Main Street, Suite 500
P.O. Box 2150
Lexington, KY 40507
rduncan@jacksonkelly.com
mjbrannon@jacksonkelly.com
*Counsel for AmerisourceBergen Drug Corporation*

Shannon E. McClure
Robert A. Nicholas
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
RNicholas@ReedSmith.com
SMcClure@ReedSmith.com
*Counsel for AmerisourceBergen Drug Corporation*

EA : 000002 of 000005

Filed 21-CI-00515 07/16/2021 Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 07/16/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:46 AM
65730-7

Thomas G. McIntosh
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202-2409
tmcintosh@ulmer.com
*Counsel for Amneal Pharmaceuticals, Inc.*

James W. Matthews
Ana M. Francisco
Katy E. Koski
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
jmatthews@foley.com
kkoski@foley.com
afrancisco@foley.com
*Counsel for Anda, Inc.*

Kevin M. Sadler
BAKER BOTTS LLP
1001 Page Mill Road, Building One
Suite 200
Palo Alto, CA 94304
kevin.sadler@bakerbotts.com
*Counsel for Assertio Therapeutics, Inc.*
*f/k/a Depomed Inc.*

Steven B. Loy
Perry M. Bentley
Monica H. Braun
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1801
steven.loy@skofirm.com
perry.bentley@skofirm.com
monica.braun@skofirm.com
*Counsel for Cardinal Health, Inc.*

Robert E. Stopher
Robert D. Bobrow
BOEHL STOPHER & GRAVES, LLP
400 W. Market Street, Suite 2300
Louisville, KY 40202
rstopher@bsg-law.com
rbobrow@bsg-law.com
*Counsel for CVS Health Corporation and*
*Kentucky CVS Pharmacy, L.L.C.*

John Kirk Ogrosky
ARNOLD & PORTER, LLP -
WASHINGTON
601 Massachusetts Avenue, N.W.
Washington, DC 20001
kirk.ogrosky@arnoldporter.com
*Counsel for Endo International PLC*

E. Frederick Straub, Jr.
Ryan T. Polczynski
WHITLOW, ROBERTS, HOUSTON &
STRAUB, PLLC
300 Broadway
P.O. Box 995
Paducah, KY 42002-0995
Estraub@whitlow-law.com
rtp@whtilow-law.com
*Counsel for Johnson & Johnson*

Charles Lifland
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
clifland@omm.com
*Counsel for Johnson & Johnson*

- 3 -

EA : 000003 of 000005

Filed       21-CI-00515       07/16/2021       Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:46 AM
65730-7

Steve Brody
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
sbrody@omm.com
*Counsel for Johnson & Johnson*

Donald L. Miller, II
QUINTAIROS, PIETRO, WOOD &
BOYER, P.A.
9300 Shelbyville Road, Suite 400
Louisville, KY 40222
dmiller@qpwblaw.com
*Counsel for KVK-Tech, Inc.*

Benjamin C. Fultz
Scott T. Dickens
Daniel E. Hancock
FULTZ MADDOX DICKENS PLC
101 South 4th Street, 27th Floor
Louisville, KY 40202
bfultz@fmdlegal.com
*Counsel for Mylan Pharmaceuticals Inc.*

Mark S. Fenzel
Elisabeth S. Gray
MIDDLETON REUTLINGER
401 S. Fourth Street, Suite 2600
Louisville, KY 40202
mfenzel@middletonlaw.com
egray@middletonlaw.com
*Counsel for Rite Aid of Kentucky, Inc. and
Rite Aid Corporation Through a Special
Appearance*

Steven A. Reed
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
steven.reed@morganlewis.com
*Counsel for Teva Pharmaceutical
Industries Ltd.*

Charles R. Hughes
BOWLES RICE, LLP
600 Quarrier Street
Charleston, WV 25301
chughes@bowlesrice.com
*Counsel for The Kroger Company*

Thomas E. Rice
BAKER STERCHI COWDEN &
RICE LLC
2400 Pershing Road, Suite 500
Kansas City, MO 64108
rice@bscr-law.com
*Counsel for KVK-Tech, Inc.*

Adam K. Levin
Rebecca C. Mandel
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
adam.levin@hoganlovells.com
rebecca.mandell@hoganlovells.com
*Counsel for Mylan Pharmaceuticals
Inc.*

Trent Spurlock
Catherine A. Stivers
DINSMORE & SHOHL LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40220
trent.spurlock@dinsmore.com
cassie.stivers@dinsmore.com
*Counsel for Teva Pharmaceutical
Industries Ltd.*

Wendy West Feinstein
MORGAN, LEWIS & BOCKIUS
LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219-6401
wendy.feinstein@morganlewis.com
*Counsel for Teva Pharmaceuticals
Industries Ltd.*

EA - 000004 of 000005

Filed       21-CI-00515       07/16/2021       Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:46 AM
65730-7

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard
Suite 5300
Miami, FL  33131-2339
brian.ercole@morganlewis.com
*Counsel for Teva Pharmaceuticals
Industries Ltd.*

Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL  60654
kaspar.stoffelmayr@bartlitbeck.com
*Counsel for Walgreen Co.*

Andrew L. Sparks
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, KY  40507
asparks@dickinsonwright.com
*Counsel for Walmart Inc.*

Mark G. Arnzen
Frank K. Tremper
ARNZEN, STORM & TURNER,
P.S.C.
600 Greenup Street
Covington, KY  41011
marzen@arzenlaw.com
ftremper@arzenlaw.com
*Counsel for Walgreen Co.*

Lester C. Houtz
Alex Harris
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO  80202
lester.houtz@bartlitbeck.com
alex.harris@bartlitbeck.com
*Counsel for Walgreen Co.*

*Counsel for McKesson Corporation*

1454172:1

- 5 -

EA : 000005 of 000005

Filed                21-CI-00515    07/16/2021        Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:55 AM
65730-7

NO. 21-CI-00515                                FRANKLIN CIRCUIT COURT
                                                            DIVISION 2
                                        JUDGE THOMAS DAWSON WINGATE


*ELECTRONICALLY FILED*


CITY OF RUSSELL, KENTUCKY, *ET AL.*                            PLAINTIFF

**NOTICE OF ENTRY OF APPEARANCE**

v.


ABBOTT LABORATORIES, *ET AL.*                                DEFENDANTS

* * * * *

      Notice is hereby given that Robert D. Bobrow of the firm of Boehl Stopher &

Graves, LLP, 400 West Market Street, Suite 2300, Louisville, Kentucky 40202, hereby enters his

appearance as counsel for the defendant, Kentucky CVS Pharmacy, L.L.C.



BOEHL STOPHER & GRAVES, LLP


/s/ Robert D. Bobrow
_____
Robert D. Bobrow (KBA No. 85871)
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone: (502) 589-5980
Fax: (502) 561-9400
E-mail: rstopher@bsg-law.com
COUNSEL FOR DEFENDANT,
KENTUCKY CVS PHARMACY, L.L.C.

EA : 000001 of 000002

Filed                21-CI-00515    07/16/2021        Amy Feldman, Franklin Circuit Clerk

Filed 21-CI-00515 07/16/2021 Amy Feldman, Franklin Circuit Clerk

NOT ORIGINAL DOCUMENT
07/19/2021 11:44:55 AM
65730-7

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that on the 16th day of July, 2021 the foregoing was electronically mailed and electronically filed via the Kentucky Court of Justice eFiling system and e-mailed to the following:

> William D. Nefzger
> BAHE COOK CANTLEY & NEFZGER PLC
> 1041 Goss Avenue
> Louisville, K 40217
>
> Michael D. Grabhorn
> Andrew M. Grabhorn
> GRABHORN LAW
> 2525 Nelson Miller Parkway, Suite 107
> Louisville, KY 40223

> /s/ Robert D. Bobrow
> Robert E. Stopher
> COUNSEL FOR DEFENDANT,
> KENTUCKY CVS PHARMACY, L.L.C.

EA : 000002 of 000002

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION 2

| | | |
|---|---|---|
| CITY OF RUSSELL, KENTUCKY, ET AL., | ) | CASE NO. 21-CI-00515 |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | **NOTICE OF APPEARANCE** |
| v. | ) | **OF KEVIN M. BANDY** |
| | ) | |
| ABBOTT LABORATORIES, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | | |

Now comes the undersigned counsel, Kevin M. Bandy, and hereby gives notice to the Court and parties to this action that he is appearing as counsel for defendant Amneal Pharmaceuticals, Inc. Please include Kevin M. Bandy on all future correspondence and filings for this action as follows:

Kevin M. Bandy, Esq.
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel:    (513) 698-5166
Email: kbandy@ulmer.com

By filing this Notice of Appearance, defendant Amneal Pharmaceuticals, Inc., specifically preserves, and does not waive, any and all defenses, including, but not limited to, lack of personal jurisdiction and all service-based defenses.

46CB8E84-555B-4D47-B524-B4E4365136D2 : 000001 of 000003

Dated: July 19, 2021

Respectfully submitted,

/s/ Kevin M. Bandy
Kevin M. Bandy (97451)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
Tel:     (513) 698-5166
Email: kbandy@ulmer.com

*Attorney for Defendant Amneal
Pharmaceuticals, Inc.*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing Notice of Appearance was electronically filed with the Clerk of the Court through the Court's electronic filing system on July 19, 2021, which will send notification of filing to all counsel of record.

<div align="right">

*/s/ Kevin M. Bandy*
Kevin M. Bandy
*Attorney for Defendant Amneal*
*Pharmaceuticals, Inc.*

</div>

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION II
CASE NO. 21-CI-515
*(ELECTRONICALLY FILED)*

CITY OF RUSSELL, KENTUCKY, et al.                                PLAINTIFFS

v.

ABBOTT LABORATORIES, et al.                                      DEFENDANTS

---

**NOTICE OF SPECIAL APPEARANCE AND CR 5.02(2) NOTICE**

---

PLEASE TAKE NOTICE that Mark G. Arnzen and Frank K. Tremper, and the law firm

of Arnzen, Storm & Turner, P.S.C. hereby enter their special appearance as counsel for

Defendant Walgreen Co.  This Notice of Appearance is made while preserving all of its rights

and defenses, including the right to timely object for lack of jurisdiction and/or venue. Pursuant

to CR 5.02(2), Walgreen Co. elects to receive and effectuate service in this action by e-mail.

Please direct future pleadings and other documents to these email addresses:

marnzen@arnzenlaw.com
ftremper@arnzenlaw.com

Respectfully submitted,

By: */s/Frank K. Tremper*
Mark G. Arnzen (01830)
Frank K. Tremper (94095)
Arnzen, Storm & Turner, P.S.C.
600 Greenup Street
Covington, KY  41011
Telephone: 859-431-6100
Facsimile: 859-292-7655
marnzen@arnzenlaw.com
ftremper@arnzenlaw.com
*Counsel for Defendant Walgreen Co.*

## CERTIFICATE OF SERVICE

I hereby on this 20th day of July, 2021, I electronically filed the foregoing with the Clerk of Court, and a copy of same was e-mailed to the following counsel of record:

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Pkwy., Suite 107
Louisville, KY 40223
m.grabhorn@grabhornlaw.com
a.grabhorn@grabhornlaw.com
and
William D. Nefzger
BABE COOK CANTLEY & NEFZGER
PLC
1041 Goss Avenue
Louisville, KY 40217
willl@bccnlaw.com
*Counsel for Plaintiffs and the Putative Class*

Andrew L. Sparks
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
E-Mail: asparks@dickinsonwright.com
*Counsel for Defendant Walmart Inc.*

Mark S. Fenzel
Elisabeth S. Gray
MIDDLETON REUTLINGER
401 S. Fourth St., Suite 2600
Louisville, KY  40202
egray@middletonlaw.com
*Counsel for Defendants Rite Aid of Kentucky, Inc. and Rite Aid Corporation*

Robert E. Stopher
Robert D. Bobrow
400 West Market Street, Suite 2300
Louisville, KY 40202
E-mail: rstopher@bsg-law.com
         rbobrow@bsg-law.com
*Counsel for Defendants Kentucky CVS Pharmacy, LLC and CVS Health Corporation, LLC*

Edmund J. Benson (KBA 82691)
Benson Law Offices, PSC
450 Old Vine Street, Suite 200
Lexington, Kentucky 40507
ned@nedbensonlaw.com
*Counsel for Defendant Kroger*

Scott T. Dickens
John David Dyche
101 South Fifth Street
2700 National City Tower
Louisville, KY 40202
sdickens@fmdlegal.com
jdyche@fmdlegal.com
*Counsel for Defendant Mylan Pharmaceuticals, Inc.*

Kevin M. Bandy
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
E-mail: kbandy@ulmer.com
*Counsel for Defendant Amneal Pharmaceuticals, Inc.*

Carol Dan Browning
Jeffrey S. Moad
Carolyn Purcell Michener
Stites & Harbison PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
cbrowning@stites.com
jmoad@stites.com
cmichener@stites.com
*Counsel for Defendant McKesson*

John A. McCauley
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
JMcCauley@Venable.com
**Counsel for Abbott Laboratories**

Brenton A. Rogers
Eric L. White
KIRKLAND & ELLIS LLP
300 North LaSalle Dr.
Chicago, IL 60201
brogers@kirkland.com
eric.white@kirkland.com
**Counsel for Abbott Laboratories**

Robert Franklin Duncan
Margaret Jane Brannon
JACKSON KELLY PLLC -
LEXINGTON
175 E. Main Street, Suite 500
P.O. Box 2150
Lexington, KY 40507
rduncan@jacksonkelly.com
mjbrannon@jacksonkelly.com
**Counsel for AmerisourceBergen Drug
Corporation**

Shannon E. McClure
Robert A. Nicholas
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
RNicholas@ReedSmith.com
SMcClure@ReedSmith.com
**Counsel for AmerisourceBergen
Drug Corporation**

James W. Matthews
Ana M. Francisco
Katy E. Koski
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
jmatthews@foley.com
kkoski@foley.com
afrancisco@foley.com
**Counsel for Anda, Inc.**

Kevin M. Sadler
BAKER BOTTS LLP
1001 Page Mill Road, Building One
Suite 200
Palo Alto, CA 94304
kevin.sadler@bakerbotts.com
**Counsel for Assertio Therapeutics, Inc.
f/k/a Depomed Inc.**

Steven B. Loy
Perry M. Bentley
Monica H. Braun
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1801
steven.loy@skofirm.com
perry.bentley@skofirm.com
monica.braun@skofirm.com
**Counsel for Cardinal Health, Inc.**

John Kirk Ogrosky
ARNOLD & PORTER, LLP -
WASHINGTON
601 Massachusetts Avenue, N.W.
Washington, DC 20001
kirk.ogrosky@arnoldporter.com
**Counsel for Endo International PLC**

E. Frederick Straub, Jr.
Ryan T. Polczynski
WHITLOW, ROBERTS, HOUSTON &
STRAUB, PLLC
300 Broadway
P.O. Box 995
Paducah, KY 42002-0995
Estraub@whitlow-law.com
rtp@whtilow-law.com
*Counsel for Johnson & Johnson*

Charles Lifland
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
clifland@omm.com
*Counsel for Johnson & Johnson*

Steve Brody
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
sbrody@omm.com
*Counsel for Johnson & Johnson*

Donald L. Miller, II
QUINTAIROS, PIETRO, WOOD &
BOYER, P.A.
9300 Shelbyville Road, Suite 400
Louisville, KY 40222
dmiller@qpwblaw.com
*Counsel for KVK-Tech, Inc.*

Thomas E. Rice
BAKER STERCHI COWDEN &
RICE LLC
2400 Pershing Road, Suite 500
Kansas City, MO 64108
rice@bscr-law.com
*Counsel for KVK-Tech, Inc.*

Trent Spurlock
Catherine A. Stivers
DINSMORE & SHOHL LLP
101 S. Fifth Street, Suite 2500
Louisville, KY 40220
trent.spurlock@dinsmore.com
cassie.stivers@dinsmore.com
*Counsel for Teva Pharmaceutical
Industries Ltd.*

Steven A. Reed
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
steven.reed@morganlewis.com
*Counsel for Teva Pharmaceutical
Industries Ltd.*

Wendy West Feinstein
MORGAN, LEWIS & BOCKIUS
LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219-6401
wendy.feinstein@morganlewis.com
*Counsel for Teva Pharmaceuticals
Industries Ltd.*

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard
Suite 5300
Miami, FL 33131-2339
brian.ercole@morganlewis.com
*Counsel for Teva Pharmaceuticals
Industries Ltd.*

*/s/Frank K. Tremper* _____
**Counsel for Defendant Walgreen Co.**

A6AC8B7D-8CBE-442D-9E95-EA571638F0A6 : 000001 of 000002

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**DIVISION II**
**CIVIL ACTION NO. 21-CI-515**

*ELECTRONICALLY FILED*

**CITY OF RUSSELL, KENTUCKY, et al.**                                    **PLAINTIFFS**

**v.**

**ABBOTT LABORATORIES, et al.**                                         **DEFENDANTS**

<u>**NOTICE OF ENTRY OF APPEARANCE**</u>

Andrew L. Sparks of the firm of Dickinson Wright PLLC, hereby enters his appearance as counsel for Defendant, Walmart, Inc.  The undersigned respectfully requests that all further filings and correspondence in this case be served on him in accordance with the Kentucky Rules of Civil Procedure.

Respectfully submitted,

*/s/ Andrew L. Sparks*
Andrew L. Sparks (Bar No. 88566)
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone:  (859) 899-8734; Fax (844) 670-6009
E-Mail:  asparks@dickinsonwright.com
COUNSEL FOR DEFENDANT,
WALMART, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 20, 2021, I electronically filed the foregoing using the

Court's e-filing system which will send electronic notice to all counsel of record.

/s/ Andrew L. Sparks
COUNSEL FOR DEFENDANT,
WALMART, INC.

4835-5874-3794 v1 [45276-9023]

A6AC8B7D-8CBE-442D-9E95-EA571638F0A6 : 000002 of 000002

434FEB96-02FA-4E3F-A106-595D0C3B8F6D : 000001 of 000002

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**DIVISION II**
**CIVIL ACTION NO. 21-CI-515**

*ELECTRONICALLY FILED*

**CITY OF RUSSELL, KENTUCKY, et al.**                                  **PLAINTIFFS**

**v.**

**ABBOTT LABORATORIES, et al.**                                         **DEFENDANTS**

## ELECTION TO RECEIVE ELECTRONIC SERVICE

Pursuant to CR 5.02(2), the undersigned counsel for Defendant Walmart, Inc. elects to receive service via electronic means to and from all other parties represented by counsel. Please direct all future filings in this matter to the undersigned counsel as follows:

Andrew L. Sparks - asparks@dickinsonwright.com , acoates@dickinsonwright.com

Respectfully submitted,

*/s/ Andrew L. Sparks*

Andrew L. Sparks (Bar No. 88566)
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
Telephone: (859) 899-8734; Fax (844) 670-6009
E-Mail: asparks@dickinsonwright.com
COUNSEL FOR DEFENDANT,
WALMART, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2021, I electronically filed the foregoing using the

Court's e-filing system which will send electronic notice to all counsel of record.

/s/ Andrew L. Sparks
COUNSEL FOR DEFENDANT,
WALMART, INC.

2

10C90F6A-CFFA-4BE3-9787-D6E97E8CD543 : 000001 of 000008

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**DIVISION II**
**CASE NO. 21-CI-515**
**(ELECTRONICALLY FILED)**

**CITY OF RUSSELL, KENTUCKY, et al. PLAINTIFFS**

**v.**

**ABBOTT LABORATORIES, et al. DEFENDANTS**

*********************

**NOTICE OF APPEARANCE AND**
**ELECTION OF ELECTRONIC SERVICE UNDER CR 5.02(2)**

PLEASE TAKE NOTICE that B. Ballard Rogers, Ballard Rogers Law Office, PLLC, and Valenti Hanley, PLLC, hereby enter their appearance as counsel for Defendant Abbott Laboratories and Abbott Laboratories Inc. ("Abbott"). Notwithstanding the appearance by counsel of record, Abbott specifically reserves all rights and defenses, including without limitation, the right to timely object for lack of jurisdiction and/or improper venue.

Pursuant to Kentucky CR 5.02(2), Abbott elects to receive and effectuate service in this action by electronic filing and e-mail. Please direct future pleadings and other documents to the following email addresses:

Ballard@ballardrogerslaw.com
brogers@kirkland.com
eric.white@kirkland.com

1

Respectfully Submitted:


/s/ B. Ballard Rogers
B. Ballard Rogers
VALENTI HANLEY, PLLC
401 W. Main Street, Suite 1950
Louisville, Kentucky 40202
Ph: (502) 640-3535
Fax: (502) 855-5932
ballard@ballardrogerslaw.com
ATTORNEY FOR ABBOTT LABORATORIES
AND ABBOTT LABORATORIES INC.

10C90F6A-CFFA-4BE3-9787-D6E97E8CD543 : 000002 of 000008

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing NOTICE OF APPEARANCE AND ELECTION OF ELECTRONIC SERVICE UNDER CR 5.02(2) was served on this 21st day of July, 2021, by electronic service and thus email upon the following:

Michael D. Grabhorn
Andrew M. Grabhorn
GRABHORN LAW
2525 Nelson Miller Pkwy., Suite 107
Louisville, KY 40223
m.grabhorn@grabhornlaw.com
a.grabhorn@grabhornlaw.com
and
William D. Nefzger
BABE COOK CANTLEY & NEFZGER PLC
1041 Goss Avenue
Louisville, KY 40217
willl@bccnlaw.com
Counsel for Plaintiffs and the Putative Class

Andrew L. Sparks
DICKINSON WRIGHT PLLC
300 West Vine Street, Suite 1700
Lexington, Kentucky 40507
E-Mail: asparks@dickinsonwright.com
Counsel for Defendant Walmart Inc.

Mark S. Fenzel
Elisabeth S. Gray
MIDDLETON REUTLINGER
401 S. Fourth St., Suite 2600
Louisville, KY 40202
egray@middletonlaw.com
Counsel for Defendants Rite Aid of Kentucky, Inc. and Rite Aid Corporation

Robert E. Stopher
Robert D. Bobrow
400 West Market Street, Suite 2300
Louisville, KY 40202
E-mail: rstopher@bsg-law.com
rbobrow@bsg-law.com
Counsel for Defendants Kentucky CVS Pharmacy, LLC and CVS Health Corporation, LLC

Edmund J. Benson (KBA 82691)
Benson Law Offices, PSC

3

450 Old Vine Street, Suite 200
Lexington, Kentucky 40507
ned@nedbensonlaw.com
Counsel for Defendant Kroger

Scott T. Dickens
John David Dyche
101 South Fifth Street
2700 National City Tower
Louisville, KY 40202
sdickens@fmdlegal.com
jdyche@fmdlegal.com
Counsel for Defendant Mylan Pharmaceuticals, Inc.

Kevin M. Bandy
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, OH 45202
E-mail: kbandy@ulmer.com
Counsel for Defendant Amneal Pharmaceuticals, Inc.

Carol Dan Browning
Jeffrey S. Moad
Carolyn Purcell Michener
Stites & Harbison PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
cbrowning@stites.com
jmoad@stites.com
cmichener@stites.com
Counsel for Defendant McKesson

Robert Franklin Duncan
Margaret Jane Brannon
JACKSON KELLY PLLC -
LEXINGTON
175 E. Main Street, Suite 500
P.O. Box 2150
Lexington, KY 40507
rduncan@jacksonkelly.com
mjbrannon@jacksonkelly.com
Counsel for AmerisourceBergen Drug
Corporation

Shannon E. McClure

10C90F6A-CFFA-4BE3-9787-D6E97E8CD543 : 000004 of 000008

Robert A. Nicholas
REED SMITH LLP
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
RNicholas@ReedSmith.com
SMcClure@ReedSmith.com
Counsel for AmerisourceBergen
Drug Corporation

James W. Matthews
Ana M. Francisco
Katy E. Koski
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
jmatthews@foley.com
kkoski@foley.com
afrancisco@foley.com
Counsel for Anda, Inc.

Kevin M. Sadler
BAKER BOTTS LLP
1001 Page Mill Road, Building One
Suite 200
Palo Alto, CA 94304
kevin.sadler@bakerbotts.com
Counsel for Assertio Therapeutics, Inc.
f/k/a Depomed Inc.

Steven B. Loy
Perry M. Bentley
Monica H. Braun
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1801
steven.loy@skofirm.com
perry.bentley@skofirm.com
monica.braun@skofirm.com
Counsel for Cardinal Health, Inc.
John Kirk Ogrosky

ARNOLD & PORTER, LLP -
WASHINGTON
601 Massachusetts Avenue, N.W.
Washington, DC 20001
kirk.ogrosky@arnoldporter.com

5

Counsel for Endo International PLC

E. Frederick Straub, Jr.
Ryan T. Polczynski
WHITLOW, ROBERTS, HOUSTON &
STRAUB, PLLC
300 Broadway
P.O. Box 995
Paducah, KY 42002-0995
Estraub@whitlow-law.com
rtp@whtilow-law.com
Counsel for Johnson & Johnson

Charles Lifland
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
clifland@omm.com
Counsel for Johnson & Johnson
Steve Brody
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
sbrody@omm.com
Counsel for Johnson & Johnson

Donald L. Miller, II
QUINTAIROS, PIETRO, WOOD &
BOYER, P.A.
9300 Shelbyville Road, Suite 400
Louisville, KY 40222
dmiller@qpwblaw.com
Counsel for KVK-Tech, Inc.

Thomas E. Rice
BAKER STERCHI COWDEN &
RICE LLC
2400 Pershing Road, Suite 500
Kansas City, MO 64108
rice@bscr-law.com
Counsel for KVK-Tech, Inc.

Trent Spurlock
Catherine A. Stivers
DINSMORE & SHOHL LLP
101 S. Fifth Street, Suite 2500

10C90F6A-CFFA-4BE3-9787-D6E97E8CD543 : 000006 of 000008

Louisville, KY 40220
trent.spurlock@dinsmore.com
cassie.stivers@dinsmore.com
Counsel for Teva Pharmaceutical
Industries Ltd.

Steven A. Reed
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
steven.reed@morganlewis.com
Counsel for Teva Pharmaceutical
Industries Ltd.

Wendy West Feinstein
MORGAN, LEWIS & BOCKIUS
LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219-6401
wendy.feinstein@morganlewis.com
Counsel for Teva Pharmaceuticals
Industries Ltd.

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard
Suite 5300
Miami, FL 33131-2339
brian.ercole@morganlewis.com
Counsel for Teva Pharmaceuticals
Industries Ltd.

Mark G. Arnzen (01830)
Frank K. Tremper (94095) Arnzen, Storm & Turner, P.S.C.
600 Greenup Street
Covington, KY 41011
Telephone: 859-431-6100
Facsimile: 859-292-7655
marnzen@arnzenlaw.com
ftremper@arnzenlaw.com
Counsel for Defendant Walgreen Co.

<u>B. Ballard Rogers</u>
B. Ballard Rogers

7

Counsel for Abbott Laboratories and Abbott
Laboratories

10C90F6A-CFFA-4BE3-9787-D6E97E8CD543 : 000008 of 000008

BF7AB25F-F234-46E8-A9D6-D71D5A0422A7 : 000001 of 000002

**COMMONWEALTH OF KENTUCKY**
**FRANKLIN CIRCUIT COURT**
**DIVISION II**
**CIVIL ACTION NO. 21-CI-515**

CITY OF RUSSELL, KENTUCKY, *ET AL*.                              PLAINTIFFS

**v.        ENTRY OF APPEARANCE AND NOTICE TO EFFECTUATE**
**AND RECEIVE SERVICE VIA ELECTRONIC MEANS**

*ELECTRONICALLY FILED*

ABBOTT LABORATORIES, *ET AL*.                              DEFENDANTS

**\*\*\* \*\*\* \*\*\***

Please take notice the undersigned attorney hereby enters his appearance as counsel for Defendant Assertio Therapeutics, Inc. formerly known as the corporation identified as Defendant Depomed, Inc.[1]

Pursuant to CR 5.02, *et seq*. and Supreme Court of Kentucky 2015-02 *Amended Order*, the undersigned elects to effectuate and receive service via electronic means to and from all other attorneys or parties in the action.

Service shall be made upon counsel for Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc. at the following electronic notification address: allancobb@cobblawpllc.com. Pursuant to CR 5.02, *et seq*. and Supreme Court of Kentucky 2015-02 *Amended Order*, all other attorneys or parties are requested to provide an electronic notification address at which they may be served.

---

[1] Defendant Assertio Therapeutics, Inc. and Defendant Depomed, Inc. are identified as separate entities in this *Civil Action Complaint*. Assertio Therapeutics, Inc. is the corporation formerly known as Depomed, Inc. This *Entry of Appearance and Notice to Effectuate and Receive Service via Electronic Means* acts as notice for both Defendant Assertio Therapeutics, Inc. and Defendant Depomed, Inc.

Respectfully submitted,


_/s/ J. Allan Cobb_
J. Allan Cobb
**COBB LAW, PLLC**
1303 Clear Springs Trace, Suite 100
Louisville, Kentucky 40223
Telephone:   (502) 966-7100
Fax:         (502) 434-5900
Email:       allancobb@cobblawpllc.com
*Counsel for Assertio Therapeutics, Inc. f/k/a*
*Depomed, Inc.*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this the 21st day of July 2021, pursuant to CR 5.02, *et seq*. and Supreme Court of Kentucky 2015-02 *Amended Order*, notice of this filing will be sent to all parties registered to receive such notice by operation of the Court's electronic filing system.


_/s/ J. Allan Cobb_
J.   Allan Cobb
*Counsel for Assertio Therapeutics, Inc. f/k/a*
*Depomed, Inc.*

BF7AB25F-F234-46E8-A9D6-D71D5A0422A7 : 000002 of 000002

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION II
CIVIL ACTION NO. 21-CI-515
***ELECTRONICALLY FILED***

CITY OF RUSSELL, KENTUCKY, et al.                                      PLAINTIFFS

v.

ABBOTT LABORATORIES, et al.                                          DEFENDANTS

## NOTICE OF ENTRY OF APPEARANCE

Edmund J. Benson of Benson Law Offices, PSC, hereby enters his appearance as counsel

for Defendant, Kroger Co.  The undersigned respectfully requests that all further filings and

correspondence in this case be served on him in accordance with the Kentucky Rules of Civil

Procedure.

*/s/ Edmund J. Benson*
Edmund J. Benson (KBA 82691)
Benson Law Offices, PSC
450 Old Vine Street, Suite 200
Lexington, Kentucky 40507
Telephone: (859) 475-1644
ned@nedbensonlaw.com
***Counsel for Defendant Kroger Co.***

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2021, I electronically filed the foregoing using the

Court's e-filing system which will send electronic notice of all counsel of record.

*/s/ Edmund J. Benson*
**COUNSEL FOR DEFENDANT KROGER CO**.

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION 2
CIVIL ACTION NO.  21-CI-00515

*Electronically filed*

CITY OF RUSSELL, KENTUCKY, ET AL.                              PLAINTIFFS

vs.

ABBOTT LABORATORIES, ET AL.                                   DEFENDANTS

## ENTRY OF APPEARANCE AND NOTICE OF
## ELECTION OF ELECTRONIC SERVICE

Please take notice that M. Jane Brannon of the firm, Jackson Kelly, PLLC, 100 West
Main Street, Suite 700, P. O. Box 2150, Lexington, Kentucky 40588-2150, hereby gives notice
of their entry of appearance as counsel of record in the above-captioned proceeding for the
Defendant, AmerisourceBergen Drug Corporation, and further, pursuant to CR 5.02, elect to
effectuate and receive service via electronic means.  This shall apply to all court filings and
any pleadings or documents when service is required by the Rules of Civil Procedure in the
above-captioned action.  Please include all electronic mail addresses listed below to assure
receipt of service:

|              |                              |
|--------------|------------------------------|
| M. Jane Brannon | mjbrannon@jacksonkelly.com |
| Linda Hoehler   | linda.hoehler@jacksonkelly.com |
| Kim Fink        | kim.fink@jacksonkelly.com  |

Respectfully submitted,


*/s/ M. Jane Brannon*
M. Jane Brannon
JACKSON KELLY PLLC
100 West Main Street,  Suite 700
P O Box 2150
Lexington, KY  40588-2150
(859) 255-9500
mjbrannon@jacksonkelly.com
*Counsel for Defendant,*
 *AmerisourceBergen Drug Corporation*

255B74CE-03CE-4502-9858-6B1B8F1A44B4 : 000002 of 000005

# CERTIFICATE OF SERVICE

I hereby certify that on July 21 2021, I electronically filed the foregoing with the clerk of the court using the Kentucky Court of Justice's electronic filing system, which will send notice of electronic filing to the following:

| | |
|---|---|
| Michael D. Grabhorn<br>Andrew M. Grabhorn<br>Grabhorn Law<br>2525 Nelson Miller Parkway, Suite 107<br>Louisville, KY 40223<br>m.grabhorn@grabhornlaw.com<br>a.grabhorn@grabhornlaw.com<br>*Counsel for Plaintiffs* | William D. Nefzger<br>1041 Goss Avenue<br>Louisville, KY 40217<br>will@bbcnlaw.com<br>*Counsel for Plaintiff* |
| Kevin M. Bandy<br>Ulmer & Berne, LLP<br>600 Vine Street, Suite 2800<br>Cincinnati, OH 45202<br>kbandy@ulmer.com<br>*Counsel for Defendant,<br> Amneal Pharmaceuticals, Inc.* | Robert E. Stopher<br>Robert D. Bobrow<br>Boehl Stopher & Graves LLP<br>400 West market Street, Suite 2300<br>Louisville, KY 40202<br>rstopher@bsg-law.com<br>rbobrow@bsg-law.com<br>*Counsel for Defendant,<br> Kentucky CVS Pharmacy, LLC* |
| E. Frederick Straub, Jr.<br>Ryan T. Polczynski<br>Whitlow, Roberts, Houston & Straub, PLLC<br>300 Broadway<br>P. O. Box 995<br>Paducah, KY 42002-0995<br>estraub@whitlow-law.com<br>rtp@whitlow-law.com<br>*Counsel for Defendant,<br> Johnson & Johnson* | Donald L. Miller, II<br>Quintairos, Prieto, Wood & Boyer, PA<br>9300 Shelbyville Road, Sjuite 400<br>Louisville, KY 40222<br>dmiller@qpwblaw.com<br>*Counsel for Defendant,<br> KVK Tech, Inc.* |
| Carol Dan Browning<br>Jeffrey S. Moad<br>Carolyn Purcell Michener<br>Stites & Harbison PLLC<br>400 West Market Street, Suite 1800<br>Louisville, KY 40202<br>cbrowning@stites.com<br>jmoad@stites.com<br>cmichener@stites.com<br>*Counsel for Defendant,<br> McKesson Corporation* | Scott T. Dickens<br>John David Dyche<br>Fultz Maddox Dickens PLC<br>101 South Fifth Street<br>2700 National City Tower<br>Louisville, KY 40202<br>sdickens@fmdlegal.com<br>jddyche@fmdlegal.com<br>*Counsel for Defendant,<br> Myland Pharmaceuticals, Inc.* |

| | |
|---|---|
| Mark S. Fenzel<br>Elisabeth S. Gray<br>Middleton Reutlinger<br>401 S. Fourth Street, Suite 2600<br>Louisville, KY  40202<br>mfenzel@middletonlaw.com<br>egray@middletonlaw.com<br>*Counsel for Defendants,*<br>*Rite Aid of Kentucky, Inc. and*<br>*Rite Aid Corporation* | Mark G. Arnzen<br>Frank K. Tremper<br>Arnzen, Storm & Turner, P.S.C.<br>600 Greenup Street<br>Covington, KY  41011<br>marnzen@arnzenlaw.com<br>ftremper@arnzenlaw.com<br>*Counsel for Defendant,*<br>*Walgreen Co.* |
| Andrew L. Sparks<br>Dickinson Wright PLLC<br>300 West Vine Street, Suite 1700<br>Lexington, KY  40507<br>asparks@dickinsonwright.com<br>*Counsel for Defendant,*<br>*Walmart, Inc.* | |

It is further certified that on July 21, 2021 a true and accurate copy of the foregoing was served by depositing same with the United States Postal Service, first-class postage prepaid to:

| | |
|---|---|
| Abbott Laboratories<br>c/o CT Corporation system<br>306 W. Main Street,  Suite 512<br>Frankfort, KY  40601<br>*Defendant* | Allergan PLC<br>c/o CT Corporation system<br>306 W. Main Street,  Suite 512<br>Frankfort, KY  40601<br>*Defendant* |
| Anda, Inc.<br>2915 Weston Road<br>Weston, FL  33331<br>*Defendant* | Cardinal Health, Inc.<br>c/o CT Corporation system<br>306 W. Main Street,  Suite 512<br>Frankfort, KY  40601<br>*Defendant* |
| CVS Health Corporation LLC<br>c/o CT Corporation system<br>306 W. Main Street,  Suite 512<br>Frankfort, KY  40601<br>*Defendant* | Endo International PLC<br>1400 Atwater Drive<br>Malvern, PA  19355<br>*Defendant* |
| Kroger Company<br>c/o Corporate Service Company<br>421 West Main Street<br>Frankfort, KY  40601<br>*Defendant* | Teva Pharmaceuticals<br>5040 Duramed Road<br>Cincinnati, OH  45213<br>Corporate Office - Israel |

255B74CE-03CE-4502-9858-6B1B8F1A44B4 : 000004 of 000005

| West-Ward Pharmaceuticals Corp.<br>c/o Hikma Pharmaceuticals USA, Inc.<br>US Headquarters<br>200 Connel Drive, 4th Floor<br>Berkeley Heights, NJ  07922<br>*Defendant* | |

/s/ M. Jane Brannon
*Counsel for Defendant,*
*AmerisourceBergen Drug Corporation*

255B74CE-03CE-4502-9858-6B1B8F1A44B4 : 000005 of 000005

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION TWO
CASE NO. 21-CI-00515
*ELECTRONICALLY FILED*

CITY OF RUSSELL, KENTUCKY, ET AL.,                PLAINTIFFS

v.

**NOTICE OF ENTRY OF APPEARANCE
AND ELECTRONIC SERVICE**

ABBOTT LABORATORIES, ET AL.,                    DEFENDANTS

\*   \*   \*   \*   \*

Comes now William D. Nefzger, and hereby enters his appearance of record in this matter as co-counsel for the Plaintiffs.

Please take further notice that pursuant to CR 5.02(2), the undersigned elects to effectuate and receive service via electronic means to and from all other attorneys and parties in this action. The undersigned is registered to receive service of all filed documents via the AOC's electronic filing system, agrees to accept service through that system and will effectuate service through that system. The undersigned does not require hardcopies sent regular mail.

For any party's attorney not registered with the AOC's electronic filing system, the undersigned will effectuate service electronically at the email address known to him or one subsequently provided to him. For any party's attorney not registered with the AOC's electronic filing system, the undersigned agrees to accept service at the following email addresses and dropbox:

1.      will@bccnlaw.com (concurrently with staff member address andria@bccnlaw.com); and

2.      https://www.hightail.com/u/willnefzgerdropbox.

The undersigned does not require hardcopies sent via regular mail.

Respectfully submitted,

**BAHE COOK CANTLEY & NEFZGER PLC**

/s/ William D. Nefzger
William D. Nefzger
The BCCN Building
1041 Goss Avenue
Louisville, Kentucky 40217
will@bccnlaw.com
(502) 587-2002 – Telephone
(502) 587-2006 – Facsimile
*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

It is hereby certified that a true and correct copy of the foregoing was served by operation of the AOC's electronic filing system to all parties indicated on the electronic filing receipt on this 22nd day of July 2021.

/s/ William D. Nefzger
*Co-Counsel for Plaintiffs*